1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| POLSKIE LINIE LOTNICZE LOT S.A., | USDC Case No.: 21-cv-1449 |
| Plaintiff, | **COMPLAINT FOR DAMAGE** |
| vs. | **JURY DEMAND** |
| THE BOEING COMPANY, | |
| Defendant. | |

COME NOW the Plaintiff, Polskie Linie Lotnicze LOT S.A ("LOT"), by and through its

attorneys Condon & Forsyth LLP, for its Complaint against The Boeing Company ("Boeing" or

"Defendant"), respectfully alleges as follows:

## **INTRODUCTION**

1.       This Complaint seeks damages on behalf of LOT, which has lost, and is continuing

to lose, millions of dollars as a result of Boeing's material false representations and omissions

concerning its 737 MAX aircraft—namely, that the 737 MAX aircraft was safe, airworthy, and

was essentially the same as the time-tested 737 Next Generation ("NG") aircraft that LOT was

intent on acquiring before Boeing purposefully convinced LOT to acquire 737 MAX aircraft in

addition to only a few 737 NGs.

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

2.      Boeing made a calculated decision to rush a re-engined 737 aircraft to market to secure its single-aisle market share, and in doing so, prioritized its bottom line over safety and the rights of its customers.  By rushing the 737 MAX to market, Boeing abandoned sound design and engineering practices, withheld safety-critical information from regulators, and deliberately misled its customers including LOT, and the public, concerning the true scope of design changes made to the 737 MAX as compared to previous iterations of Boeing 737 aircraft.

3.      Boeing's deliberate misrepresentations and purposeful omissions caused LOT to believe that the 737 MAX aircraft was airworthy, and that it was to LOT's economic advantage to acquire 737 MAX aircraft as opposed to Boeing 737 NG aircraft or Airbus A320 NEO aircraft.

4.      Boeing's representations proved to be false, and its purposeful omissions just as costly.  The 737 MAX was grounded worldwide for almost two years because it was unsafe, unairworthy, and contrary to Boeing's representations, distinct from the 737 family of aircraft that preceded it.

5.      Boeing had added a software-based flight control logic called the Maneuvering Characteristics Augmentation System ("MCAS") to the 737 MAX to compensate for the problems that Boeing's use of larger engines on the 737 MAX had caused.  Boeing concealed this system, which did not exist on any other 737 aircraft, from regulators, and operators such as LOT.

6.      Boeing's false representations and deliberate omissions, made directly to LOT, caused LOT to acquire 737 MAX aircraft and to suffer the monetary damages it seeks to recoup in this lawsuit.

7.      Tragically, the economic losses sustained by LOT are not the only results of Boeing's misrepresentations about the 737 MAX aircraft.  Boeing's rushed certification and introduction of the 737 MAX aircraft into the hands of trusting operators who believed that

-2-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

Boeing carefully designed a safe and airworthy aircraft, and had disclosed all of the information needed to safely operate the aircraft, caused two fatal crashes within a five-month period: the Lion Air Flight 610 crash on October 29, 2018, that killed 189 individuals; and, the Ethiopian Airlines Flight 302 crash on March 10, 2019, that killed 154 individuals.

8.      After the 737 MAX aircraft crashed for the second time within a five-month period and the death toll attributable to Boeing's defective design of MCAS nearly doubled, the world could no longer trust Boeing's representations that the 737 MAX aircraft was safe.  In the three days after the Ethiopian Airlines crash, civil aviation authorities worldwide, including LOT's, grounded the 737 MAX aircraft for almost two years.  In light of these grounding orders, LOT had to cancel a large number of flights for which it had to compensate passengers, losing revenue, while being forced to continue to compensate its employees, who would have worked on LOT's 737 MAX aircraft.  Similarly, during the grounding, among other damages, LOT was forced to acquire replacement aircraft less suitable to its flight network.

9.      Since those tragic and preventable accidents it has become clear that Boeing's representations concerning the 737 MAX aircraft were false and that, contrary to what Boeing told LOT prior to LOT agreeing to acquire 737 MAX aircraft, Boeing concealed the fact that the 737 MAX aircraft was not airworthy because, *inter alia*, it incorporated a single-point failure condition, MCAS, which if fed erroneous data from a single angle-of-attack sensor, would command the aircraft to nose-down into an unrecoverable dive without pilot input or knowledge.

10.      LOT flew its 737 MAX aircraft heavily prior to the worldwide grounding during which time LOT was susceptible to the same fate as those airlines whose aircraft crashed.

11.      Had LOT known the truth about the 737 MAX aircraft before it agreed to acquire them, it never would have agreed to enter into lease agreements to acquire the aircraft.

-3-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

12.     Boeing is liable to LOT for the damages it has sustained, and continues to sustain, as the result of Boeing's purposeful and negligent false representations and omissions concerning the 737 MAX aircraft, and Boeing's negligence in self-certifying an aircraft that Boeing knew would be subject to a grounding order if the truth were discovered.

## PARTIES

13.     Plaintiff LOT is a corporation organized and existing under the laws of Poland, and maintains its principal place of business in Poland.  LOT is a commercial airline that operates scheduled air services, among other places, between the United States and Poland, pursuant to the terms of a foreign air carrier permit issued by the United States Department of Transportation.

14.     Boeing is an aerospace company involved in the design, manufacture, and sale of, among other things, commercial aircraft.  Upon information and belief, and at all times referenced herein, Defendant Boeing was, and still is, a corporation organized and existing under the laws of Delaware.  Boeing maintains its corporate headquarters in Chicago, Illinois.  Boeing transacts business and manufactured (and continues to manufacture) the 737 MAX in King County, Washington.

## JURISDICTION, VENUE, AND CHOICE OF LAW

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendant, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

16.     This Court has personal jurisdiction over Boeing because it transacts business and manufactures the 737 MAX in King County, Washington.

17.     Venue is proper because Boeing transacts business in King County, and the MAX

-4-

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

is designed, assembled, and sold in King County, Washington.

18.     LOT leased the Boeing 737 MAX aircraft that it acquired and was scheduled to acquire.  Under those leases, the lessors assigned certain of its rights under their Aircraft General Terms Agreement ("AGTA") and Purchase Agreements with Boeing to LOT. Each of these Agreements is a standardized adhesion contract drafted by Boeing, and LOT never was provided a meaningful opportunity to negotiate better contractual protections against Boeing's fault or negligence.  Each of the Agreements provides that it is to be interpreted and governed under the laws of the State of Washington.

19.     This lawsuit arises under Article 2 of Washington's Uniform Commercial Code, RCW 62A.2-101 et seq., the Washington Consumer Protection Act, RCW 19.86.020, the Washington Product Liability Act, RCW 7.72.010 et seq., and Washington common law.

## FACTUAL ALLEGATIONS

20.     Plaintiff repeats, reiterates, and realleges each and every allegation in paragraphs 1 through 19 above with the same force and effect as if set forth herein in full.

21.     At all times mentioned herein, Boeing, and each of its officers, employees, agents, and servants named herein were operating and acting within the scope of their employment, agency and service, and Boeing was aware of, and ratified and approved the acts of and misrepresentations and omissions made by each named officer, employee, agent or servant.  Each act, misrepresentation and omission made by each named officer, employee, agent or servant of Boeing was done in furtherance of Boeing's interest and substantially assisted Boeing's commission and omission of the wrongful acts alleged herein.

22.     LOT relied on each of Boeing's publicly-made misrepresentations and omissions detailed below as if they were true and complete (*i.e.*, that they did not contain any material

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

omissions).

23.     In the same manner, LOT relied on each of Boeing's misrepresentations and omissions that Boeing made to the U.S. Federal Aviation Administration ("FAA") as if they were true and complete, that, as described below, ultimately were passed on to LOT's civil aviation authority, the European Aviation Safety Agency, commonly known as EASA.

24.     Similarly, LOT relied on each of Boeing's misrepresentations and omissions made directly to LOT, its officers, and employees, as if they were true and complete.

I.     **THE DEVELOPMENT OF THE 737 MAX AND ITS INHERENT, UNDISCLOSED RISKS**

A.     **The Boeing 737 MAX Aircraft is Introduced to the Public**

25.     Boeing has been manufacturing and selling the 737, a narrow-body single aisle aircraft, for over 50 years.

26.     Boeing's main competitor in the narrow-body market is, and at all relevant times herein has been, Airbus.  Airbus manufactures the A320 family of narrow-body aircraft.

27.     In 2010, Airbus announced the introduction of the Airbus A320 NEO ("A320 NEO") aircraft, a new engine variant of its popular A320 aircraft, which offered greater fuel efficiency than Airbus's prior generations of A320 aircraft and Boeing's 737 Next Generation ("NG") aircraft, which was Boeing's most recent 737 iteration at that time.

28.     Following Airbus's announcement, Boeing considered but rejected the idea of introducing a new engine variant of its 737, and believed that it could wait to produce an aircraft to compete with the A320 NEO.

29.     At a meeting in January 2011, Jim Albaugh, then the president of Boeing Commercial Airplanes, told Boeing employees that Boeing could wait until the end of the decade

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

to produce a new plane from scratch rather than refit the most recent 737 NG with new, more fuel-efficient engines.  He further explained that the A320 NEO's use of a bigger, more fuel-efficient engine would be a "design change that will ripple through the airplane."[1]

30.    Subsequently, Boeing learned that American Airlines, which was an exclusive Boeing customer for more than a decade, was considering the purchase of 200 Airbus A320 NEOs.

31.    Rather than designing a new aircraft from scratch, and risking American's defection, Boeing immediately reversed course and launched its own new engine variant of the existing, widely flown and time-tested 737.  To make the new 737 more fuel efficient, and therefore competitive with the new A320 NEO, the 737 NG's engines were to be replaced with the larger, more fuel-efficient CFM International LEAP1-B (the "LEAP1-B") engines.[2]

32.    A former senior Boeing official stated that the company opted to mount the new LEAP1-B engines on Boeing's existing 737 airframe rather than an entirely new airframe because it would be "far quicker, easier and cheaper than starting from scratch, and would provide almost as much fuel savings for airlines."[3]

33.    In August 2011, Boeing's Board of Directors authorized the launch of a new iteration of 737 aircraft to compete with the A320 NEO—the "MAX" Series.

---

[1] David Gelles et al., *Boeing Was 'Go, Go, Go' to Beat Airbus With the 737 Max*, N.Y. TIMES, March 23, 2019, https://www.nytimes.com/2019/03/23/business/boeing-737-max-crash.html.

[2] *Id.*; *see also* Andy Pasztor, et al., *How Boeing's 737 MAX Failed*, WALL ST. J., March 27, 2019, https://www.wsj.com/articles/how-boeings-737-max-failed-11553699239; Andrew Tangel, et al., *The Four-Second Catastrophe: How Boeing Doomed the 737 Max*, WALL ST. J., August 16, 2019, https://www.wsj.com/articles/the-four-second-catastrophe-how-boeing-doomed-the-737-max-11565966629.

[3] David Gelles et al., *Boeing Was 'Go, Go, Go' to Beat Airbus With the 737 Max*, N.Y. TIMES, March 23, 2019, https://www.nytimes.com/2019/03/23/business/boeing-737-max-crash.html; *see also* Andy Pasztor, et al., *How Boeing's 737 MAX Failed*, WALL ST. J., March 27, 2019, https://www.wsj.com/articles/how-boeings-737-max-failed-11553699239; Andrew Tangel, et al., *The Four-Second Catastrophe: How Boeing Doomed the 737 Max*, WALL ST. J., Aug. 16, 2019, https://www.wsj.com/articles/the-four-second-catastrophe-how-boeing-doomed-the-737-max-11565966629.

-7-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

34.     On August 30, 2011, Boeing announced the launch of the 737 MAX family of aircraft.[4] In its launch announcement, Boeing emphasized the 737 MAX's connection to the 737 product line's service history explaining that "[w]e call it the 737 MAX because it optimizes everything we and our customers have learned about designing, building, maintaining and operating the world's best single-aisle airplane."[5]

35.     In its launch announcement Boeing asserted, *inter alia*, that:[6]

   a.  "The 737 MAX will deliver big fuel savings that airlines will need to successfully compete in the future. Airlines will benefit from a 7 percent advantage in operating costs over future competing airplanes as a result of optimized CFM International LEAP-1B engines, more efficient structural design and lower maintenance requirements"; and

   b.  "Airlines will continue to benefit from maximum reliability. The 737 MAX will build upon the Next-Generation 737's highest reliability performance of any airplane in the world – 99.7 percent on-time departure rate."

36.     Despite knowing that customers such as LOT would be relying on Boeing's public statements, Boeing's 737 MAX launch announcement did not disclose that as compared to the most recent 737 NG, the addition of the LEAP1-B engines would, *inter alia*:

   a.  Change the aircraft's center of gravity;

   b.  Decrease aircraft stability;

   c.  Negatively affect flight handling characteristics to make the aircraft more susceptible to the catastrophic risk of aerodynamic stall; and

   d.  Create inherent safety risks.

37.     When an airframe is designed, engineers consider the specifications of the engine

---

[4] The Boeing Company, *Boeing Introduces 737 MAX With Launch of New Aircraft Family*, Aug. 30, 2011, https://boeing.mediaroom.com/2011-08-30-Boeing-Introduces-737-MAX-With-Launch-of-New-Aircraft-Family.

[5] *Id.*

[6] *Id.*

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

that will be used, take that engine's weight and size into account, and determine the ideal engine mounting point and placement to ensure that the aircraft has a stable aerodynamic center of gravity.

38.     But Boeing's announcement did not mention the inherent risks created by adding the LEAP1-B engines to an existing airframe designed to accommodate smaller, less powerful engines with far smaller fan diameters.

39.     The difference between the original engine (left photo) mounted on the 737 airframe and the LEAP1-B engine (right photo) can be seen below.  Despite the massive difference in size, the 737 MAX still used the original 737 airframe.

 

40.     Here, Boeing eschewed the opportunity to properly engineer the 737 MAX and instead found a way to fit the new, larger engine on an existing airframe, thereby creating inherent risks that Boeing would later attempt and fail to mitigate.

**B.     Boeing Marketed the 737 MAX Based on the 737 Family Legacy**

41.     From its inception, Boeing marketed the 737 MAX family as the newest variant of its 737 family of aircraft, specifically a new version of what was then the latest 737 model, the 737 NG.

42.     Boeing's website featured a page marketing the 737 MAX entitled "The Legacy and Strength of the Boeing 737 Family," which boasted that reliability, safety, and simplicity of

-9-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

design had been the hallmarks of the 737 family since its inception in 1967 and would continue with the 737 MAX.[7]

43.     Boeing presented the following infographic to highlight the 737's extensive in-service history:[8]





44.     In other words, Boeing was specifically marketing the 737 MAX based on the 737 family's long track-record for safety without disclosing the safety critical changes that made the 737 MAX a fundamentally different aircraft from prior generations of the 737 family.

45.     Boeing's 737 family legacy messaging appeared throughout Boeing's press releases and public statements upon which potential future 737 MAX operators such as LOT, as well as the public, relied.

46.     For example, a November 3, 2011 Boeing press release announcing 737 MAX design changes described the MAX as a "new-engine variant" and reminded the public and potential customers and operators that "[t]he Boeing 737 is the world's most popular and reliable

---

[7] The Boeing Company, *737 MAX Updates*, https://www.boeing.com/commercial/737max/737max-legacy.page.

[8] *See id.*

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

commercial jet transport."[9]

47.     A February 12, 2012 press release discussing the final phase of 737 MAX wind tunnel testing described the MAX as "a new engine variant of the world's best-selling airplane [that] builds on the strengths of today's NEXT-Generation 737."[10]

48.     An April 11, 2012 press release disclosed the changes from the 737 NG to the 737 MAX, including an extension of the tail cone; integration of the LEAP1-B engines with the wing; a new pylon and strut, nose gear extension; and flight control and system updates such as fly-by-wire spoilers and an electronic bleed air system.[11]

49.     In this same statement, Boeing's 737 MAX Chief Project Engineer characterized the allegedly limited changes to the MAX, and assured the public that "[a]ny new technology incorporated into the MAX design must offer substantial benefit to our customers with minimal risk for the team to pursue it."[12]

50.     But in disclosing only minor differences, Boeing concealed that the use of LEAP1-B engines, and their placement on the airframe rendered the 737 MAX distinct from its 737 predecessors, and that the design changes advertised did not disclose the full scope of differences between the prior 737 variants and the 737 MAX.

51.     In an October 29, 2013 press release, Boeing echoed its prior marketing efforts, stating "we are being very deliberate about any changes we make to airplane systems on the 737

[9] The Boeing Company, *Boeing Updates 737 MAX Engine Configuration Status and Customer Commitments*, Nov. 3, 2011, https://boeing.mediaroom.com/2011-11-03-Boeing-Updates-737-MAX-Engine-Configuration-Status-and-Customer-Commitments.

[10] The Boeing Company, *Boeing to Begin Final Phase of 737 MAX Wind Tunnel Testing*, Feb. 12, 2012, https://boeing.mediaroom.com/2012-02-12-Boeing-to-Begin-Final-Phase-of-737-MAX-Wind-Tunnel-Testing.

[11] The Boeing Company, *Boeing Makes 737 MAX Design Decisions*, April 11, 2012, https://boeing.mediaroom.com/2012-04-11-Boeing-Makes-737-MAX-Design-Decisions.

[12] *Id.*

-11-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

MAX to make the airplane even easier to operate."[13]

52.     Yet again, Boeing concealed the truth.

**C.      The Promise of a Common Type Rating and No Simulator Training Was Fundamental to the 737 MAX Program's Success**

53.     The 737 MAX program's overarching goal and primary design objective was to achieve commonality with the 737 NG, and to ensure that the FAA would not require a new type certificate or aircraft simulator training for pilots transitioning to the 737 MAX from the 737 NG, which some of Boeing's largest customers were flying at the time.[14]

54.     These design objectives served two important purposes.  First, if Boeing could convince aviation regulators and airline customers that the 737 MAX was so similar to the 737 NG that costly and time-consuming simulator training was not necessary, the 737 MAX would be more competitive relative to the A320 NEO, more fiscally attractive to customers, and, in turn, more profitable for Boeing.

55.     Second, presenting the 737 MAX merely as an update to the 737 NG, not a new aircraft type, made it possible for Boeing to fast-track the type certification process by seeking an amendment to its existing FAA Type Certificate No. A16WE for the 737, which was issued in 1967.  This approach allowed Boeing to bring the 737 MAX to market at around the same time as the A320 NEO.

---

[13] The Boeing Company, *Boeing Continues to Improve 737 MAX Performance*, Oct. 29, 2013, https://boeing.mediaroom.com/2013-10-29-Boeing-Continues-to-Improve-737-MAX-Performance.

[14] Majority Staff of the House Committee on Transportation and Infrastructure, September 2020. *Final Committee Report The Design, Development & Certification of the Boeing 737 MAX.* [online] (hereinafter "Transportation Committee Final Report") p. 25, available at: https://transportation.house.gov/imo/media/doc/2020.09.15%20FINAL%20737%20MAX%20Report%20for%20Public%20Release.pdf [Accessed 17 November 2020] citing Boeing internal email, "Subject: 737 MAX Firm Configuration Status/Help Needed," Sent: May 4, 2013 11:35 AM, BATES Number TBC-T&I 048706 – 048707, at pp. 128-129 accessed here: https://www.govinfo.gov/content/pkg/CHRG-116hhrg38282/pdf/CHRG-116hhrg38282.pdf.

-12-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

56.     Thus, Boeing had to ensure that pilot training for the 737 MAX was no greater than "Level B."  The FAA Aircraft Evaluation Group ("AEG") assigned a specific training range from "Level A" through "Level E," with Level A being the least intensive and costly and Level E being the most intensive and costly.  Level B training required only computer-based training, which could be completed from any laptop, iPad or similar device anywhere in a few hours, whereas Level D training required flight simulator training. Level D flight simulator training required buying and using multi-million dollar equipment, and required pilots to take time from flying to train on costly flight simulator equipment.[15]

57.     Against this backdrop, Boeing's 737 MAX design and training objectives became a driving force in its development, certification, and marketing.

58.     Rick Ludtke, an employee at Boeing for 19 years and an engineer who helped design the 737 MAX cockpit, explained that "[a]ny designs we created could not drive any new [pilot] training that required a simulator."[16] He described this difficult process, based on an existing airframe, to be "such a kludge," that he and other engineers working on the MAX wondered during the design process whether it was safe to create the 737 MAX.[17]

59.     He further wondered whether the 737 MAX, with its new engine but existing airframe, was "a bridge too far."[18]

---

[15] Transportation Committee Final Report, *supra* note 14, at 97.

[16] David Gelles et al., *Boeing Was 'Go, Go, Go' to Beat Airbus With the 737 Max*, N.Y. TIMES, March 23, 2019, https://www.nytimes.com/2019/03/23/business/boeing-737-max-crash.html; *see also* Andy Pasztor, et al., *How Boeing's 737 MAX Failed*, WALL ST. J., March 27, 2019, https://www.wsj.com/articles/how-boeings-737-max-failed-11553699239; Andrew Tangel, et al., *The Four-Second Catastrophe: How Boeing Doomed the 737 Max*, WALL ST. J., Aug. 16, 2019, https://www.wsj.com/articles/the-four-second-catastrophe-how-boeing-doomed-the-737-max-11565966629.

[17] Mike Baker & Dominic Gates, *Lack of Redundancies on Boeing 737 MAX System Baffles Some Involved in Developing the Jet*, The Seattle Times, March 26, 2019, https://www.seattletimes.com/business/boeing-aerospace/a-lack-of-redundancies-on-737-max-system-has-baffled-even-those-who-worked-on-the-jet/.

[18] *Id.*

-13-

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

60.     Nonetheless, Boeing's management imposed an internal directive that employees designing and working on the 737 MAX ensure that 737 NG pilots seeking to obtain certification on the 737 MAX would require no more than Level B training.[19]

**D.     Boeing Purposefully Downplayed Changes to the 737 MAX as Compared to the 737 NG to Maximize its Profit and Ensure Speedy Certification**

61.     Boeing set out to ensure that the disclosed changes from the 737 NG to the 737 MAX were minor, would not drive additional costs, and would not require additional pilot simulator training.

62.     As Ludtke described: "The company was trying to avoid costs and trying to contain the level of change. They wanted the minimum change to simplify the training differences, minimum change to reduce costs, and to get it done quickly."[20]

63.     As was later revealed in a U.S. House of Representatives' Committee on Transportation and Infrastructure ("House T&I Committee") hearing, a March 4, 2014 slide that Boeing used to market the 737 MAX called the pilot skill needed to fly the 737 MAX "interchangeable" with the training and skill needed to pilot the 737 NG, and boasted that no simulator training would be required for 737 MAX pilots who already knew how to pilot the 737 NG.

---

[19] David Gelles et al., *Boeing Was 'Go, Go, Go' to Beat Airbus With the 737 Max*, N.Y. TIMES, March 23, 2019, https://www.nytimes.com/2019/03/23/business/boeing-737-max-crash.html; *see also* Andy Pasztor, et al., *How Boeing's 737 MAX Failed*, WALL ST. J., March 27, 2019, https://www.wsj.com/articles/how-boeings-737-max-failed-11553699239; Andrew Tangel, et al., *The Four-Second Catastrophe: How Boeing Doomed the 737 Max*, WALL ST. J., Aug. 16, 2019, https://www.wsj.com/articles/the-four-second-catastrophe-how-boeing-doomed-the-737-max-11565966629.

[20] *David Gelles et al., Boeing Was 'Go, Go, Go' to Beat Airbus With the 737 Max,* N.Y. TIMES, March 23, 2019, https://www.nytimes.com/2019/03/23/business/boeing-737-max-crash.html; *see also* Andrew Tangel, et al. *Prosecutors, Transportation Department Scrutinize Development of Boeing's 737 MAX*, WALL ST. J., March 18, 2019, https://www.wsj.com/articles/how-boeings-737-max-failed-11553699239; Andrew Tangel, et al., *The Four-Second Catastrophe: How Boeing Doomed the 737 Max*, WALL ST. J., August 16, 2019, https://www.wsj.com/articles/the-four-second-catastrophe-how-boeing-doomed-the-737-max-11565966629.

-14-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

64.     Further, as set forth above, presenting the 737 MAX merely as an update to the 737 NG made it possible for Boeing to pursue an amendment to its FAA Type Certificate. Applying for a new type certificate would have taken years longer than amending the original 737 type certificate, would have cost Boeing far more, and would have garnered more intense FAA scrutiny.

65.     Thus, on January 27, 2012, Boeing petitioned the FAA for certification of the 737 MAX as an amendment to Type Certificate No. A16WE.[21]

66.     The FAA reviewed Boeing's application in February 2012, and based on the now known to be false representations in Boeing's application – namely that the 737 MAX would be sufficiently similar to prior generations of 737 aircraft already included on the same type certificate – and determined that the MAX project qualified for an amended type certificate rather than a new type certificate.

67.     Under an amended type certificate, as agreed by the FAA and Boeing, only the significant, "new and novel" differences between the 737 NG and the 737 MAX were required to be certified to current regulatory airworthiness standards.[22]

68.     These "new and novel" differences would draw extra FAA scrutiny.[23]

69.     Accordingly, Boeing claimed that it did not need to identify MCAS as new and

---

[21] Department of Transportation, Federal Aviation Administration, Docket No. FAA–2014–0301; Special Conditions No. 25–550–SC Special Conditions: The Boeing Company, Models 737–700, –700C, –800, –900ER, –7, –8, and –9 Series Airplanes; Airplane Electronic Systems Security Protection From Unauthorized External Access, 79 Fed. Reg. 32,640 (proposed June 6, 2014), available at: https://www.govinfo.gov/content/pkg/FR-2014-06-06/pdf/2014-13244.pdf.

[22] 14 C.F.R. § 21.101 and Advisory Circular 21.101-A, referred to as the "Changed Product Rule."

[23] 14 C.F.R. Part 25; *see also* Department of Transportation, Federal Aviation Administration, Docket No. FAA–2014–0301; Special Conditions No. 25–550–SC Special Conditions: The Boeing Company, Models 737–700, –700C, –800, –900ER, –7, –8, and –9 Series Airplanes; Airplane Electronic Systems Security Protection From Unauthorized External Access, 79 Fed. Reg. 32,640 (proposed June 6, 2014), available at: https://www.govinfo.gov/content/pkg/FR-2014-06-06/pdf/2014-13244.pdf.

-15-

Complaint for Damages
USDC Case No. 21-cv-1449

novel because it had been covered under existing regulations relating to flight control systems, and were included on the military Boeing 767 refueling tanker.[24]

70.     But, as set out in greater detail below, the version of MCAS on the 767 tanker was entirely different from the version of MCAS that was ultimately installed on the 737 MAX.  For example, the 767 tanker version took a median input value from two angle of attack sensors, whereas the 737 MAX relied on only one sensor.[25]

71.     Additionally, the 737 MAX's version of MCAS controlled the aircraft's movement in ways that MCAS on the military tanker did not.[26]

72.     On the foregoing basis, the FAA also determined that the 737 MAX certification could be managed by Boeing under the FAA's Organization Designation Authorization ("ODA") program, which delegates certification authority from the FAA to the manufacturer, in this case, Boeing.

73.     From the FAA's then-mistaken point of view, and Boeing's widely disseminated point of view, the 737 MAX design "had minor changes to the 737 Next Generation design,"[27] meaning that the use of a type certificate amendment and the ODA program were appropriate given the purported similarities between the 737 NG and 737 MAX.

---

[24] Id.

[25] Id.

[26] Id.

[27] Federal Aviation Administration, *Airworthiness Certification*, https://www.faa.gov/licenses_certificates/aircraft_certification/airworthiness_certification/.

-16-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

**E.      Boeing's Efforts to Rush the 737 MAX Launch Created Catastrophic, Undisclosed Risks**

74.     Boeing claimed that it is "committed to being the leader in commercial aviation by offering airplanes and services that deliver superior design, efficiency and value to customers around the world."[28]

75.     But in the rush to get the 737 MAX certified under the 737 type rating and without the need for simulator training, Boeing's plan to add new engines onto an existing airframe introduced the catastrophic risk of aerodynamic stall.

76.     Adding the new, heavier LEAP1-B engines triggered design and engineering challenges for the aircraft, the same ripple effect that James Albaugh, Boeing's then commercial airplanes chief executive, had predicted back in 2011, when criticizing the A320 NEO.

77.     Unlike Airbus's addition of a new, more fuel-efficient engine on the A320 NEO, Boeing was not able to mount the LEAP1-B engines in the same location as the 737 NG engines because the airframe was too close to the ground.

78.     Boeing had to mount the LEAP1-B engines higher up and farther forward on the wing than 737 NG engines.

79.     The weight and placement of the new engines, *inter alia*:

    a.   Changed the 737 MAX's aerodynamic center of gravity;

    b.   Decreased aircraft stability;

    c.   Created a greater pitch-up tendency at elevated angles of attack; and

    d.   Negatively affected the flight handling characteristics, making the 737 MAX more susceptible to the catastrophic risk of stall.

---

[28] The Boeing Company, *Our Company*, https://www.boeing.com/company/.

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

80.     The 737 NG did not have the same problems.

81.     If Boeing did not fix the 737 MAX's pitch-up characteristic, the FAA could have determined that the 737 MAX did not meet U.S. federal airworthiness standards required for the 737 MAX to obtain an amendment to Boeing's existing 737 type-certificate.

82.     To address the issue, Boeing developed MCAS, the software-based flight control logic unique to the 737 MAX aircraft.[29]

83.     Yet the existence of MCAS, the need for MCAS and how MCAS function all did not come to light until the aircraft entered passenger service, and caused the Lion Air 610 crash on October 29, 2018.

**F.      Boeing Employed a Novel, Undisclosed Flight Control Logic to Mitigate the Catastrophic Risk of Stall**

84.     When the 737 MAX is in full thrust, such as during takeoff, the aircraft nose tends to point too far upward, which creates a risk of aerodynamic stall.

85.     An aerodynamic stall occurs when an aircraft experiences a sudden reduction in lift as the pilot increases the wing's angle of attack and exceeds its critical angle of attack.  If not quickly corrected, a stall can lead to a loss of controlled flight and crash of the aircraft.

86.     The prior 737s did not have the same risk of aerodynamic stall.

87.     The center of gravity change and the red flags it raised were first noticed in 2012

---

[29] Andrew Tangel & Andy Pasztor, *Regulators Found High Risk of Emergency After First Boeing MAX Crash*, WALL ST. J., July 31, 2019, https://www.wsj.com/articles/regulators-found-high-risk-of-emergency-after-first-boeing-max-crash-11564565521; Douglas MacMillan & Aaron Gregg, *Boeing's 737 Max Design Contains Fingerprints of Hundreds of Suppliers*, The Washington Post, April 5, 2019, https://www.washingtonpost.com/steps-for-disabling-firefoxs-native-adblocker/2018/05/21/fb95bf4e-5d37-11e8-b2b808a538d9dbd6_story.html?utm_term=.8c5fedae8660; Anurag Kotoky & Kyunghee Park, *When Will Boeing 737 Max Fly Again and More Questions*, Bloomberg, June 16, 2019, https://www.bloomberg.com/news/articles/2019-06-17/boeing-s-grounded-737-max-the-story-so-far-quicktake.

-18-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

on a model 737 MAX that was the size of an eagle and was being tested in a wind tunnel.[30]

88.     Boeing's Chief Test Pilot, Ray Craig, also discovered an issue with the 737 MAX's high-speed handling qualities while conducting FAA-required evasive maneuvers in a simulator.

89.     Although Craig disliked automatic systems such as MCAS that take control from pilots and would have preferred a structural aerodynamic fix, he relented because the need for such high-speed maneuvers was so rare that he believed MCAS would rarely engage.[31]

90.     But as described below, Boeing's concept of MCAS changed so radically throughout the development process that the final result was an entirely new system that engaged in far different circumstances and far too often, with catastrophic consequences.

91.     For example, in 2012, it took a Boeing test pilot more than 10 seconds to respond to uncommanded MCAS activation in a flight simulator, which the pilot found to be "catastrophic."[32]

92.     Despite knowing from its own test pilots that operator pilots may not respond quickly enough to successfully counter uncommanded MCAS activation, Boeing explained away test results and chose not to inform the FAA, or potential customers of this internal data.[33]

93.     In other words, Boeing knew years ago, at the infancy of 737 MAX development that the aircraft was not going to work as intended, and yet it chose to hide that fact from

---

[30] Maureen Tkacik, *Crash Course: How Boeing's Managerial Revolution Created the 737 MAX Disaster*, The New Republic, Sept. 18, 2019, https://newrepublic.com/article/154944/boeing-737-max-investigation-indonesia-lion-air-ethiopian-airlines-managerial-revolution.

[31] Jack Nicas et al., *Boeing Built Deadly Assumptions Into 737 Max, Blind to a Late Design Change*, N.Y. TIMES, June 1, 2019, https://www.nytimes.com/2019/06/01/business/boeing-737-max-crash.html.

[32] Transportation Committee Final Report, *supra* note 14, at 87.

[33] *Id.* at 161-162.

-19-

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

regulators, and potential customers.[34]

94.     The problems with Boeing's use of a software rather than structural fix became exacerbated when later, as described below, the software could not sufficiently correct for the problems the changes to the aircraft's center of gravity caused.

95.     In the meantime, Boeing kept MCAS a secret.  Indeed, in a November 27, 2012 email that Boeing produced to the House T&I Committee, a Boeing employee noted that an MCAS light indication on the flight control panel had been removed enabling Boeing to hide MCAS's existence.

96.     With MCAS in place, the 737 MAX program forged ahead toward its design milestones:

    a.   Boeing began final wind tunnel testing in February 2012;

    b.   Boeing achieved firm concept in October 2012;

    c.   Boeing achieved firm configuration in July 2013;

    d.   Boeing initiated ground testing of the LEAP1-B engine in June 2014;

    e.   Boeing began engine flight testing in May 2015;

    f.   Boeing debuted the first assembled 737 MAX in December 2015;

    g.   Boeing began the flight next testing phase in January 2016;

    h.   Boeing tested MCAS from March through August 2016; and

    i.   Boeing settled on its final iteration of MCAS in August 2016.

97.     During this time, Boeing continued to market the 737 MAX as if it was but a more fuel efficient version of the 737 NG, as opposed to the different aircraft it really is, and it

---

[34] Jack Nicas et al., *Boeing Built Deadly Assumptions Into 737 Max, Blind to a Late Design Change*, N.Y. TIMES, June 1, 2019, https://www.nytimes.com/2019/06/01/business/boeing-737-max-crash.html.

-20-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

continued to conceal the existence of MCAS and to reject changes to MCAS or the 737 MAX generally that would have provided for greater safety, but risked reducing commonality with the 737 NG or driving new required pilot simulator training.

98.     For example, in 2013, a Boeing employee sent an email asking whether synthetic airspeed could be used in connection with MCAS.  The synthetic airspeed system is used on Boeing's 787 Dreamliner and draws on several data sources to measure how fast an aircraft is flying.  In doing so, it can detect when an angle of attack ("AOA") sensor is malfunctioning and prevent other systems, such as MCAS, from relying on that faulty information.

99.     Curtis Ewbank, an engineer who worked on the development of the 737 MAX, explained that Boeing decided not to look into the use of a synthetic airspeed system because of its potential cost and effect on training requirements for pilots.[35]

100.     In other words, Boeing elected to forego the incorporation of synthetic airspeed because it would jeopardize its ability to maintain Level B training for the 737 MAX.

101.     Further, Boeing designed MCAS to rely on data from only one AOA sensor, which measures the angle of the aircraft's nose, instead of two or more.  If data from that single AOA sensor was wrong, it could activate MCAS and force the aircraft into a dive when one is unnecessary, and potentially at altitudes that could – and did – result in a catastrophic crash.[36]

102.     The reason for Boeing's using only one AOA sensor is obvious: using two AOA sensors may have created an AOA disagree alert when one sensor was feeding false data, a

---

[35]  Natalie Kitroeff et al., *Boeing Engineer, in Official Complaint, Cites Focus on Profit Over Safety on 737 Max*, N.Y. TIMES, October 2, 2019, https://www.nytimes.com/2019/10/02/business/boeing-737-max-crashes.html.

[36] Dominic Gates, *FAA Cautions Airlines on Maintenance of Sensors that were Key to 737 Max Crashes,* The Seattle Times, Aug. 20, 2019, https://www.seattletimes.com/business/boeing-aerospace/faa-cautions-airlines-on-maintenance-of-sensors-that-were-key-to-737-max-crashes/.

-21-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

problem which may have required the additional pilot training Boeing so desperately was seeking to avoid.[37]

103.    The problem with using only one AOA sensor was compounded by the fact that the AOA sensor feeding data to MCAS was mounted on the aircraft fuselage, just behind the nose, where it is vulnerable to damage from jetbridges, ground equipment, and birds.

104.    According to a review by Bloomberg, there have been at least 140 instances over the past 30 years wherein AOA sensors mounted in the same area were damaged.[38]  By relying on data from only one AOA sensor, Boeing unreasonably risked a false data feed from a damaged sensor.

105.    Yet Boeing did not include an AOA disagree alert as a standard feature on the 737 MAX.

106.    Similarly, Boeing meeting minutes from 2013 confirm that employees working on the 737 MAX recognized that if MCAS "was emphasized as a new function, there may be a greater certification and training impact."[39]

107.    Unwilling to jeopardize the program's design and training objectives, Boeing decided to abandon the term MCAS in external communications and instead present MCAS to

---

[37] Maureen Tkacik, *Crash Course: How Boeing's Managerial Revolution Created the 737 MAX Disaster*, The New Republic, Sept. 18, 2019, https://newrepublic.com/article/154944/boeing-737-max-investigation-indonesia-lion-air-ethiopian-airlines-managerial-revolution.

[38] Alan Levin & Ryan Beene, *Sensors Linked to Boeing 737 Crashes Vulnerable to Failure*, Bloomberg, April 10, 2019, https://www.bloomberg.com/news/articles/2019-04-11/sensors-linked-to-737-crashes-vulnerable-to-failure-data-show.

[39] Transportation Committee Final Report, *supra* note 14, at 92 citing Internal Boeing email, "PRG – 37MAXFCI-PDR_AI22 – MCAS/Speed Trim," June 7, 2013, 9:10 PM, accessed at p. 93 here: https://transportation.house.gov/imo/media/doc/Compressed%20Updated%202020.01.09%20Boeing%20Production.pdf.

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

the FAA as an extension of the 737 existing speed trim system that would only activate under certain limited circumstances.[40]

108.    This narrow definition was a strategy to muddy the waters around MCAS so that Boeing could claim that MCAS was not new or novel, and therefore should not be subjected to greater scrutiny during certification.[41]

109.    This point was echoed in Boeing's publication called Aero, which in the first quarter of 2014, stated that the 737 MAX would offer "improved fuel efficiency and reduced emissions and noise while extending the 737's reputation for reliability and retaining commonalities with the current 737 fleet."[42]

110.    Yet a May 2, 2014 Boeing email also produced to the House T&I Committee demonstrated that Boeing tried to convince the FAA AEG that the handling qualities of the 737 MAX would be the same as the 737 NG although at this point Boeing knew the opposite was true.

111.    Thus, in another email sent five days later, a Boeing employee noted that Boeing "definitely" wanted to emphasize the commonalities between the 737 MAX and the 737 NG as opposed to their differences.

112.    On December 8, 2015, following the assembly of the first 737 MAX aircraft, Boeing Commercial Airplanes Vice President and General Manager Keith Leverkuhn stated "…

---

[40] U.S. Dep't of Transportation, Office of the Inspector General: Timeline of Activities Leading to the Certification of the Boeing 737 Max 8 Aircraft and Actions Taken After the October 2018 Lion Air Accident Report No. AV2020037, June 29, 2020,  (hereinafter "OIG Audit Report") p. 13, available at: : https://www.oig.dot.gov/sites/default/files/FAA%20Oversight%20of%20Boeing%20737%20MAX%20Certification%20Timeline%20Final%20Report.pdf.

[41] Gregory Travis, *How the Boeing 737 Max Disaster Looks to a Software Developer*, IEEE Spectrum, April 18, 2019, https://spectrum.ieee.org/how-the-boeing-737-max-disaster-looks-to-a-software-developer.

[42] Michael Teal, Vice President and Chief Project Engineer for the 737 MAX, *New 737 MAX: Improved Fuel Efficiency and Performance*, Issue 53, First Quarter 2014, p. 5, available at: https://www.boeing.com/commercial/aeromagazine/articles/2014_q1/pdf/AERO_2014q1.pdf.

-23-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

our team is upholding an incredible legacy while taking the 737 to the next level of performance."[43]

113.    After a successful first flight, Boeing's Chief Production Pilot, Ed Wilson, stated, "[t]he 737 Max just felt right in flight giving us complete confidence that this airplane will meet our customers' expectations."[44]

114.    But as flight testing continued, Mr. Wilson and his co-pilot, Craig Bomben, began to notice that the 737 MAX was not handling like the 737 NG when nearing aerodynamic stalls at low air speeds.

115.    Specifically, the control forces required to pull the column (yoke) back were too low and could cause the airplane to stall, and the forces required to push the column forward to increase speed and recover from a stall were too high.[45]

116.    In other words, the 737 MAX did not handle like, and was dissimilar to, prior 737 generations despite what Boeing was telling its operators, customers, potential customers, and the public, and despite what Boeing had told the FAA since 2012 in order to certify the 737 MAX as a new variant of the 737 rather than seek a new type certificate as would be required for a new aircraft.

117.    The 737 MAX was more susceptible to an aerodynamic stall at low speeds than prior generations of 737s.

---

[43] The Boeing Company, *Boeing Debuts First 737 MAX 8*, Dec. 8, 2015, https://boeing.mediaroom.com/Boeing-Debuts-First-737-MAX-8.

[44] The Boeing Company, *Boeing Completes Successful 737 MAX First Flight*, Jan. 29, 2016, https://boeing.mediaroom.com/2016-01-29-Boeing-Completes-Successful-737-MAX-First-Flight.

[45] Jack Nicas et al., *Boeing Built Deadly Assumptions Into 737 Max, Blind to a Late Design Change*, N.Y. TIMES, June 1, 2019, https://www.nytimes.com/2019/06/01/business/boeing-737-max-crash.html; *see also* Scott McCartney, *Inside the Effort to Fix the Troubled Boeing 737 MAX*, WALL ST. J., June 5, 2019, https://www.wsj.com/articles/testing-the-fix-for-the-troubled-737-max-11559772634.

-24-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

118.    However, the technology on the older generations of 737 aircraft that enabled pilots to manually control the aircraft by pulling back on the control column was disabled in the 737 MAX when MCAS activated meaning that 737 MAX pilots (who would not even know of MCAS's existence) could not avoid an aerodynamic stall in the same manner that they would have on prior 737s.

119.    Around this time in 2015, Boeing became aware of the growing problems surrounding MCAS.  For example, a Boeing Authorized Representative ("AR") (a Boeing employee who is granted special permission to represent the interests of the FAA and to act on the agency's behalf in validating aircraft systems and designs' compliance with FAA requirements), raised questions concerning whether MCAS was "vulnerable to single AOA sensor failures."  But Boeing failed to incorporate a second AOA sensor into MCAS.[46]

120.    July 2015 Boeing notes also showed a test pilot's slow "catastrophic" reaction time to uncommanded MCAS activation.  Boeing never shared this data with the FAA.[47]

121.    As disclosed in another document that Boeing produced to the House T&I Committee from December 2015, another Boeing employee raised the same single-point AOA sensor failure concern, and was also ignored.

122.    Meanwhile, Boeing engineers scrambled to find a fix for the 737 MAX's dangerous low-speed handling characteristics.[48]

123.    By March 2016, Boeing settled on a revision of the MCAS flight control logic,

---

[46] Transportation Committee Final Report, *supra* note 14, at 20.

[47] Transportation Committee Final Report, *supra* note 14, at 100.

[48] Jack Nicas et al., *Boeing Built Deadly Assumptions Into 737 Max, Blind to a Late Design Change*, N.Y. TIMES, June 1, 2019, https://www.nytimes.com/2019/06/01/business/boeing-737-max-crash.html.

-25-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

and began testing it right away.[49]

124.    However, in this second iteration of MCAS, Boeing chose to omit key safeguards that had previously been included in earlier iterations of MCAS, such as those used on the 767 military tanker, also known as the KC-46A Pegasus.[50]

125.    For example, engineers who created MCAS for the military tanker designed the system to rely on inputs from multiple sensors and with limited power to move the tanker's nose. These deliberate checks sought to ensure that the system could not act erroneously or cause a pilot to lose control.   Those familiar with the tanker's design explained that these checks were incorporated because "[y]ou don't want the solution to be worse than the initial problem."[51]

126.    As a result of, among other things, Boeing's failure to include these key safety measures, Boeing employees who were testing the second iteration of MCAS began to notice problems almost immediately.

127.    For example, in a March 2, 2016 document that Boeing produced to the House T&I Committee, a Boeing employee noted that in contrast to the 737 NG, the 737 MAX had an unacceptable stall risk.

128.    Another document that Boeing produced dated just one week later noted "I don't know enough about this requirement's background but it is going to violate this requirement if the updated MCAS command requires more stab[?]"

129.    Yet, around this time, while problematic MCAS testing was still ongoing,

---

[49] Transportation Committee Final Report, *supra* note 14, at 119.

[50] Alison Sider et al., *Before 737 MAX, Boeing's Flight-Control System Included Key Safeguards*, WALL ST. J., Sept. 29, 2019, https://www.wsj.com/articles/before-737-max-boeings-flight-control-system-included-key-safeguards-11569754800.

[51] *Id.*

-26-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Boeing's Chief Technical Pilot asked the FAA whether he could remove all references to MCAS from the 737 MAX's Flight Crew Operations Manual.

130.    No one at Boeing had told the FAA about the second iteration MCAS, so the FAA was considering the request based on its knowledge of the first iteration.

131.    In April 2016, Boeing discovered during testing of the second iteration of MCAS that it could activate in a much broader flight envelope than the first MCAS iteration.

132.    Around the same time, a Boeing AR questioned the ability of MCAS to activate repeatedly, a feature that ultimately would lead to the two 737 MAX crashes.

133.    A Boeing AR also questioned what would happen if MCAS received a faulty AOA sensor reading.  A colleague responded that if such a problem occurred, MCAS would shut down immediately.  This answer was demonstrably false and presumably prevented the AR from elevating this concern.

134.    By May 2016, Boeing noticed that the second iteration of MCAS was affecting the handling characteristics of the 737 MAX in low speed situations at high angles of attack.  This finding spurred more revisions to the second iteration of MCAS.

135.    In continued testing in June 2016, a Boeing AR again raised concerns regarding a single AOA sensor failure, as well as concerns that MCAS was countering a pilots' attempt to trim the aircraft.[52]

136.    AOA sensors are designed to, among other things, provide pilots with a direct reading of when an aircraft is nearing or entering an aerodynamic stall. But as set forth in paragraphs 104, 119, 121 and 135, *supra*, AOA sensors are prone to failure.  Despite this problem,

---

[52] Transportation Committee Final Report, *supra* note 14, at 21.

-27-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

while Boeing still was modifying the second iteration of MCAS, Boeing elected not to include self-diagnostic software for MCAS that would have allowed it to detect and shutdown a malfunctioning AOA sensor.

137.    On June 16, 2016, a Boeing employee raised another issue that would prove critical to the 737 MAX crashes: the employee noted that a test pilot was having trouble countering repetitive MCAS activation, and questioned whether such difficulties were a safety or certification issue.[53]

138.    Four days later, Boeing acknowledged that a pilot could continually fight MCAS and find the aircraft in a large "mistrim."

139.    Notwithstanding its growing awareness of the inherent risks introduced by its design of the 737 MAX and the second iteration of MCAS, Boeing continued to conceal this necessary safety information from everyone.

140.    For example, on July 26, 2016, Boeing presented a flight demonstration video at an Air Show in Oshkosh, Wisconsin.  In connection with that demonstration, Boeing again touted the MAX's LEAP1-B engines without mentioning their unintended side-effects, stating "[t]he 737 MAX incorporates the latest technology CFM International LEAP-1B engines . . . to deliver the highest efficiency, reliability and passenger comfort in the single-aisle market."[54]

141.    As Boeing acknowledged in written responses to the House T&I Committee, Boeing completed the final second version of MCAS, the one that would ultimately be installed on all delivered 737 MAX aircraft prior to its grounding, by August 15, 2016.

---

[53] *Id.* at 71.

[54] The Boeing Company, *Boeing Debuts 737 MAX Flight Demonstration Video at Oshkosh Air Show*, July 26, 2016, https://boeing.mediaroom.com/news-releases-statements?item=129746.

-28-

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

142.    The next day, Boeing would complete its Level B training program for the 737 MAX despite Boeing's knowledge that FAA approval of Level B training was based on the FAA's incorrect understanding that there were no significant systems changes to the 737 MAX as compared prior 737 generations.

143.    But Boeing knew that the FAA's understanding was incorrect and based on Boeing's effort to conceal the true nature of MCAS from the FAA.

144.    The Level B training determination was particularly problematic because in its second iteration MCAS, was far more powerful.  Boeing gave MCAS enough authority to autonomously move the aircraft tail's horizontal stabilizer to the full nose-down limit if MCAS determined a stall may be oncoming.[55]

145.    Although this fix was intended to conform the 737 MAX's handling characteristics to the 737 NG, it introduced the risk that the stabilizer would overpower the pilots' ability to counter MCAS' nose-down command with nose-up movement to stop an uncontrollable dive toward the ground.  The graphic below demonstrates the problem.[56]

---

[55] Dominic Gates, *Flawed analysis, failed oversight: How Boeing, FAA certified the suspect 737 MAX flight control system*, The Seattle Times, March 17, 2019, https://www.seattletimes.com/business/boeing-aerospace/failed-certification-faa-missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/; *see also* Andy Pasztor & Andrew Tangel, *Boeing's Latest 737 MAX Concern: Pilots' Physical Strength*, WALL ST. J., June 19, 2019, https://www.wsj.com/articles/physical-strength-of-pilots-emerges-as-issue-in-returning-737-max-to-flight-11560937879.

[56] Dominic Gates, *Flawed analysis, failed oversight: How Boeing, FAA certified the suspect 737 MAX flight control system*, The Seattle Times, March 17, 2019, https://www.seattletimes.com/business/boeing-aerospace/failed-certification-faa-missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/.

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

146.    Boeing's Chief Technical Pilot, Mark Forkner knew as much, at least by November 16, 2016, when he exchanged messages with another Boeing Technical Pilot, Patrik Gustavvson, describing that MCAS was "running rampant" on him when in a flight simulator, and acknowledging that he had lied to the FAA about MCAS.  Forkner asked why he was first learning of this, and other MCAS issues, in November 2016, and Gustavsson replied that Boeing test pilots were being kept out of the loop.

147.    Put simply, Forkner and Gustavsson knew that the second iteration of MCAS was different than what been described to the FAA, and yet Boeing withheld that information from regulators, and operators that would ultimately fly the 737 MAX.

148.    Further compounding its mistakes, Boeing submitted documentation to the FAA indicating that MCAS could move the horizontal tail a maximum of 0.6 degrees, which described the first iteration of MCAS.

149.    At the time of certification in 2017, when Boeing was presenting the aircraft that

-30-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

would actually be delivered to customers, MCAS actually was capable of moving the tail 2.5 degrees, more than four times the 0.6 degrees stated in the initial safety analysis provided to the FAA.

150.    Because Boeing had ODA authority to self-certify this aspect of the 737 MAX, Boeing was able to conceal this change from the FAA and never updated its documentation on this point.

151.    Boeing's FAA-mandated System Safety Analysis for MCAS also failed to account for how MCAS could reset itself after each time a pilot responded to its nose-down command. This means that when MCAS malfunctioned, it would not just cause a single downward movement of 2.5 degrees, but would nose-down command the aircraft 2.5 degrees lower several times in succession as the pilot tried to regain control.  Without correction, two cycles of MCAS at the 2.5 degree limit could cause the aircraft to reach its maximum nose-down trim position, which could cause the pilot to lose control of the aircraft, and a crash into the ground.

152.    Peter Lemme, a former Boeing flight controls engineer, explained that since MCAS could reset each time it was used, "it effectively has unlimited authority."[57]

153.    Based on the false representation that MCAS's maximum authority was 0.6 degrees, Boeing's System Safety Analysis submitted to the FAA incorrectly classified the MCAS as a "major failure" risk in normal flight and a "hazardous failure" risk in the event of an extreme maneuver, such as a banked descending spiral.

154.    A "major failure" indicates that the system's failure could cause physical distress to passengers, but not death.  A "hazardous failure" could cause serious or fatal injuries to a small

---

[57] *Id.*

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

number of passengers.   By contrast, a "catastrophic failure" risk, which is what the second iteration of MCAS really was, represents the potential for loss of the plane with multiple fatalities.

155.    The fact that MCAS is a "catastrophic failure" risk was tragically demonstrated when both Lion Air Flight 610 and Ethiopian Airlines Flight 302 crashed, killing scores of people.

156.    Indeed, as set forth above, Boeing had data demonstrating that MCAS was a "catastrophic" risk as early as 2015.

157.    Boeing also knew that pilot response time to uncommanded MCAS activation could be greater than 10 seconds, a condition that would require Boeing to classify MCAS as a "catastrophic" failure risk.[58]

158.    Despite this knowledge, and while knowing that the second iteration of MCAS was far more powerful than the first, Boeing hid these changes and risks from the FAA, and by extension other civil aviation regulators.[59]

159.    Boeing, fearing a disruption to its 737 MAX schedule, and certification and training goals, never changed the MCAS classification from "major" to "catastrophic."

160.    In fact, Boeing's website, press releases, annual reports, public statements and statements to operators and customers, submissions to the FAA and other civil aviation authorities, and 737 MAX flight manuals made no mention of the increased stall hazard or MCAS itself.

161.    Then, having deceived the FAA concerning the true function and role of MCAS,

---

[58] U.S. Department of Transportation Office of Inspector General: Timeline of Activities Leading to the Certification of the Boeing 737 Max 8 Aircraft and Actions Taken After the October 2018 Lion Air Accident Report No. AV2020037, June 29, 2020, p. 21 available at: https://www.oig.dot.gov/sites/default/files/FAA%20Oversight%20of%20Boeing%20737%20MAX%20Certification%20Timeline%20Final%20Report.pdf.

[59] *Id.*

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

Mark Forkner succeeded in persuading the FAA to allow Boeing to delete any reference to MCAS from the Flight Crew Operations Manual ("FCOM"), the document that provides procedures, performance and systems information to flight crews to enable their safe and efficient operations of the airplane.[60]

162.    With MCAS deleted from the 737 MAX manual, Forkner wrote in a November 3, 2016 email *to the FAA* that he was "jedi-mind tricking regulators into accepting the training that I got accepted by the FAA, etc."

163.    In other words, Boeing was purposefully "tricking" the FAA and other worldwide aviation authorities into accepting lesser training on the 737 MAX than should have been required, and that ultimately would lead to more than 300 deaths and the world-wide grounding of 737 MAX aircraft.

164.    While attempting to sell the 737 MAX to foreign carriers in 2015, Forkner used the same language, telling the FAA that he was "jedi mind trick[ing] these people into buying some airplanes!" namely, the 737 MAX.

165.    Boeing thus displayed a consistent pattern of believing, and admitting, that, given the known shortcomings of the 737 MAX, it had to *trick* regulators into approving the aircraft, and operators into acquiring them.

166.    On January 17, 2017, just months before the 737 MAX would launch, Boeing doubled down on its deletion from the FCOM when Mr. Forkner falsely told the FAA in an email that MCAS would not be covered in the FCOM because "it's way outside the normal operating envelope," even though his own prior 737 MAX flight simulator experience demonstrated that

---

[60] Maureen Tkacik, *Crash Course: How Boeing's Managerial Revolution Created the 737 MAX Disaster*, The New Republic, September 18, 2019, https://newrepublic.com/article/154944/boeing-737-max-investigation-indonesia-lion-air-ethiopian-airlines-managerial-revolution.

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

was untrue.

167.   Accordingly, Boeing failed to inform the FAA that, unlike the first iteration of MCAS, which likely only would operate in the event of a rare high-speed maneuver, the second iteration would operate to prevent potential low altitude, low speed stalls, which could occur far more frequently.

168.   The risk profile and required risk assessment of the second iteration of MCAS was thus completely different from the first, and yet Boeing neither assessed that increased risk nor even attempted to mitigate it.  Instead, Boeing used its ODA authority to hide this information.[61]

169.   With respect to Boeing's hiding MCAS from the FAA, the Joint Authorities Technical Review (JATR), an organization commissioned by the FAA to evaluate the 737 MAX Crisis and composed of technical representatives from national aviation regulators from around the world, found:

a.   "[T]he content of certification deliverables would not have provided FAA technical staff with awareness of key details of the MCAS function on the B737 MAX, including architecture, signal inputs, and limits of authority."[62]

b.   "MCAS should have been considered a novelty (and therefore clearly highlighted to the FAA technical staff) owing to the important differences in function and implementation it has on the B737 MAX compared with the previous MCAS installed on the B767-C2 (tanker)."[63]

c.   "The FAA was not completely unaware of MCAS; however, because the information and discussions about MCAS were so fragmented and were delivered to disconnected groups within the process, it was difficult to recognize the impacts and implications of this system. If the FAA technical staff had been fully aware of

---

[61] Troy Wolverton, *Boeing reportedly kept the FAA in the dark about big changes it made to the 737 Max's flight-control software late in its development*, Business Insider, July 27, 2019, https://www.businessinsider.com/boeing-737-max-flight-system-faa-oversight-2019-7.

[62] *See* Boeing 737 Max Flight Control System Joint Authorities Technical Review (JATR), Oct. 11, 2019 (hereinafter referred to as "JATR Report"), p. 24, available here: https://www.skybrary.aero/bookshelf/books/5319.pdf.

[63] *Id.* at 23.

-34-

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

the details of MCAS function, the JATR team believes the agency likely would have required an issue paper for using the stabilizer in a way that it had not previously been used. MCAS used the stabilizer to change the column force feel, not trim the aircraft . . . If an issue paper had been required, the JATR team believes it would have likely identified the potential for the stabilizer to overpower the elevator."[64]

170. According to the U.S. Department of Transportation Office of Inspector General, which also investigated the 737 MAX Crisis:

Boeing included limited information in initial briefings to FAA on the MAX's flight control software, MCAS, which subsequently has been cited as a contributing or potentially contributing factor in both accidents. However, Boeing presented the software as a modification to the existing speed trim system that would only activate under certain limited conditions. As such, MCAS was not an area of emphasis in FAA's certification efforts and therefore did not receive a more detailed review or discussion between FAA engineers and Boeing.[65]

171. And the House T&I Committee investigation concluded that the 737 MAX development and certification process revealed a "disturbing pattern of technical miscalculations and troubling management misjudgments by Boeing."[66]

172. Among the "several unmistakable facts" uncovered (*id.* at 6) the House T&I Committee discovered are that:

a. "Boeing withheld crucial information from the FAA, [and] its customers . . . " including "concealing the very existence of MCAS from 737 MAX pilots."[67]

b. "In November 2012, for instance, it took a Boeing test pilot more than 10 seconds to respond to uncommanded MCAS activation during a flight simulator test, a condition the pilot found to be 'catastrophic[.]' . . . This event should have focused Boeing's attention on the need for enhanced pilot training for MAX pilots. It didn't." Rather, despite Boeing's "keen awareness of the importance of this information" and the "potentially 'catastrophic' consequences" that could result if it took a pilot 10 seconds to respond to uncommanded MCAS activation," there is "no evidence that Boeing shared

---

[64] JATR Report, *supra* note 62, at 13-14.

[65] OIG Audit Report, *supra* note 40, at 8.

[66] Transportation Committee Final Report, *supra* note 14, at 6-7.

[67] *Id.* at 13.

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

this information with the FAA, [or] its customers . . . ."[68]

    c.   "One of Boeing's key goals for the 737 MAX program was that simulator-based training would not be required for pilots transitioning to the 737 MAX from the 737 NG.  That goal undermined appropriate pilot training requirements, hampered the development of safety features that conflicted with that goal and created management incentives to downplay the risks of technologies that jeopardized that goal."[69]

    d.   In March 2016, "Boeing sought, and the FAA approved, the removal of references to MCAS from Boeing's Flight Crew Operations Manual (FCOM) . . . . As a result, 737 MAX pilots were precluded from knowing of the existence of MCAS and its potential effect on aircraft handling without pilot command."[70]

    173.    On September 26, 2019, the U.S. National Transportation Safety Board ("NTSB") issued a Safety Recommendation Report to address Boeing's erroneous "assumptions about pilot recognition and response to failure conditions used during the design and certification process" of the 737 MAX.[71]

    174.    The NTSB found that neither Boeing's System Safety Assessment for MCAS nor its simulator tests satisfied the requirements of 14 C.F.R. § 25.1309 and it directed the FAA to "require that Boeing (1) ensure that system safety assessments for the 737 MAX in which it assumed immediate and appropriate pilot corrective actions in response to uncommanded flight control inputs, from systems such as [MCAS], consider the effect of all possible flight deck alerts and indications on pilot recognition and response; and (2) incorporate design enhancements (including flight deck alerts and indications), pilot procedures, and/or training requirements,

---

[68] *Id.* at 25.

[69] *Id.*

[70] *Id.* at 20.

[71] NTSB, Safety Recommendation Report: Assumptions Used in Safety Assessment Process and the Effects of Multiple Alerts and Indications on Pilot Performance, Sept. 19, 2019, p. 9-10, available at: https://www.ntsb.gov/investigations/AccidentReports/Reports/ASR1901.pdf.

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

where needed, to minimize the potential for and safety impact of pilot actions that are inconsistent with manufacturer assumptions."[72]

175.    Finally, and most notably, the U.S. Department of Justice ("DOJ") investigated Boeing's conduct during certification of the 737 MAX and indicted Boeing on a Charge of Criminal Conspiracy to Defraud the United States.

176.    In a Deferred Prosecution Agreement reached with the DOJ, Boeing itself admitted that, in the course of the 737 MAX certification process, it knowingly conspired to intentionally defraud the FAA AEG.   Specifically, Boeing acknowledged that two of the Company's 737 MAX Flight Technical Pilots deceived the FAA AEG about MCAS and that, through this deception, Boeing interfered with the FAA AEG's lawful function to evaluate MCAS.   In doing so, Boeing fraudulently obtained from the FAA AEG a differences-training determination for the 737 MAX (*i.e.*, an evaluation of the differences between the 737 MAX and 737 NG) of the Level B it was hoping for, and which was based on incomplete and inaccurate information about MCAS. [73]

177.    Boeing's implementation of MCAS – a new flight control logic with a single input that takes control away from the pilot, and had no in-service history to address a potentially deadly stall hazard – marked a profound departure from the time-tested 737 family of aircraft.

178.    But because of Boeing's decision not to disclose the second iteration of MCAS to the FAA, not to disclose the existence of MCAS at all to operators, the public, customers and potential customers, the MAX was added to Boeing's FAA 737 type certificate and approved for

---

[72] *Id.* at 10.

[73] Deferred Prosecution Agreement, Jan. 7, 2021, United States of America v. The Boeing Company, No. 4:21-CR-00005-O (Dist. Ct. N.D. Tex.) (hereinafter "Boeing Deferred Prosecution Agreement") p. 4, available at: https://www.justice.gov/opa/press-release/file/1351336/download.

-37-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

operations on March 9, 2017.

179.   Despite its knowledge concerning the 737 MAX's stall risk, and of the risks associated with the incorporation of MCAS, when Boeing announced the 737 MAX's FAA certification on the same date, it again stated that "The 737 MAX incorporates the latest technology CFM International LEAP-1B engines . . . to deliver the highest efficiency, reliability and passenger comfort in the single-aisle market."[74]

180.   Boeing failed to note any of the problems associated with the addition of the new engines.

181.   Specifically, Boeing failed to note, *inter alia*, the:

    a.   Decrease in aircraft stability;

    b.   Greater pitch-up tendency at elevated angles of attack;

    c.   Negative change in aircraft handling characteristics;

    d.   Increase in susceptibility to the risk of catastrophic stall; and

    e.   Reliance on MCAS, a novel yet safety critical flight control logic with no service history that purported to mitigate the deadly risk of stall but in fact caused greater problems.

182.   In fact, it was so important to Boeing that the public and potential customers believe that the 737 MAX was essentially a re-engined 737 NG with limited design changes that the ultimate Level B training program that it provided to pilots before they entered the 737 MAX cockpit for the first time was only a two-hour iPad training course.[75]

183.   Falsely minimizing the real differences in the 737 MAX was Boeing's strategy

---

[74] The Boeing Company, *Boeing 737 MAX 8 Earns FAA Certification*, March 9, 2017, https://boeing.mediaroom.com/2017-03-09-Boeing-737-MAX-8-Earns-FAA-Certification.

[75] Natalie Kitroeff et al., *After 2 Crashes of New Boeing Jet, Pilot Training Now a Focus*, N.Y. TIMES, March 16, 2019, https://www.nytimes.com/2019/03/16/business/boeing-max-flight-simulator-ethiopia-lion-air.html.

-38-

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

with its all of its customers and potential customers.  For example, Brian Lesko, the Chair of the Air Safety Organization Aircraft Design/Operations Group for the Air Line Pilots Association International, who also is a pilot for United Airlines, repeatedly asked Boeing if there were any new major systems on the 737 MAX in connection with an article that he was writing on changes between the 737 NG and the 737 MAX.  Boeing repeatedly told him that there were no major changes.[76]   Boeing's misrepresentations and concealments of MCAS thus were repeated throughout the industry.

184.    But as the spokesperson for the American Airlines' pilots union noted after the first MCAS-caused crash noted, MCAS created a "huge difference" between the 737 MAX and prior generations of 737s.[77]

185.    Because Boeing had concealed these differences, in March 2017, EASA (of which Poland is a member, and which is LOT's civil aviation authority), certified the 737 MAX as well. The involvement of EASA as validating authority in the technical investigation activities for the 737 MAX was regulated by the Agreement between the U.S. and the E.U. on cooperation in the regulation of civil aviation safety (BASA) and the associated FAA-EASA Technical Implementation Procedures for airworthiness and environmental certification (TIP), Rev.5 (FAA-EASA, 2015) in effect at the time.[78]

186.    In other words, EASA relied on the misrepresentations and omissions that Boeing

---

[76] Andy Pasztor, et al., *How Boeing's 737 MAX Failed*, WALL ST. J., March 27, 2019, https://www.wsj.com/articles/how-boeings-737-max-failed-11553699239.

[77] Jack Nicas, David Gelles & James Glanz, *Changes to Flight Software on 737 Max Escaped F.A.A. Scrutiny*, N.Y. TIMES, April 11, 2019, https://www.nytimes.com/2019/04/11/business/boeing-faa-mcas.html.

[78] European Union Aviation Safety Agency (EASA): Boeing 737 Max Return to Service Report, issued Jan. 27, 2021, (hereinafter "EASA Report"), p. 14 available at: https://www.easa.europa.eu/sites/default/files/dfu/B737_Max_Return_to_Service_Report.pdf.

-39-

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

made to the FAA when certifying the 737 MAX.

187.    Thus, LOT's reliance on EASA's certification of the 737 MAX was procured by the same fraud that Boeing used to induce the FAA to certify the aircraft.

**G.    Boeing's Misrepresentations Continued After it Launched the 737 MAX**

188.    After Boeing delivered the first 737 MAX in May 2017, its misrepresentations concerning the 737 MAX continued.

189.    On its website, Boeing represented that "millions of dollars will be saved because of [the 737 MAX's] commonality with the Next Generation 737."[79]  Boeing's website failed to mention, *inter alia*, the 737 MAX's:

  a.    Change in the aircraft's aerodynamic center of gravity;

  b.    Decrease in aircraft stability;

  c.    Greater pitch-up tendency at elevated angles of attack;

  d.    Negative change in handling characteristics;

  e.    Increase in susceptibility to the risk of catastrophic stall; and

  f.    Reliance on MCAS, a novel yet safety critical flight control logic with no service history that purported to mitigate the deadly risk of stall but in fact caused greater problems.

190.    None of these problems existed on prior 737 generation aircraft.

---

[79] The Boeing Company, *737 MAX By Design*, https://www.boeing.com/commercial/737max/by-design/#/operational-commonality.

-40-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

II.   **THE 737 MAX'S ENTRY INTO SERVICE REVEALED A CRITICAL DESIGN DEFECT THAT TOOK 346 LIVES AND LED TO A WORLDWIDE GROUNDING AND LOSS OF CONFIDENCE IN THE 737 MAX**

   **A.  The Lion Air Crash**

191.   After just one year of in-service history, on October 29, 2018, a 737 MAX, operated as Lion Air Flight 610, crashed into the Java Sea killing all 189 people onboard.[80]

192.   A preliminary report issued by Indonesia's National Transportation Safety Committee indicated that erroneous AOA data from a single sensor caused MCAS to repeatedly command automatic nose-down trim.[81]

193.   Like LOT, prior to the Lion Air crash, Lion Air pilots was not aware of the presence of MCAS, did not understand how it operated, and had no training on how to manage an MCAS activation caused by erroneous AOA data.[82]

194.   After the crash, operators all over the world, including LOT, were outraged by Boeing's failure to disclose the presence of MCAS before the Lion Air crash.

195.   At that time, Boeing maintained that the 737 MAX was a safe aircraft and instead focused on alleged pilot error and maintenance issues rather than the flight safety hazard posed by the activation of MCAS at low altitude, and the 737 MAX's need for MCAS in the first place.

196.   Boeing maintained that the Lion Air crash was caused by pilot error, and that the

---

[80] Hannah Beech & Muktita Suhartono, *Confusion, Then Prayer, in Cockpit of Doomed Lion Air Jet*, N.Y. TIMES, March 20, 2019, https://www.nytimes.com/2019/03/20/world/asia/lion-air-crash-boeing.html; *see also* Ben Otto & Gaurav Raghuvanshi, *Indonesian Plane With 189 People on Board Crashes Near Jakarta*, WALL ST. J., Oct. 29, 2018, https://www.wsj.com/articles/plane-with-188-people-on-board-crashes-off-indonesia-1540784983.

[81] Komite Nasional Keselamatan Transportasi Republic of Indonesia, *Preliminary Aircraft Accident Investigation Report* (Nov. 2018), available at: https://reports.aviation-safety.net/2018/20181029-0_B38M_PK-LQP_PRELIMINARY.pdf.

[82] *Id.*

---

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

circumstances that led to the crash would not repeat.

197.    Boeing misleadingly and incorrectly continued to minimize the differences between the 737 MAX and prior generations of 737 aircraft.

198.    Boeing's representatives knew or should have known that the unintended activation of MCAS by faulty data coming from a single AOA sensor was responsible for the Lion Air crash.

199.    In fact, in the week after the Lion Air crash, Boeing published a flight crew operations manual update warning of a possible fault in the AOA system.

200.    Then, on November 7, 2018, the FAA issued an "Emergency Airworthiness Directive ("AD") 2018-23-51," warning that an unsafe condition likely could exist or develop on 737 MAX aircraft.[83]

201.    Relying on Boeing's erroneous description of the problem released one day earlier,[84] the AD directed that in the event of un-commanded nose-down stabilizer trim such as what happened during the Lion Air crash, the flight crew should comply with the Runaway Stabilizer procedure in the Operating Procedures of the 737 MAX manual.

202.    But the AD did not provide a complete description of MCAS or the problem in 737 MAX aircraft that led to the Lion Air crash, and would lead to another crash and the 737 MAX's grounding just months later.

203.    Moreover, an MCAS failure is not like a runaway stabilizer.  A runaway stabilizer has continuous un-commanded movement of the tail, whereas MCAS is not continuous and pilots

---

[83] Federal Aviation Administration, *Emergency Airworthiness Directive 2018-53-51*, Nov. 7, 2018, https://rgl.faa.gov/Regulatory_and_Guidance_Library/rgad.nsf/0/83ec7f95f3e5bfbd8625833e0070a070/$FILE/2018-23-51_Emergency.pdf.

[84] Boeing, Flight Crew Operations Manual for the Boeing Company (FCOM), TBC-19, Nov. 6, 2018, available at: https://lbblawyers.com/wp-content/uploads/2019/03/Boeing-Service-Bulletin.pdf.

-42-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

1   (theoretically) can counter the nose-down movement, after which MCAS would move the aircraft

2   tail down again.

3   204.   Furthermore, unlike runaway stabilizer, MCAS disables the control column

4   response that 737 pilots had grown accustomed to and relied upon in earlier generations of 737

5   aircraft.

6   205.   Even after the Lion Air crash, Boeing's description of MCAS was still insufficient

7   to correct its lack of disclosure as demonstrated by a second MCAS-caused crash.

8   206.   Indeed, Boeing continued to maintain after the issuance of the Preliminary Report,

9   contrary to all available evidence, that "the MAX is as safe as any airplane that has ever flown

10  the skies."[85]

11

12  207.   On October 25, 2019 the Komite Nasional Keselamatan Transportasi Republik

13  Indonesia, Indonesia's civil aviation authority, published its Final Aircraft Accident Investigation

14  Report concerning the Lion Air Crash.  The report, which described the causes of the Lion Air

15  accident, found, *inter alia*:[86]

16

17          a.   Boeing made incorrect assumptions about MCAS and whether pilots would
             have the ability to counter its operation during low-altitude stalls;

18

19          b.   Boeing incorrectly considered the loss of one AOA sensor and erroneous AOA
             sensor data as two independent events, and wrongly concluded that it was

20           improbable that those two events would occur.  In reality, MCAS's reliance on
             input from a single angle of attack sensor made it susceptible to single point

21           failure;

22          c.   Boeing failed to submit the required documentation to the FAA for
             certification of the 737 MAX, and without such documentation the FAA flight

23           control specialists were unaware of the MCAS design change from the first to

24  ────────────────────────────

[85] The Boeing Company, *Boeing Statement on Lion Air Flight 610 Preliminary Report*, available at:
25  https://boeing.mediaroom.com/news-releases-statements?item=130336.

[86] Komite Nasional Keselamatan Transportasi, Rublik of Indonesia, *Preliminary Aircraft Accident Investigation
26  Report*, Octo. 25, 2019, available at: http://knkt.dephub.go.id/knkt/ntsc_aviation/baru/2018%20-%20035%20-
%20PK-LQP%20Final%20Report.pdf.

-43-

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

second iteration of the system;

    d.   Boeing failed to consider the flight scenario that resulted in the Lion Air crash;

    e.   Boeing failed to provide critical information and additional training the flight crew to properly operate the 737 MAX;

    f.   Boeing should have relied on two AOA sensors for MCAS, and included an AOA sensor disagree alert message that was installed on the 737 NG, the absence of which made it more difficult for the flight crew to diagnose an AOA sensor failure; and

    g.   The lack of an AOA sensor disagree alert did not match the Boeing's system description that was the basis for certifying the 737 MAX.

**B.  The Ethiopian Airlines Crash**

208.    On March 10, 2019, before Boeing had sufficiently updated its 737 MAX flight manuals to provide the necessary instructions to combat repeated incorrect MCAS commands, a second 737 MAX, this one operated as Ethiopian Airlines Flight 302, crashed near Addis Ababa killing all 157 people onboard.[87]

209.    According to a Preliminary Report, one minute into the flight, the pilots noticed flight-control problems.  MCAS activated and pushed the nose of the aircraft down.  The pilots fought to pull the nose of the plane up, and were briefly able to resume climbing.  Then MCAS pushed the nose down again.  The pilots then flipped two switches and temporarily disconnected MCAS, then tried to regain control.  They asked to return to the airport but were continuing to struggle gaining altitude.  MCAS engaged again, pushing the plane into a dive.  Thirty seconds later the aircraft crashed. [88]

---

[87] Hadra Ahmed, et al. *Ethiopian Airlines Plane Is the 2nd Boeing Max 8 to Crash in Months*, N.Y. TIMES, March 10, 2019, https://www.nytimes.com/2019/03/10/world/africa/ethiopian-airlines-plane-crash.html; *see also* Matina Stevis-Gridneff, *Ethiopian Airlines Jet Crashes En Route to Nairobi*, WALL ST. J., March 11, 2019, https://www.wsj.com/articles/ethiopian-airlines-flight-crashes-en-route-to-nairobi-11552207841?mod=hp_lead_pos1&mod=article_inline.

[88] Federal Democratic Republic of Ethiopia Ministry of Transport: *Aircraft Accident Investigation Bureau Preliminary Report*, March 10, 2019, available at: https://flightsafety.org/wp-content/uploads/2019/04/Preliminary-Report-B737-800MAX-ET-AVJ.pdf.

-44-

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

**C.  The 737 MAX was Grounded Because it was Unsafe**

210.    On March 11, 2019, Boeing finally acknowledged the reality of MCAS to the public in a press release stating, "[a] pitch augmentation control law (MCAS) was implemented on the 737 MAX to improve aircraft handling characteristics and decrease pitch-up tendency at elevated angles of attack."[89]

211.    In the days following the Ethiopian Airlines crash, aviation authorities in the European Union (of which Poland is a member), China, Indonesia, Australia, Hong Kong, Oman, the United Arab Emirates, Vietnam, the United Kingdom, South Korea, Singapore, Argentina, Mexico, Brazil, Canada, India, Fiji, New Zealand, and Malaysia suspended 737 MAX operations.[90]

212.    The FAA did so as well.[91]

213.    The Ethiopian Airlines crash demonstrated conclusively that even after the Lion Air crash, Boeing had continued its pattern of misrepresentations by telling operators including LOT, as well as the public, that the 737 MAX was safe and similar to prior generations of 737 aircraft.  That was untrue.

214.    As a result, LOT learned the truth of the matter for the first time in 2019.

215.    Boeing's use of the new LEAP1-B engines on 737 MAX aircraft, the primary

---

[89] The Boeing Company, *Boeing Statement on 737 MAX Software Enhancement*, March 11, 2019, https://boeing.mediaroom.com/news-releases-statements?item=130402.

[90] *Which countries have grounded the Boeing 737 MAX jets*, PBS, March 14, 2019, https://www.pbs.org/newshour/world/which-countries-have-grounded-the-boeing-737-max-jets; *see also* Nigel Chiwaya & Jiachuan Wu, *MAP: These are the countries that have grounded the Boeing 737 MAX 8*, NBC NEWS, March 13, 2019, https://www.nbcnews.com/news/world/country-banned-boeing-737-max-airplanes-list-n982776.

[91] Federal Aviation Administration, Operators of Boeing Company Model 737-8 and Boeing Company Model 737-9 Airplanes: Emergency Order of Prohibition (2019), March 13, 2019, available at: https://www.faa.gov/sites/faa.gov/files/2021-08/Emergency_Order.pdf.

-45-

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

selling point for MAX aircraft, *inter alia*:

    a.   Changed the aircraft's aerodynamic center of gravity;

    b.   Decreased the aircraft's stability;

    c.   Created greater pitch-up tendency at elevated angles of attack;

    d.   Negatively changed the aircraft's handling characteristics;

    e.   Increased the aircraft's susceptibility to the risk of catastrophic stall; and

    f.   Relied on MCAS, a novel yet safety critical flight control logic with no service history that purported to mitigate the deadly risk of stall but in fact caused greater problems.

## III.    BOEING'S RESPONSE AND BELATED DISCLOSURE OF MCAS

216.    On March 13, 2019, after consultation with the FAA, the NTSB, other national civil aviation authorities and customers around the world, Boeing conceded and recommended the temporary suspension of operations of the entire global fleet of three-hundred and seventy-one (371) 737 MAX aircraft.

217.    The following day, Boeing suspended all 737 MAX deliveries.[92]

218.    In an April 5, 2019 press release, Boeing acknowledged that MCAS caused both the Lion Air and Ethiopian Airlines crashes.  Boeing stated that the "Lion Air Flight 610 and Ethiopian Airlines Flight 302 accidents were caused by a chain of events, with a common link being erroneous activation of the aircraft's MCAS function."[93]

219.    The day before, Boeing CEO Dennis Muilenburg also stated "erroneous activation of the MCAS function can add to what is already a high workload environment.  It's our

---

[92] The Boeing Company, *In Consultation with the FAA, NTSB and its Customers, Boeing Supports Action to Temporarily Ground 737 MAX Operations*, March 13, 2019, https://boeing.mediaroom.com/news-releases-statements?item=130404.

[93] The Boeing Company, *Statement from Boeing CEO Dennis Muilenburg: We Own Safety - 737 MAX Software, Production and Process Update*, April 5, 2019, https://boeing.mediaroom.com/2019-04-05-Statement-from-Boeing-CEO-Dennis-Muilenburg-We-Own-Safety-737-MAX-Software-Production-and-Process-Update.

-46-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

[Boeing's] responsibility to eliminate this risk."  Mr. Muilenburg further acknowledged that Boeing was working on a software fix for MCAS.[94]

220.    He did not explain why Boeing chose not to disclose the presence of MCAS on 737 MAX aircraft prior to or at the time Boeing launched the MAX.

## IV.    THE 737 MAX WAS SUBJECTED TO INTENSE REGULATORY REVIEW AND ULTIMATELY RECERTIFIED FOR FILGHT

221.    Subsequent to the grounding, regulators discovered additional, previously undisclosed problems with the 737 MAX that had to be fixed before the MAX could again be certified for flight.

222.    For example, in June 2019, the FAA discovered an additional safety issue relating to the 737 MAX's flight control system that required fixing.[95]

223.    Around the same time, the FAA also noticed problems associated with the 737 MAX's emergency procedures, requiring an additional delay in recertification.[96]

224.    On July 5, 2019, it was reported that EASA, outlined five (5) issues that Boeing had to address before it would approve the 737 MAX for return to service, including problems associated with the 737 MAX's AOA sensors, inadequate training measures, potential difficulty that pilots could have in turning the manual trim wheel, and problems associated with the MAX's

---

[94] The Boeing Company, *Boeing CEO Dennis Muilenburg Addresses the Ethiopian Airlines Flight 302 Preliminary Report*, April 4, 2019, https://boeing.mediaroom.com/2019-04-04-Boeing-CEO-Dennis-Muilenburg-Addresses-the-Ethiopian-Airlines-Flight-302-Preliminary-Report; *see also* Robert Wall and Merrill Sherman, *The Multiple Problems, and Potential Fixes, With the Boeing 737 MAX*, WALL. ST. J., August 19, 2019, https://www.wsj.com/articles/fixing-the-problems-with-boeings-737-max-11566224866.

[95] BBC, *Boeing 737 Max: New issue could delay aircraft's return*, June 27, 2019, https://www.bbc.com/news/business-48752992; *see also* Anurag Kotoky & Kyunghee Park, *Boeing's Grounded 737 MAX – The Story So Far*, Bloomberg, July 9, 2019, https://newsbeezer.com/boeings-grounded-737-max-the-story-so-far/.

[96] David Gelles, *Boeing Pledges $100 Million to Those Affected by 737 MAX Crashes*, N.Y. TIMES, July 3, 2019, https://www.nytimes.com/2019/07/03/business/boeing-737-max-crash-compensation.html.

-47-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

autopilot function.[97]

225.    EASA also focused on a pilot's potential inability to counteract MCAS in the event of malfunction.[98]

226.    Ultimately, after Boeing had struggled to fix the problems of its own creation, on November 18, 2020, the FAA finally rescinded its 737 MAX grounding order.[99]

227.    But EASA, of which Poland is a member, would not recertify the 737 MAX for flight until January 27, 2021, just six weeks shy of the two year anniversary of its grounding.[100]

228.    Boeing admitted in connection with the 737 MAX re-certification, and in direct contradiction of its prior representations to the public, regulators, and customers including LOT, that 737 pilots seeking to transition to the 737 MAX would have to undergo flight simulator training before being certified to operate the MAX.[101]

229.    EASA thus required flight simulator training as a condition of its re-certification.[102]

---

[97] Benjamin D. Katz & Alan Levin, *Boeing 737 MAX has Autopilots, European Regulators Find*, Bloomberg, July 5, 2019, https://www.bloomberg.com/news/articles/2019-07-05/europe-sets-out-demands-for-boeing-before-max-can-fly-again.

[98] *Id.*

[99] United States Department of Transportation Federal Aviation Administration, Rescission of Emergency Order of Prohibition, Nov. 18, 2020, available here: https://www.faa.gov/foia/electronic_reading_room/boeing_reading_room/media/737_MAX_Rescission_of_Grounding_Order.pdf.

[100] EASA declares Boeing 737 Max safe to return to service in Europe, EASA, Jan. 27, 2021, https://www.easa.europa.eu/newsroom-and-events/press-releases/easa-declares-boeing-737-max-safe-return-service-europe.

[101] Natalie Kitroeff and David Gelles, *In Reversal, Boeing Will Recommend 737 MAX Flight Simulator Training for Pilots*, N.Y. TIMES, Jan. 7, 2020, available at: https://www.nytimes.com/2020/01/07/business/boeing-737-max-simulator-training.html.

[102] EASA declares Boeing 737 Max safe to return to service in Europe, EASA, Jan. 27, 2021, https://www.easa.europa.eu/newsroom-and-events/press-releases/easa-declares-boeing-737-max-safe-return-service-europe.

-48-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

## V. BOEING'S DIRECT MATERIAL MISREPRESENTATIONS AND DELIBERATE OMISSIONS CONCERNING THE 737 WAS MADE DIRECTLY TO LOT AS IT INVESTIGATED LEASING NEW NARROW-BODY AIRCRAFT

230. In 2015, LOT began to consider adding new fuel efficient narrow-body aircraft to its fleet.

231. This decision was part of LOT's efforts to modify its flight network to focus on medium-haul flights within Central and Eastern Europe.

232. Doing so would be financially favorable to LOT based on the projected growth of those types of flights within the specified regions, because of LOT's financial position at the time, and because LOT could use its wide-body long-haul aircraft to bring passengers into Poland, and then offer flights from Poland to a greater variety of destinations within Central and Eastern Europe.

233. At this time, LOT considered adding to its fleet, the A320 NEO and/or other A320 family of aircraft, the 737 MAX and/or 737 NG, and Bombardier C-Series aircraft.

234. At the beginning of 2016, LOT then sent requests for proposals to aircraft leasing companies for LOT to lease six (6) of each of the narrow-body aircraft identified above, each of which could be used for the medium-haul flights that LOT planned to concentrate on.

235. LOT also set up meetings with Airbus, Boeing, and Bombardier, during which each manufacturer would come to LOT's facilities in Warsaw, Poland, explain the benefits of each aircraft that LOT was considering, and be subject to LOT's questions concerning the potential benefits and drawbacks of each aircraft, as well as how each aircraft compared to the others that LOT was considering.

236. The information that each manufacturer would provide would be key to LOT's

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

decision because it was calculating the operating costs of each aircraft, and certain inputs into that calculation could not be obtained without specific and honest information provided by the manufacturer.

237.    For example, at the time, LOT did not have pilots who could were certified to fly any of the aircraft it was considering.  Thus, pilot and crew training time and costs for each aircraft was a significant consideration.

238.    LOT also considered to what extent each of the new aircraft could reach desirable locations that its existing aircraft could not, or that some of the aircraft it was considering could reach certain destinations, while others could not.

239.    Similarly, LOT considered the cost of maintenance and spare parts for each aircraft type.

240.    LOT also intended to ask each manufacturer about aircraft costs and financial incentives that each manufacturer was willing to provide LOT that could reduce costs.

241.    Finally, LOT considered the risks associated with acquiring and operating each of the foregoing aircraft, including but not limited to risks associated with operation and training, continued airworthiness management, and ground operations.

242.    To analyze the foregoing, in addition to the LOT executives and Board members who would attend LOT's meetings with each manufacturer, LOT assembled a twelve-person team, whose members also would attend those meetings, and would conduct the relevant analysis. LOT also engaged a consultant to assist it with this analysis.

243.    Although LOT was initially most interested in the A320, LOT had been exposed to the myriad of misrepresentations and omissions that Boeing made to the public regarding the 737 MAX.

-50-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

244.   Accordingly, when Boeing was coming to speak to LOT concerning its aircraft, LOT asked Boeing to present the benefits and drawbacks of both the 737 NG and the 737 MAX.

245.   Boeing would spend the coming months making material direct misrepresentations and omissions to LOT aimed at inducing LOT to acquire 737 MAX aircraft, over Boeing's own 737 NG, as well as the A320 family or Bombardier C-Series aircraft, thereby enriching Boeing.

246.   Specifically, Herb Wallen, Boeing Regional Director of Boeing Commercial Airplanes, came to LOT's facilities and gave four presentations attempting to induce LOT into acquiring 737 MAX aircraft.

247.   Because LOT was so invested in its new narrow-body acquisitions, it sent a significant number of employees to these meetings with Boeing beginning with LOT's CEO and Chairman Rafal Milczarski.  Each of the meetings at LOT's facilities described below, also included: (1) LOT's COO Maciej Wilk; (2) individuals from its Treasury and Asset Management Department, including but not limited to Władysław Metelski and Dorota Michalska; (2) individuals from its strategy department, including but not limited to Michał Nowak and Małgorzata Lembicz; and (3) representatives from its technical department, including, but not limited to Tadeusz Stachera, Tomasz Stafiej, and Ryszard Bogdanowicz.

248.   The first Boeing presentation, given in February 2016, was 56 pages and entitled "Next-Generation 737 and 737 MAX Product Updates".

249.   As of the date of this presentation, Boeing knew at least the following with respect to the 737 MAX:

   a.   That the addition of the LEAP 1-B engines changed the 737 MAX's center of gravity as compared to the existing 737 models;

   b.   That the foregoing caused a decrease in aircraft stability;

   c.   That the 737 MAX was more susceptible to aerodynamic stalls than the

-51-

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

previous, time-tested 737s;

d.  That the addition of the LEAP 1-B engines negatively affected the handling characteristics of the 737 MAX;

e.  That it also created a greater pitch-up tendency in the 737 MAX;

f.  That MCAS, a software solution that was not on the prior 737 models was being used to counteract the 737 MAX's pitch-up tendency as opposed to a structural change;

g.  That MCAS would rely on only a single AOA sensor and therefore would be susceptible to the risks associated with non-redundant systems;

h.  That Boeing had rejected the inclusion of synthetic airspeed on the 737 MAX as a means of assisting pilots who were dealing with a potential AOA sensor malfunction;

i.  That there would be no control panel signal to pilots indicating when MCAS activated, and that to the contrary that Boeing was intending to actively conceal MCAS's existence from operators;

j.  That it could take pilots more than 10 seconds to respond to uncommanded MCAS activation, a problem deemed a "catastrophic" risk by certain Boeing employees despite Boeing's decision to label MCAS as a "major" hazard risk;

k.  That the first iteration of MCAS was insufficient to solve the problems listed above, and that Boeing therefore was in the midst of creating a second, more powerful version of MCAS; and that accordingly

l.  Boeing was executing a strategy to emphasize the commonalities between the 737 MAX and 737 NG (with the exception of fuel-efficiency), while hiding the differences;

m.  Boeing was attempting to evade greater regulatory scrutiny in order to ensure that the 737 MAX was added to Boeing's existing 737 type certificate with only Level B training needed to operate the MAX; and

n.  Therefore, that the warranties that Boeing ultimately would provide LOT would fail their essential purpose.

250.  This presentation was specifically targeted towards LOT as its slides featured several photographs of Boeing 737 aircraft with LOT livery, and was directed to the significant number of LOT representatives identified above.

-52-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

251.    This presentation was replete with material misrepresentations and omissions regarding the 737 MAX consistent with the misrepresentations Boeing was making to the public, other air carriers, the FAA, and by extension, EASA.

252.    For example, it featured a slide that marketed the 737 MAX as extending the 737 legacy and market advantage.

253.    This slide showed a timeline starting in 1980 and ending in 2020, which compared the 737 Classic, the 737 NG, and the 737 MAX.

254.    The slide made it appear as if the 737 MAX was but another iteration of the time-tested 737 aircraft, as opposed to the new aircraft that it really is.

255.    This slide boasted that the 737 MAX had improved fuel efficiency, a new engine, and a new AT Winglet as compared to the 737 NG, but did not disclose that, as compared to the 737 NG, the 737 MAX had all of the problems set forth in paragraph 249, *supra*.

256.    This presentation was not only meant to induce LOT to acquire 737 MAX aircraft, but also intended to induce LOT to acquire 737 MAX aircraft instead of other aircraft.

257.    For example, a multitude of slides directly compared the 737 MAX to the A320 NEO stating that the aircraft would never be equal, that the 737 MAX has a superior design as compared to the A320 NEO, that 737 MAX customers would obtain better operating costs and fuel efficiency than the A320 NEO, and that customers could save up to $4 million dollars by choosing the 737 MAX over the A320 NEO.

258.    However, these slides did not disclose any issues the 737 MAX experienced as outlined in paragraph 249, *supra*, or even the existence of MCAS.

259.    Other slides stated that the 737 MAX factory rollout and first flight were on time and according to plan.

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

260.    However, this was untrue.  The slide did not disclose that Boeing rushed the timeline for the 737 MAX rollout and implemented shortcuts such as MCAS, or that Boeing's timeline to develop and rollout the 737 MAX was far more compressed than for Boeing's other aircraft.

261.    Another slide depicted changes to the 737 MAX relative to the 737 NG highlighting six differences including: Aft body aerodynamic improvements, CF LEAP-1B engines, MAX AT Winglets, the Boeing Sky Interior, the Onboard Network System, and Advanced flight deck displays/systems.

262.    This slide did not disclose the other changes present in the 737 MAX, which caused the issues explained in paragraph 249, *supra*.

263.    Several other pages of the presentation were dedicated to the CF LEAP-1B engines and featured their alleged benefits such as long-range fuel performance, high-cycle reliability and durability, better fuel efficiency, and reduced drag.

264.    These slides did not disclose that the engines caused issues with the 737 MAX as explained in paragraph 249, *supra*.

265.    In fact, multiple slides discussed the 737 MAX's fuel efficiency in depth, explaining that the 737 MAX would save customers money over time from fuel costs alone.

266.    Not one slide, however, disclosed that the engines that allowed the 737 MAX to be more fuel efficient also caused the issues in paragraph 249, *supra*.

267.    Several other slides detailed differences between the 737 MAX and 737 NG, focusing on differences relating to the wings, aircraft performance, navigation, fly-by-wire spoilers, digital bleed control, and new technology.

268.    But these slides, like others, hid the vital differences between the 737 MAX and

-54-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

737 NG, including MCAS and that the use of new engines in the 737 MAX caused the problems identified in paragraph 249, *supra*.

269.    Boeing had more opportunities to disclose MCAS in this presentation in the slides that highlighted changes in the 737 MAX flight deck technology.  Instead, Boeing highlighted the similarities between the 737 MAX and prior iterations of the 737, as well as other Boeing aircraft, claimed that LOT 737 MAX flight crews would feel "at home" in the 737 MAX, and omitted the key differences between the 737 MAX and prior versions of the 737, as well as Boeing's other aircraft that LOT was operating and familiar with.

270.    In yet more slides, Boeing discussed the 737 MAX's lighter structure based on the 737 NG design.

271.    But Boeing did not disclose that with the lighter structure inherent to the 737 NG, Boeing affixed larger, heavier, engines to create the 737 MAX, which altered the 737 MAX's center of gravity  and caused the problems set forth in paragraph 249, *supra*.

272.    The presentation also featured many of the 737 MAX's new sophisticated systems such as the Onboard Network Systems, which "provides access to more data for improved operations" and stated that systems provided troubleshooting and data collection, advanced airplane health monitoring, wireless data loading, and at least fifteen (15) other new systems on the 737 MAX that were not present on the 737 NG.

273.    But here as well, Boeing did not mention the existence of MCAS, a system that was a cause of two fatal crashes.

274.    Finally, the presentation boasted in several slides that the 737 was the most reliable aircraft in the world, as if the 737 MAX would carry on the tradition of the 737 family, and as if the all of those aircraft were the same.

-55-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

275.   These slides, like others, did not factually distinguish between the 737 NG and 737 MAX for purposes of reliability and safety, including new systems on the 737 MAX that ultimately would cause the aircraft to be grounded while the 737 NG was not, meaning that they are not equals in reliability.

276.   LOT reasonably expected this presentation to be accurate and complete.

277.   LOT also reasonably expected Boeing's representatives to be honest and forthcoming about the 737 MAX aircraft, and the differences between the 737 MAX and 737 NG, which was among the purposes of the presentation.

278.   LOT could not have independently verified the statements in this presentation.

279.   Because LOT had no way of knowing whether the facts set forth in Boeing's presentation were accurate and complete, LOT was justified in relying on Boeing to be truthful.

280.   In fact, LOT representatives asked Boeing's representatives questions at this meeting about the differences between the 737 NG and the 737 MAX.

281.   However, much like in the text of the foregoing slide presentation, Boeing purposefully hid the differences between the aircraft consistent with its strategy to emphasize the commonalities between the 737 NG and 737 MAX, to hide the differences, and ensure that greater regulatory scrutiny could be avoided.

282.   In response to LOT's questions, and at other times throughout the presentation, Boeing assured LOT's representatives that the 737 MAX would retain the basic design and unparalleled safety record of the 737 NG.  Boeing also assured LOT that the 737 MAX would require no new simulator training.

283.   This was particularly significant to LOT because at the time LOT had no pilots qualified to fly any of the aircraft that it was considering acquiring, thereby making the costs

-56-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

associated with the training required for each aircraft a significant consideration.

284.   Similarly, Boeing assured LOT that the documentation that it would provide to LOT in the event that LOT acquired 737 MAX aircraft would include all materials and information necessary to safely operate the aircraft.

285.   These representations all proved to be false.

286.   LOT representatives also questioned Boeing's representatives regarding the differences between 737 MAX and the A320 NEO.

287.   In response, Boeing hid the true differences between the two aircraft.

288.   Although this Boeing presentation did not specifically address the Bombardier C-Series, LOT questioned Boeing concerning the differences between its aircraft and the Bombardier aircraft.

289.   As with Boeing's responses to questions concerning the A320, Boeing hid the true differences between the aircraft.

290.   Mr. Wallen gave another presentation to LOT's representatives at LOT's facilities in February 2016.

291.   This presentation was entitled "Market and Product Update" and was 63 pages.

292.   This presentation also featured slides showing Boeing aircraft with LOT livery on them, demonstrating that this presentation was targeted toward LOT specifically.   The presentation also was made to the LOT representatives identified above.

293.   One purpose of the presentation was to induce LOT to acquire additional Boeing aircraft, and specifically 737 MAX aircraft.

294.   As with the prior February 2016 presentation, at this time Boeing knew of the facts set forth in paragraph 249, *supra*.

-57-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

295.    This presentation, consistent with Boeing's other presentation to LOT, and Boeing's communications to the public and the FAA and EASA generally, also described 737 aircraft as a family without differentiating the prior iterations from the 737 MAX.

296.    This added to LOT's reasonable belief that the 737 MAX was essentially a re-engined 737 NG, but more fuel efficient and with limited design changes.

297.    In this presentation, Boeing claimed that it made the most efficient, capable, and flexible aircraft: the 737 MAX.

298.    However, Boeing did not mention that in the process of building the 737 MAX, it strayed from the time-tested 737 NG design by including MCAS, and introducing the LEAP 1-B engines caused the problems identified in paragraph 249, *supra*.

299.    During this meeting, Boeing's representatives also discussed updates to the 737 MAX.

300.    However, while discussing these updates, Boeing did not disclose MCAS or the issues described in paragraphs 249, *supra*, or even that MCAS was undergoing revisions at that time.

301.    LOT reasonably expected this presentation to be accurate and complete.

302.    LOT also reasonably expected Boeing's representatives to be honest and forthcoming about the 737 MAX aircraft, and the differences between the 737 MAX and prior iterations of the 737, which was among the purposes of the presentation.

303.    LOT could not have independently verified the statements in this presentation.

304.    Because LOT had no way of knowing whether the facts set forth in Boeing's presentation were accurate and complete, LOT was justified in relying on Boeing to be truthful.

305.    In fact, LOT representatives asked Boeing's representatives questions at this

-58-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

meeting about the differences between the 737 NG and the 737 MAX.

306.    However, much like in the text of the foregoing slide presentation, Boeing hid the differences between the aircraft.

307.    In response to LOT's questions, and at other times throughout the presentation, Boeing assured LOT's representatives that the 737 MAX would retain the basic design and unparalleled safety record of the 737 NG.

308.    Boeing again assured LOT that the 737 MAX's cockpit commonality with prior 737 iterations would drive no new simulator training.

309.    Similarly, Boeing assured LOT that the documentation that it would provide to LOT in the event that LOT acquired 737 MAX aircraft would include all materials and information necessary to safely operate the aircraft.

310.    These representations all proved to be false.

311.    At this time, LOT representatives also questioned Boeing's representatives regarding the differences between 737 MAX and the A320 NEO.

312.    In response, again, Boeing hid the true differences between the two aircraft.

313.    LOT also questioned Boeing concerning the differences between its aircraft and the Bombardier's during the course of this presentation.

314.    As with Boeing's responses to questions concerning the A320, Boeing hid the true differences between the aircraft.

315.    In mid-April 2016, LOT re-issued its leasing requests for proposals, this time to 47 lessors, seeking information regarding their available narrow-body aircraft.

316.    LOT was presented with options for 111 aircraft, including the A320 NEO, the 737 MAX, and the 737 NG.

-59-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

317.   Then, in the same month, LOT's Chairman and CEO travelled with some of LOT's technical representatives to meet with Boeing representatives at Boeing's facility near Seattle, Washington, to discuss, among other things, LOT's potential acquisition of 737 MAX aircraft.

318.   By this time, in addition to the facts set forth in paragraph 249, *supra*, Boeing also knew at least the following with respect to the 737 MAX:

   a.   Boeing had already changed the first iteration of MCAS to a second, far more powerful version that further distinguished the 737 MAX from the 737 NG;

   b.   The second iteration of MCAS was at that time undergoing testing with an uncertain outcome;

   c.   The second iteration of MCAS was already showing problems during testing including an unacceptable risk of an aerodynamic stall;

   d.   The second iteration of MCAS operated in a much broader flight envelope than the first iteration;

   e.   Boeing intended to delete all references to MCAS from the 737 MAX FCOM, thus further concealing it from operators such as LOT; and

   f.   Boeing employees were concerned with MCAS's ability to activate repeatedly, a feature that would play a large role in the two 737 MAX crashes that resulted in the grounding of the 737 MAX and LOT's losses.

319.   Boeing described the 737 MAX to LOT's Chairman and CEO, as well as the LOT technical representatives, explained the differences between the 737 NG and the 737 MAX, and LOT's representatives asked questions concerning the two aircraft.

320.   In response to those questions, and at other times throughout the meetings, Boeing assured LOT's representatives that the 737 MAX would retain the basic design and unparalleled safety record of the 737 family.

321.   Boeing also assured LOT's representatives that the 737 MAX's cockpit commonality with prior 737s would ensure that no new 737 MAX simulator training would be required.

-60-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

322.    Similarly, Boeing assured LOT that the documentation that it would provide to LOT in the event that LOT acquired 737 MAX aircraft would include all materials and information necessary to safely operate the aircraft.

323.    These representations all proved to be false.

324.    LOT reasonably expected the information conveyed during meetings to be accurate and complete.

325.    LOT also reasonably expected Boeing's representatives to be honest and forthcoming about the 737 MAX aircraft, and the differences between the 737 MAX and 737 NG, which was among the purposes of the meeting.

326.    Neither LOT as a whole nor its representatives at this meeting could have independently verified the statements made during these meetings.

327.    Because LOT had no way of knowing whether the facts set forth by Boeing were accurate and complete, LOT was justified in relying on Boeing to be truthful.

328.    After this meeting, LOT still was not convinced that the 737 MAX was its best option.

329.     Accordingly, LOT requested from the lessor from which it would ultimately acquire 737 MAX aircraft, a proposal for six (6) 737 NGs or A320 NEOs.

330.    At this time, LOT believed based on Boeing's presentations that it might ultimately want to acquire 737 MAX aircraft, but that if LOT was going to select 737 aircraft, it should first acquire 737 NGs to serve as a bridge to LOT's operation of the 737 MAX.

331.    Accordingly, Mr. Wallen returned to meet with LOT again later in April 2016 at LOT's facilities to convince LOT to acquire 737 MAX aircraft as opposed to the others it was considering.

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

332.    The same significant number of LOT representatives who attended prior Boeing 737 MAX presentations made at LOT's facilities attended this meeting as well.

333.    At the time of this meeting, Boeing knew with respect to the 737 MAX, at least the information set forth in paragraphs 249 and 318, *supra*.

334.    At the April 2016 meeting, Mr. Wallen gave a presentation entitled "Value Assessment of Market Choices… Which airplane provides the best long-term value?" to LOT representatives.

335.    This presentation also featured slides showing Boeing aircraft with LOT livery on them, demonstrating that this presentation was targeted toward LOT specifically.

336.    At this time, Boeing's fraud continued.

337.    For example, one slide focused on when and how to replace a 737 Classic aircraft, which LOT was at that time operating, and boasted the 737 Classic's longevity in operation, familiarity, capability, and capacity to generate revenue.  This slide tied the 737 family, including the 737 MAX, together, presenting them as iterations of the same aircraft instead of the new aircraft, which the 737 MAX really is.

338.    Next, Boeing presented a slide also present in one of its February 2016 presentations, wherein Boeing described over thirty (30) innovations made to 737 aircraft since 2000, including several new systems.

339.    But this slide omitted MCAS, and the need for MCAS.

340.    In the next several slides, Boeing continually emphasized the 737 "legacy" and stated that the legacy was "worth preserving," again emphasizing the commonality between the 737 MAX and its predecessors without explaining the key differences, including MCAS, as well as the problems identified in paragraphs 249 and 318, *supra*.

-62-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

341.    These slides culminated with the same timeline presented in one of the February 2016, which showed the 737's evolution from 1980 through 2020 and highlighting the changes over time.

342.    This slide, like others, and like the same timeline presented in February 2016, omitted MCAS, the need for MCAS, and that the 737 MAX had the problems set forth in paragraphs 249 and 318, *supra*.

343.    Boeing's use of the same slides emphasizing the commonality between prior 737 models and the 737 MAX, which omitted key differences, was essential to Boeing's message and its continued pattern of misrepresentation.

344.    The slide also featured a timeline entitled "Extending the 737 legacy and market advantage," showing the progression from the 737 Classic to the 737 MAX.

345.    This slide highlighted certain features of the 737 MAX including its fuel efficiency and new LEAP 1-B engines, but as before omitted the relevant differences.

346.    Slides in the presentation made direct comparisons between the 737 family of aircraft and the A320 family, and discussed a "value assessment" of the two families of aircraft, concluding that the 737 family of aircraft was more valuable than the A320 family.

347.    The slides pointed out several key technical differences between the 737 family and the A320 family, but none noted the existence of, or need for, MCAS.

348.    Indeed, no slide in the presentation discussed the true differences between the 737 MAX and the A320 NEO, namely that the 737 MAX utilized MCAS, a system that would eventually cause two fatal air crashes as well as the issues described in paragraphs 249 and 318, *supra*.

349.    Another slide compared the 737 MAX to the 737 NG, claiming that the aircraft

-63-

have a 71% commonality.

350.    Though these slides compared the 737 MAX and the 737 NG, they did not mention that the 737 MAX, as compared to the 737 NG, experienced the issues explained in paragraphs 249 and 318, *supra*.

351.    The presentation also discussed flight crew economics, and stated that LOT has had a long and successful partnership with Boeing in its operation of the 737.

352.     This slide, however, did not truthfully differentiate between the 737 MAX and prior versions of the 737 that LOT was operating.

353.    Yet another slide again stressed that the 737 MAX had maximum flight deck commonality with prior 737s, would require pilots to take only interactive computer-based training that would only take two days before they could be certified to fly the 737 MAX, and stated again that there was no full flight simulator training required.

354.    The slide also described the differences training as "Level B training".

355.    Ultimately, Boeing settled on Level B transition training that could be completed on a tablet computer in less than one hour.[103]

356.    That training proved to be insufficient, however, was one of the causes of the grounding, and the 737 MAX recertification requires pilot training above Level B.

357.    The April 2016 presentation also stated that LOT would save money in pilot costs by acquiring the 737 MAX as opposed to aircraft from other manufacturers.

358.    However, again, this slide did not discuss any of the issues with the 737 MAX as

---

[103] Gregory Wallace, Drew Griffin and Madeleine Ayer, *Boeing promoted 737 MAX as requiring little additional pilot training*, CNN, March 22, 2019, https://www.cnn.com/2019/03/22/politics/boeing-737-manual/index.html; *see also* Oren Liebermann, *737 pilots trained for Max 8 with short online course*, CNN, March 22, 2019, https://www.cnn.com/2019/03/22/us/max-8-boeing-self-administered-courses-lion-air-ethiopian-airlines-intl/index.html.

-64-

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

described in paragraphs 249 and 318, *supra*.

359.    LOT reasonably expected this presentation to be accurate and complete.

360.    LOT also reasonably expected Boeing's representatives to be honest and forthcoming about the 737 MAX aircraft, and the differences between the 737 MAX and 737 NG, which was among the purposes of the presentation.

361.    LOT could not have independently verified the statements in this presentation.

362.    Because LOT had no way of knowing whether the facts set forth in Boeing's presentation were accurate and complete, LOT was justified in relying on Boeing to be truthful.

363.    In fact, at this time too, LOT representatives asked Boeing's representatives questions about the differences between the 737 NG and the 737 MAX.

364.    However, much like in the text of the foregoing slide presentation, and consistent with its prior conduct, Boeing hid the differences between the aircraft.

365.    In response to LOT's questions, and at other times throughout the presentation, Boeing assured LOT's representatives that the 737 MAX would retain the basic design and unparalleled safety record of the 737 family.

366.    Boeing again assured LOT that the 737 MAX's cockpit commonality with the 737 family meant that training for the yet to be released 737 MAX would drive no simulator training.

367.    Similarly, Boeing assured LOT that the documentation that it would provide to LOT in the event that LOT acquired 737 MAX aircraft would include all materials and information necessary to safely operate the aircraft.

368.    These representations all proved to be false.

369.    At this time, LOT representatives again questioned Boeing's representatives regarding the differences between 737 MAX and the A320 NEO.

-65-

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

370.     Yet again Boeing hid the true differences between the two aircraft.

371.     Although this Boeing presentation did not specifically address the Bombardier C-Series, LOT questioned Boeing concerning the differences between its aircraft and Bombardier's.

372.     As with Boeing's responses to questions concerning the A320, Boeing hid the true differences between the aircraft.

373.     Mr. Wallen and his colleagues returned to LOT's facilities yet again in May 2016, to discuss the 737 MAX, at which time he gave another presentation.

374.     By this time, in addition to the issues identified in paragraphs 249 and 318, *supra*, Boeing knew at least the following with respect to the 737 MAX:

> a.   In testing, the second iteration of MCAS was affecting the handling characteristics of the 737 MAX in low speed situations at high angles of attack, the precise situation encountered in the Lion Air and Ethiopian Airlines crashes, thus further differentiating the 737 MAX from its predecessors in key ways; and that accordingly

> b.   Further revisions to the second iteration of MCAS would be needed.

375.     The May 2016 presentation focused on LOT's potential investment in additional 737 NG as opposed to 737 MAX aircraft, but Boeing still discussed the 737 MAX.

376.     This presented yet another opportunity for Boeing to be truthful about the differences between the 737 NG and 737 MAX, and about the 737 MAX generally.

377.     Yet, the text of the presentation shows almost no significant differences between the two aircraft other than fuel efficiency.

378.     And during this presentation Mr. Wallen made no distinction between the 737 NG and the 737 MAX other than fuel efficiency.

379.     LOT reasonably expected this presentation to be accurate and complete.

380.     LOT also reasonably expected Boeing's representatives to be honest and

forthcoming about the 737 MAX aircraft, and the differences between the 737 MAX and 737 NG, which was among the purposes of the presentation.

381.    LOT could not have independently verified the statements in this presentation.

382.    Because LOT had no way of knowing whether the facts set forth in Boeing's presentation were accurate and complete, LOT was justified in relying on Boeing to be truthful.

383.    During this meeting, LOT representatives again asked Boeing's representatives questions at this meeting about the differences between the 737 NG and the 737 MAX.

384.    However, much like in the text of the foregoing slide presentation, Boeing hid the differences between the aircraft.

385.    In response to LOT's questions, and at other times throughout the presentation, Boeing assured LOT's representatives that the 737 MAX would retain the basic design and unparalleled safety record of the 737 family, and again made its prior assurances regarding the training necessary to pilot the 737 MAX, and the documentation that LOT would receive at delivery if it acquired the 737 MAX.

386.    These representations all proved to be false.

387.    Right after this presentation, Boeing travelled to LOT's facilities in Poland to meet with LOT to negotiate financial commitments that Boeing would provide to LOT if LOT leased 737 MAX and/or 737 NG aircraft.   During these negotiations, Boeing repeated the same assurances to LOT concerning that 737 MAX that it had made previously, and that all proved to be false.

388.    In the same month, Boeing sent to LOT key performance data concerning both the 737 NG and the 737 MAX that LOT ultimately would use to guide its decision determining which aircraft it would acquire.

-67-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

389.     At the same time, Boeing sent LOT a spreadsheet setting forth route and network data that LOT could use to determine how operating the 737 MAX and/or the 737 NG could assist LOT to achieve its profit and growth strategy.  The spreadsheet also set forth the number of passengers and amount of cargo that LOT could carry based on its selection of either of the two 737 aircraft.

390.     This data, at least applied to the 737 MAX, would become useless when the aircraft was grounded, the 737 MAX could not be flown anywhere, and rather than contribute to LOT's profit and growth strategy, the grounding would cause LOT millions of dollars in damages.

391.     In the coming month, Boeing guided LOT through the 737 leasing process in an attempt to induce LOT to lease Boeing aircraft, and specifically the 737 MAX.

392.     In fact, Boeing met with LOT at LOT's facilities in early June 2016 to discuss 737 MAX technical items with LOT, and to continue to negotiate the commitments that Boeing was willing to provide to LOT if LOT leased 737 aircraft.

393.     By late June 2016, Monty W. Oliver, Boeing's Senior Vice President for European Sales sent LOT a letter in which Boeing confirmed the commitments that Boeing would provide to LOT if during the next Supervisory Board meeting, LOT's Board voted to authorize the acquisition of six (6) 737 MAX aircraft.  Boeing made separate commitments to LOT if it voted to acquire 737 NG aircraft in addition to the MAX.

394.     The 737 MAX commitments represented millions of dollars in value and demonstrated the lengths to which Boeing was willing to go to induce LOT to acquire 737 MAX aircraft.

395.     LOT's twelve member team whose job it was to put forth a recommendation to LOT's Supervisory Board as to which type(s) of aircraft to acquire then met and completed a

-68-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

detailed analysis of each of the relevant considerations for each potential aircraft set forth in paragraphs 230 through 241, *supra*.

396.    The team concluded that LOT's best strategy toward achieving its growth and profit strategy was to acquire 737 NG aircraft, and to use them as a bridge to the 737 MAX that LOT could acquire later on.

397.    On this basis, LOT's team explained that entering into leases to acquire 737 MAX aircraft at that time made little sense because Boeing's 737 MAX order sheet was so full that LOT presumably would not be able to acquire 737 MAX aircraft in the near term anyway.

398.    This conclusion was based on the responses that LOT had received from lessors in response to its RFP.

399.    Indeed, the 737 NG best fit LOT's plans at that time.

400.    For example, at this time, LOT had only 737 Classic aircraft, the version of the 737 that preceded the 737 NG.

401.    Accordingly, LOT was going to need to hire and train new pilots to fly the newly acquired aircraft regardless of which aircraft LOT ultimately acquired, and to the extent that LOT was going to train some of its existing pilots to operate the 737 NG, those pilots would need new training as well.

402.    The training for pilots to transition from the 737 Classic to the 737 NG is significant, and requires pilot time in the 737 NG simulator.

403.    Thus, LOT planned to train new pilots first in the 737 Classic, then have them transition to the 737 NG, and to have existing 737 Classic pilots simply undergo the 737 NG transition training.

404.    However, the twelve-member LOT team then explained in its recommendation to

-69-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

the Supervisory Board, that contrary to all expectations and market data, it was possible for LOT to acquire 737 MAX aircraft beginning at the end of 2017.

405.    Indeed, so eager was Boeing to ensure that LOT acquired 737 MAX that the team explained to the Supervisory Board that the incentives Boeing had offered LOT if LOT acquired 737 MAX aircraft made the cost differential between the 737 NG and the 737 MAX almost negligible.

406.    Further, the team explained that Boeing had demonstrated to LOT that the differences in training cost as between the 737 NG and 737 MAX was insignificant because any LOT pilot who was going to upgrade from the 737 Classic to the 737 NG would then only have to take a short, computer-based course that would last at most two days before the same pilot would be qualified to fly the 737 MAX (as set forth in paragraph 355, *supra*, the actual training 737 MAX training that Boeing would settle on took only two hours).

407.    This misrepresentation was critical to the team's recommendation.  It was already going to be costly for LOT to train its pilots to operate the 737 NG.  But that training was necessary regardless of whether LOT was going to operate the 737 NG or the 737 MAX.  If the training necessary to operate the 737 MAX was a negligible addition to the training required for the 737 NG, acquiring 737 MAX aircraft would be more palatable to LOT.

408.    Based on Boeing's material misrepresentations and omissions concerning the 737 MAX, LOT believed not only that the 737 MAX was essentially a re-engined 737 NG, except more fuel efficient and with limited design changes, but also that the differences in training required of LOT's pilots as between the 737 NG and MAX would be an almost irrelevant consideration.

409.    Boeing's campaign of material misrepresentations and omissions concerning the

-70-

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

737 MAX convinced the LOT team to recommend that LOT acquire the six (6) 737 MAX aircraft that had become available in the near term in addition to its recommendation that LOT acquire 737 NG aircraft as well.

410.    Indeed, the team explained that the minimal difference in training needed for the 737 NG as compared to the MAX, coupled with the minimal difference in price between the 737 NG and MAX based on the financial incentives that Boeing was providing to LOT, meant that both aircraft were equally affordable.

411.    In the same vein, based on Boeing's presentations and material misrepresentations and omissions to LOT and the public, when the team considered the risks associated with acquiring each type of aircraft it was considering, LOT concluded that the risk of acquiring the 737 NG as opposed to the MAX was essentially the same.

412.    On the basis of Boeing's material misrepresentations and omissions, LOT believed Boeing that flying the 737 MAX required no additional simulator training, it elected to forego its 737 NG-only plan and acquire both aircraft.

413.    On that basis, LOT trained five (5) flight crews per 737 MAX aircraft, meaning that for the 737 MAX aircraft that LOT was going to acquire, it trained 50 crews, including 100 pilots.

414.    Boeing's inducing LOT to reach those conclusions proved not only financially costly, but potentially deadly because LOT's operation of its 737 MAX aircraft prior to the grounding, but for good fortune, could have produced the same deadly crashes that Lion Air and Ethiopian Airlines experienced.

415.    Further, because they were caused by Boeing's endless campaign of misinformation, LOT's conclusions were patently wrong.  The 737 NG and the 737 MAX were

-71-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

not equally affordable, nor did they require essentially the same amount of training.

416.    LOT's 737 NG aircraft have flown without incident while its 737 MAX were grounded for nearly two years.  And to return the 737 MAX aircraft to service, LOT pilots had to undergo expensive, time consuming training.

417.    The problems with the 737 MAX described throughout this Complaint made it inherently different from, and less safe, than the 737 NG.

418.    Notwithstanding the foregoing, on June 21, 2016, the team, which had first believed that acquiring 737 NGs was the best course of action but had been convinced otherwise by Boeing, ultimately recommended to the Supervisory Board that LOT acquire 737 NG and 737 MAX aircraft.

419.    On the basis of Boeing's material misrepresentations and omissions concerning the 737 MAX, on June 24, 2016, LOT elected to sign a Letter of Intent with an aircraft lessor, Air Lease Corporation ("ALC"), to lease the six (6) 737 MAX aircraft that had become available far sooner than LOT had anticipated was possible.

420.    LOT's profit and growth strategy would be ruined by this decision.  Rather than acquiring only 737 NGs and then using those aircraft as a bridge to the 737 MAX several years down the road, LOT, fraudulently induced by Boeing, elected to begin its acquisition of 737 MAX aircraft, a model that should have remained under development for several more years until Boeing could meet the promises it had made to LOT, regulators, other operators, and the public, and until Boeing could make the aircraft safe and airworthy.

421.    In the months leading up to LOT's signing of the ALC Lease Agreement for the 737 MAX aircraft, which occurred in September 2016, Boeing continued to meet with LOT, and during those meetings, Boeing continued to make the same material misrepresentations and

-72-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

omissions concerning the 737 MAX described above.

422.    For example, LOT and its lessor met with Boeing at Boeing's Washington State facilities in July 2016 to discuss 737 MAX specifications during which time Boeing repeated its prior material misrepresentations and omissions.

423.    LOT's representatives, including but not limited to Krzysztof Moczulski, Tadeusz Stachera, and Władysław Metelski, met for three days with Boeing employees, including but not limited to Bryan Johnson and Andrew Bon to discuss technical and configuration details relating not only to the 737 MAX that LOT would be acquiring, but also to discuss the same details concerning 737 NG aircraft that LOT intended to acquire, and the differences between the two aircraft.

424.    Despite being under a legal duty to do so, Boeing did not correct any of its prior misrepresentations or omissions or explain to LOT the facts set forth in paragraphs 249, 318 and 374, *supra*.

425.    Specifically, Boeing's employees stressed the commonality between the 737 MAX and the 737 NG to LOT's employees to convince LOT that in addition to the six (6) 737 MAX aircraft for which LOT had already signed a Letter of Intent, for the additional narrow-body aircraft that LOT planned to lease in or about 2018, LOT should choose the 737 MAX rather than the 737 NG.

426.    Indeed, during the three days of these meetings, Boeing stressed to LOT that the 737 MAX had to have only minor differences as compared to the 737 NG otherwise Boeing would be unable to obtain an amended Type Certificate for the 737 MAX.

427.    At this time, Boeing had already lied to the FAA about the differences between the 737 NG and the 737 MAX, and would continue to do so in the coming months before the

-73-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

FAA added the 737 MAX to the 737 Type Certificate, including by hiding the second iteration of MCAS, how much more powerful it was than the first iteration that the FAA was aware of, and why the second iteration was needed, and how much more likely it was to operate than the first iteration.

428.    During these three days, Johnson and Bon also gave LOT a presentation regarding the differences between the 737 NG and 737 MAX.

429.    This presentation touted the 737 MAX's greater fuel efficiency, longer range, and new engines, among other features, as compared to the 737 NG.

430.    But as with all presentations that Boeing gave to LOT, it omitted the key differences between the 737 NG and 737 MAX described throughout this Complaint.

431.    At this meeting, LOT's employees questioned Boeing's concerning the differences between the two aircraft, and yet again Boeing's responses focused only on the commonalities between the two aircraft, with the exception of the fuel efficiency benefits of the 737 MAX.

432.    Boeing's purposeful, continued material misrepresentations and omissions to the LOT representatives were a deliberate attempt to induce LOT to acquire 737 MAX aircraft with a mistaken understanding of the aircraft to be acquired.

433.    Because Boeing had such superior knowledge of its aircraft as compared to LOT, there was no way for LOT to have known those facts on its own.

434.    LOT relied on the statements made by Boeing employees directly to LOT's representatives, as well as the statements of Boeing's website and in press releases, in connection with its decision to proceed from a Letter of Intent for the 737 MAX aircraft to signing a Lease Agreement, rather than negotiating with ALC to switch its order from 737 MAX aircraft to 737 NGs, as LOT originally intended.

-74-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

435.    But before LOT signed its first 737 MAX Lease Agreement, Mr. Wallen gave yet another false presentation to LOT on behalf of Boeing in Warsaw during September 2016.

436.    The presentation was LOT-specific because all aircraft depicted on the slides had LOT livery, and because the presentation was given to the significant contingent of LOT officers and employees identified above.

437.    By the time of this presentation, Boeing knew, in addition to the facts set forth in paragraphs 249, 318 and 374, *supra*, at least the following with respect to the 737 MAX:

    a.  The second iteration of MCAS had been finalized and would be installed on all new 737 MAX aircraft;

    b.  Boeing ARs had again raised concerns regarding MCAS's susceptibility to single AOA sensor failures, an issue that was not corrected in the final version of MCAS;

    c.  Boeing test pilots were having trouble countering repeated MCAS activation, as occurred in the Lion Air and Ethiopian Air crashes;

    d.  As a result of the foregoing, a 737 MAX aircraft could have a large "mistrim";

    e.  Boeing had not changed its representation to the FAA concerning how much MCAS could move the aircraft's horizontal stabilizer as compared to the first iteration of MCAS, or that MCAS could reset itself even if a pilot responded to MCAS's nose down command, creating the possibility, as occurred in the Lion Air and Ethiopian Airlines crashes, that MCAS could push an aircraft to its nose down limit, causing the pilot to lose control of the aircraft and the aircraft to crash into the ground;

    f.  Boeing had not changed its System Safety Analysis submitted to the FAA to categorize MCAS as a "catastrophic" failure risk rather than a "major" one even though it should have; and accordingly

    g.  EASA would be under the same misimpression concerning MCAS as the FAA.

438.    The presentation Mr. Wallen gave was titled "737 MAX-Product and Flight Test Updates; 787-8/9 Review Topics."

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

439. This presentation was made within a month of Boeing having completed all MCAS testing, and settling on a final version of MCAS that would be uploaded to all 737 MAX aircraft.

440. Despite being called "Flight Test Updates," which presumably would have included information from the most recent MCAS flight tests, MCAS is not referenced in any slide of this presentation, and was not addressed verbally during the presentation either.

441. This presentation continued Boeing's pattern of affirmative material misrepresentations and deliberate omissions.

442. For example, one slide reviewed the specifics of the 737 MAX aircraft that LOT would be acquiring after its leases were executed (but which LOT had not yet committed to acquire), and emphasized the differences that LOT could expect in the 737 MAX as opposed to its other 737 aircraft, but omitted any mention of MCAS, the need for MCAS or the effects of the LEAP1-B engines, and their placement and mounting on 737 MAX aircraft.

443. Another slide continued to describe the 737 MAX as extending the legacy of the 737, pointing to some changes in the 737 MAX as compared to prior versions of the 737, but included nothing concerning the changes brought about by the use of the LEAP1-B engines, the need for MCAS, MCAS itself, or how MCAS functioned.  In doing so, this slide created the impression that the 737 MAX was nothing but a more fuel efficient 737 NG, when in reality it was entirely different aircraft.

444. Yet another slide listed differences that LOT could expect in the 737 MAX and contained the same misrepresentations and material omissions described above.

445. A different slide stated that the 737 MAX aircraft performance was meeting Boeing's commitments, had undergone flight testing, and would be dual certified by the FAA and

-76-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

EASA without describing the recent results of the MCAS flight tests, why those tests were needed, or revealing that the FAA and EASA certifications would be procured by Boeing's fraud because Boeing was withholding key information from those regulators and misrepresenting MCAS's power, and when and how often it would engage.

446.    Next, yet another slide stated that in creating the 737 MAX, Boeing was identifying, mitigating, and minimizing risks, but that was untrue because Boeing's need for MCAS on the 737 MAX, and its implementation actually exacerbated risks, as would be proven by two fatal crashes and a near two-year grounding.

447.    Boeing's statement in the same slide that the 737 MAX aircraft that LOT would be receiving if it executed the leases for those aircraft would meet all performance guarantees that LOT would be getting from Boeing also was untrue because the warranties that Boeing would be providing to LOT would fail their essential purpose, and the aircraft would not meet the Detail Specification that Boeing would provide to LOT as guaranteed in those warranties.  It also was untrue because that Detail Specification would be scrubbed of any mention of MCAS, the need for MCAS, or how it functions.

448.    This presentation provided yet another opportunity for Boeing to be truthful about the 737 MAX.

449.    Yet again Boeing made the same material misrepresentations and omissions, and failed to correct its prior material misrepresentations and omissions.

450.    LOT reasonably expected this presentation to be accurate and complete.

451.    LOT also reasonably expected Boeing's representatives to be honest and forthcoming about the 737 MAX aircraft.

452.    LOT could not have independently verified the statements in this presentation.

-77-

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

453.    Because LOT had no way of knowing whether the facts set forth in Boeing's presentation were accurate and complete, LOT was justified in relying on Boeing to be truthful.

454.    Again, LOT representatives asked Boeing's representatives questions at this presentation concerning the 737 MAX.

455.    However, much like in the text of the foregoing slide presentation, Boeing hid and misrepresented the truth.

456.    Accordingly, on September 30, 2016, after being guided by Boeing through the leasing process, and relying on Boeing's material misrepresentations and omissions, LOT formally entered into a Lease Agreement with a nonparty lessor, ALC, to lease six (6) 737 MAX aircraft.

457.    In doing so, LOT was foregoing the possibility of either pulling out of its Letter of Intent with ALC, or negotiating with ALC to switch from the 737 MAX to other aircraft, including the 737 NGs, the sole aircraft that LOT was initially intent on acquiring and using as a bridge to operating the 737 MAX years down the road.

458.    Because Boeing knew that LOT has executed the ALC Lease Agreement for 737 MAX aircraft, Boeing also knew that ALC would be assigning to LOT certain rights the lessor had that arise from the Aircraft General Terms Agreement ("AGTA") and Purchase Agreements it entered into with Boeing.

459.    For example, ALC would be assigning its rights arising from the Boeing Product Assurance Document to LOT, and the warranties contained in the AGTA (the "Warranties").

460.    LOT would not have agreed to this Lease Agreement, based upon which those rights would be assigned to LOT (including the limitations therein), but for Boeing's material misrepresentations and omissions.

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

461.    LOT had the opportunity to agree to similar assignments and limitations with respect to other aircraft, but elected to forego those opportunities based on Boeing's material misrepresentations and omissions, which were made with the knowledge that LOT would be the ultimate recipient of those rights and limitations on those rights.

462.    After that Lease Agreement was signed, in October 2017, Boeing provided LOT another presentation, this one written by Boeing's Chief Technical Pilot, Mark Forkner, the individual who bragged about "jedi mind tricking" regulators into certifying the 737 MAX, and foreign carriers into acquiring 737 MAX aircraft, and who the DOJ found, in their recent indictment of Mr. Forkner, "deprived" airlines, such as LOT, of "economically material information—including the fact that FORKNER withheld MCAS from the FAA AEG . . . ."[104]

463.    This presentation provided Boeing yet another opportunity to correct its prior material misrepresentations and omissions concerning the 737 MAX generally, and MCAS specifically.

464.    Indeed, the 61-page presentation was titled "737 NG to MAX Differences," and thus naturally should have included information concerning the second iteration of MCAS because by the time of this presentation Boeing had already finalized that version, and was loading it onto 737 MAX aircraft.

465.    Yet tellingly, MCAS appears nowhere in the presentation.

466.    Instead, the presentation focuses on, among other things: (1) the LEAP 1-B engine without setting forth the negative consequences of adding that engine to the existing 737 airframe; (2) fly-by-wire spoilers; (3) avionics; and (4) changes to the exterior and interior of the aircraft.

---

[104] Indictment of Mark A. Forkner, *United States of America v. Mark A. Forkner*, No. 4-21CR-268-0 (N.D. Tex.  Oct. 14, 2021), at ¶34.d, available at: https://www.justice.gov/opa/press-release/file/1442191/download.

-79-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

467.    It also focuses extensively on a system known as the roll command alerting system ("RCAS"), explaining how an indication that the system had engaged would arise, and the training associated with RCAS.

468.    Boeing could have presented the identical information for MCAS as it did RCAS, but purposefully elected not to.

469.    This presentation also focused on 737 MAX differences training, emphasizing that no new simulator training would be required, a problem that civil aviation regulators around the world would have to correct at the time they re-certified the 737 MAX for flight.

470.    The presentation also included supporting information, which went through details of several different parts of the aircraft, including the nose and engines, but of course did not explain either the effect of the new LEAP 1-B engines on the 737 MAX or how it would cause the nose to be pushed down when MCAS activated.

471.    The presentation also shows the flight control panel from which an MCAS indicator light had been removed.

472.    As before, LOT relied on Boeing for the accuracy and completeness of this presentation.

473.    Boeing had superior knowledge of the content of this presentation, and accordingly, LOT could not ascertain the truthfulness or completeness of the presentation.

474.    But yet again, this presentation was replete with material misrepresentations and omissions that would only come to light after two fatal 737 MAX crashes and its worldwide grounding.

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

475.    Had LOT known the truth regarding the 737 MAX, even though it already had executed a Lease Agreement for six of those aircraft, it would have negotiated with its lessor to switch to different aircraft, and avoided the losses it suffered.

476.    In December 2016, Boeing sent employees including but not limited to its Regional Director Kathy Henneford, to meet with LOT's 737 personnel, including but not limited to Mateusz Szyguła, LOT's 737 Director of Crew Training, at LOT's facilities in Warsaw.

477.    The meeting lasted approximately four hours, during which time the Boeing employees instructed their LOT counterparts on 737 NG to 737 MAX differences training.

478.    The Boeing employees also met with LOT's 737 pilots who were going to undergo training to pilot the 737 MAX.

479.    Boeing delivered a four-page presentation to LOT concerning its entitlement to free 737 MAX training from Boeing, and set forth the materials that each trained individual would need.

480.    During this meeting, yet again, Boeing did not mention MCAS despite covering all other differences between the 737 NG and 737 MAX.

481.    This meeting offered Boeing yet another opportunity to correct its prior material misrepresentations and omissions concerning the 737 MAX, but again, despite knowing that LOT would be relying on the representations made during this meeting, Boeing elected to again continue its pattern of fraud.

482.    Then, in early January 2017, Boeing employee Casey Goelzer delivered another presentation to LOT entitled "737 MAX & 787 Review for LOT."

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

483.   This presentation offered Boeing the opportunity to correct its prior material misrepresentations and omissions made to LOT, and to inform LOT of the safety-critical MCAS information that Boeing knew but had been withholding from LOT.

484.   Indeed, by the time of this presentation, in addition to the facts set forth in paragraphs 249, 318, 374, and 437, *supra*, Boeing also knew at least the following with respect to the 737 MAX:

a.   That MCAS was "running rampant" in flight simulator testing;

b.   That Boeing test pilots were not being told of MCAS issues;

c.   That the MCAS System Safety Analysis that had by this time been submitted to and approved by the FAA contained a number of false statements;

d.   That like the FAA, EASA would rely on those false statements;

e.   That its MCAS System Safety Analysis was non-compliant with 14 C.F.R. § 25.1309.

f.   That Boeing also violated FAA's Airworthiness Standards for Commercial Aircraft, 14 C.F.R. § 25.203(a) – Stall Characteristics, which states in part "[n]o abnormal nose-up pitching may occur…. In addition, it must be possible to promptly prevent stalling and to recover from a stall by normal use of the controls."

g.   That Boeing had falsely told the FAA that MCAS would be deleted from the FCOM because it only operated "way outside the normal operating envelope";

h.   That Boeing had "jedi-mind trick[ed]" regulators into approving only Level B training for 737 MAX operators;

i.   That Boeing's representatives were using the same "jedi-mind tricks" to induce foreign operators such as LOT to acquire 737 MAX aircraft; and

j.   That operators including LOT would not know of MCAS's existence when operating the 737 MAX.

485.   Yet each of the foregoing was omitted from this January 2017 presentation.

486.   Like Boeing's prior presentations, rather than correct Boeing's prior history of providing misinformation to LOT, this one continued to do the same.

-82-

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

487.    For example, one slide stated that the 737 MAX was meeting its performance commitments even though that proved to be untrue at the time the aircraft were delivered to LOT.

488.    The same slide said that flight testing was progressing well even though MCAS testing was demonstrating that the system was "running rampant" in a manner that would later cause the Lion Air and Ethiopian Airlines crashes.

489.    Yet another slide indicated that flight testing simulated real life operations, but omitted that one of those potential operations would be the activation of MCAS, and a pilot's inability to counteract MCAS, leading to a potential catastrophic crash.

490.    Next, another slide stated that as between the 737 NG and 737 MAX, they had maximum flight deck commonality, but omitted that to achieve such commonality, Boeing removed an MCAS indicator light so that it could hide MCAS's existence from operators.

491.    The same slide stated that the Level B training required to be certified on the 737 MAX would be computer-based, would take one day, and that no simulator or fixed device training would be needed.  When the 737 MAX was later recertified, those assertions were proven false.

492.    Yet another slide guaranteed that the 737 MAX was on track to meet all performance guarantees, even though that would prove untrue of all 737 MAX aircraft delivered to LOT.

493.    The same slide stated that the 737 MAX would be "right at first flight," which was proven untrue by the Lion Air and Ethiopian Airlines crashes, which could have just as easily happened to LOT during its 737 MAX operations.

494.    Next, slides showed the additional revenue that the 737 MAX would drive, which all would later be nullified by the grounding.  These slides compared projected revenue operating

-83-

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

the 737 MAX as opposed to the 737 NG or Airbus A320 NEO, two aircraft that were not grounded, and which LOT initially sought to acquire before Boeing's misrepresentations and omissions convinced it to acquire the 737 MAX.

495.    Another slide set forth Boeing's aggressive 737 MAX delivery schedules, which were the product of unreasonably compressed schedules, and much of which would be nullified by the grounding.

496.    Other slides stressed the commonalities between the 737 MAX and the 737 NG without mentioning any of the facts set forth in 249, 318, 374, 437, and 484, *supra*.

497.    Boeing claimed in another slide that it was providing LOT "The Right Information" when that was obviously false, both because of Boeing's material misrepresentations and omissions listed throughout this Complaint.

498.    Finally, other slides bragged about the 737 MAX's reliability showing that the aircraft was monitoring the health of its onboard systems, but failed to set forth that MCAS existed, that it was so susceptible to failure, the need for MCAS, how it functioned, and that unlike with other systems on the 737 MAX would be unable to counteract an MCAS malfunction.

499.    Boeing was under a legal duty to explain the issues with the 737 MAX as described in paragraphs 249, 318, 374, 437, and 484, *supra*.

500.    Boeing was under those legal duties because it knew the 737 MAX was profoundly different than prior 737 models.

501.    In short, despite Boeing's legal duties, Boeing repeatedly misrepresented and concealed the key differences between earlier 737 models and the 737 MAX that would have affected LOT's decision as to whether to go forward with its 737 MAX acquisition, or to attempt

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

to negotiate with its lessor to change models of aircraft even though LOT had already signed one 737 MAX Lease Agreement.

502.    In September 2017, LOT sent its Instructors Jarosław Jackiewicz and Mariusz Papież to Boeing's facilities in London to, among other things, discuss the 737 MAX with Boeing employees.

503.    Boeing continued its pattern of material misrepresentations and omissions during this time.

504.    Had LOT known the truth about the 737 MAX, and specifically that the training it was going to provide to its pilots would be woefully insufficient, it would have attempted to negotiate with its lessor to change its 737 MAX order to 737 NGs, and never would have flown the 737 MAX.

505.    Then, on October 19, 2017, approximately six (6) weeks before LOT was scheduled to take delivery of its first 737 MAX aircraft, Boeing provided LOT updated data that would be used by LOT in furtherance of its profit and growth strategy, including its deployment of the 737 MAX aircraft that it was about to acquire.

506.    Although Boeing knew at that time, as it did throughout its development of the 737 MAX and its presentations to LOT, that the 737 MAX had a condition susceptible to malfunction, and that such malfunction of which could lead to a grounding of the aircraft, Boeing continued to make material misrepresentations concerning the alleged benefits of the 737 MAX, and material omissions concerning its safety-critical flaws.

507.    Because LOT had been convinced by Boeing's material misrepresentations and omissions that only Level-B computer-based training was needed to transition a pilot from the 737 NG to 737 MAX, LOT elected to waste its free 737 training provided by Boeing on the

-85-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

training of eight (8) 737 NG crews, figuring that those crews could be trained to operate the 737 MAX quickly and inexpensively.

508.     Because LOT had been duped by Boeing's year-and-one-half long misinformation campaign, LOT went forward with the deliveries of the 737 MAX aircraft that it had leased pursuant to the September 16, 2016 Lease Agreement.

509.     The leased aircraft that ultimately were delivered to LOT have Manufacturer (Boeing) Serial Numbers ("MSN") 64067, 64068, 43347, 64069, and 43320.

510.     Each of lease aircraft referenced above was to be delivered on a different date.

511.     On December 1, 2017, LOT representatives traveled to a Boeing facility in Washington State to take delivery of the aircraft MSN 64067.

512.     LOT sent a technical team to Boeing, including Pawel Kątnik and Władysław Metelski, to take delivery of the aircraft and to ensure that the aircraft was in conformance with the promises and representations that Boeing had made to LOT as well as in public statements.

513.     For this first delivery, LOT also sent flight attendants and a mechanic for the same reason.

514.     During this time, Boeing continued its pattern of material misrepresentations and omissions set forth above.

515.     During this time, Boeing was also under a legal duty to correct its prior misrepresentations and omissions that created LOT's belief that the 737 MAX was essentially a re-engined albeit more fuel-efficient and with limited design changes.

516.     Boeing was under that legal duty because it knew that the 737 MAX was profoundly different than prior 737 models.

-86-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

517.    At the time of this delivery, Boeing also induced LOT to accept delivery of the aircraft by providing to LOT Detail Specifications that knowingly and purposefully omitted any reference to MCAS, the need for MCAS, and its effects, as well as that the aircraft's AOA sensor Disagree Warning system functioned, which it did not.

518.    The Detail Specification stated that LOT's 737 MAX aircraft being delivered would comply with its Type Certificate, which it did not because that Type Certificate was procured by Boeing's fraudulent misconduct.

519.    The Detail Specification also stated that the operations and characteristics of the 737 MAX aircraft being delivered would be set forth in the FCOM being given to LOT, which was untrue because Boeing had convinced the FAA to allow MCAS to be scrubbed from that document.

520.    Boeing also provided to LOT an Export Certificate of Airworthiness that was fraudulently obtained, and was invalid because the aircraft was not airworthy.

521.    Boeing also provided LOT 737 MAX manuals that did not mention MCAS.

522.    At the time of delivery, Boeing also induced LOT to accept delivery of the aircraft through the Warranties that Boeing knew would be assigned from its lessor to LOT that warranted that the aircraft would conform to its Detail Specification, which it did not.

523.    Boeing, LOT and LOT's lessor executed an assignment of rights at this time.

524.    But Boeing knew that the Warranties that LOT's lessor was passing to LOT were useless because they failed their essential purpose.

525.    The Warranties were for an aircraft other than what LOT actually would be receiving because Boeing hid the key defects in the 737 MAX and misrepresented its similarities to prior 737 models.

-87-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

526.    On the same date, immediately after LOT took off to fly the aircraft MSN 64067 back to Poland, Boeing tweeted that LOT became the first carrier in Central or Eastern Europe to operate the 737 MAX.[105]

527.    Boeing was using LOT's 737 MAX operation to convince other potential customers in Central and Eastern Europe to acquire the MAX, proving how essential Boeing's campaign of misinformation being provided to LOT could be to Boeing's bottom line.

528.    On December 18, 2017, LOT representatives traveled to a Boeing facility in Washington State to take delivery of the aircraft MSN 64068.

529.    LOT sent a technical team to Boeing, including Pawel Kątnik and Władysław Metelski, to take delivery of the aircraft, and to ensure that the aircraft was in conformance with the promises and representations that Boeing had made to LOT as well as in public statements.

530.    During this time, Boeing continued its pattern of material misrepresentations and omissions set forth above.

531.    During this time, Boeing was also under a legal duty to correct its prior misrepresentations that created LOT's belief that the 737 MAX was essentially a re-engined  737 NG except more fuel-efficient and with limited design changes.

532.    Boeing was under that legal duty because it knew that the 737 MAX was profoundly different than prior 737 models.

533.    At the time of this delivery, Boeing also induced LOT to accept delivery of the aircraft by providing to LOT Detail Specifications that knowingly and purposefully omitted any

---

[105] Boeing Airplanes, Stunning right? LOT Polish Airlines takes delivery of the carrier's first Boeing 737 Max 8, on lease from Air Lease Corporation (ALC), and becomes the first operator of #737Max in Central and East Europe, Dec. 1, 2017, https://twitter.com/BoeingAirplanes/status/936746623677341696.

-88-

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

reference to MCAS, the need for MCAS, and its effects, as well as that the aircraft's AOA sensor Disagree Warning system functioned, which it did not.

534.    The Detail Specification stated that LOT's 737 MAX aircraft being delivered would comply with its Type Certificate, which it did not because that Type Certificate was procured by Boeing's fraudulent misconduct.

535.    The Detail Specification also stated that the operations and characteristics of the 737 MAX aircraft being delivered would be set forth in the FCOM being given to LOT, which was untrue because Boeing had convinced the FAA to allow MCAS to be scrubbed from that document.

536.    Boeing also provided to LOT an Export Certificate of Airworthiness that also was fraudulently obtained, and was invalid because the aircraft was not airworthy.

537.    Boeing also provided LOT 737 MAX manuals that did not mention MCAS.

538.    At the time of delivery, Boeing also induced LOT to accept delivery of the aircraft through the Warranties that Boeing knew would be assigned from its lessor to LOT that warranted that the aircraft would conform to its Detail Specification, which it did not.

539.    Boeing, LOT and LOT's lessor executed an assignment of rights at this time.

540.    But Boeing knew that the Warranties that LOT's lessor was passing to LOT were useless because they failed their essential purpose.

541.    The Warranties were for an aircraft other than what LOT actually would be receiving because Boeing hid the key defects in the 737 MAX and misrepresented its similarities to prior 737 models.

542.    On June 23, 2018, LOT representatives traveled to a Boeing facility in Washington State to take delivery of the aircraft MSN 43347.

-89-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

543.    LOT sent a technical team to Boeing, including Pawel Kątnik and Władysław Metelski, to take delivery of the aircraft and to ensure that the aircraft was in conformance with the promises and representations that Boeing had made to LOT as well as in public statements.

544.    During this time, Boeing continued its pattern of material misrepresentations and omissions set forth above.

545.    During this time, Boeing was also under a legal duty to correct its prior misrepresentations that created LOT's belief that the 737 MAX was essentially a re-engined 737 NG except more fuel-efficient and with limited design changes.

546.    Boeing was under that legal duty because it knew that the 737 MAX was profoundly different than prior 737 models.

547.    At the time of this delivery, Boeing also induced LOT to accept delivery of the aircraft by providing to LOT Detail Specifications that knowingly and purposefully omitted any reference to MCAS, the need for MCAS, and its effects, as well as that the aircraft's AOA sensor Disagree Warning system functioned, which it did not.

548.    The Detail Specification stated that LOT's 737 MAX aircraft being delivered would comply with its Type Certificate, which it did not because that Type Certificate was procured by Boeing's fraudulent misconduct.

549.    The Detail Specification also stated that the operations and characteristics of the 737 MAX aircraft being delivered would be set forth in the FCOM being given to LOT, which was untrue because Boeing had convinced the FAA to allow MCAS to be scrubbed from that document.

550.    Boeing also provided to LOT an Export Certificate of Airworthiness that also was fraudulently obtained, and was invalid because the aircraft was not airworthy.

-90-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

551.    Boeing also provided LOT 737 MAX manuals that did not mention MCAS.

552.    At the time of delivery, Boeing also induced LOT to accept delivery of the aircraft through the Warranties that Boeing knew would be assigned from its lessor to LOT that warranted that the aircraft would conform to its Detail Specification, which it did not.

553.    Boeing, LOT and LOT's lessor executed an assignment of rights at this time.

554.    But Boeing knew that the Warranties that LOT's lessor was passing to LOT were useless because they failed their essential purpose.

555.    The Warranties were for an aircraft other than what LOT actually would be receiving because Boeing hid the key defects in the 737 MAX and misrepresented its similarities to prior 737 models.

556.    On June 27, 2018, LOT representatives traveled to a Boeing facility in Washington State to take delivery of the aircraft MSN 64069.

557.    LOT sent a technical team to Boeing, including Pawel Kątnik and Władysław Metelski, to take delivery of the aircraft and to ensure that the aircraft was in conformance with the promises and representations that Boeing had made to LOT as well as in public statements.

558.    During this time, Boeing continued its pattern of material misrepresentations and omissions.

559.    During this time, Boeing was also under a legal duty to correct its prior misrepresentations that created LOT's belief that the 737 MAX was essentially a re-engined 737 NG except more fuel-efficient and with limited design changes.

560.    Boeing was under that legal duty because it knew that the 737 MAX was profoundly different from prior 737 models.

-91-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

561.     At the time of this delivery, Boeing also induced LOT to accept delivery of the aircraft by providing to LOT Detail Specifications that knowingly and purposefully omitted any reference to MCAS, the need for MCAS, and its effects, as well as that the aircraft's AOA sensor Disagree Warning system functioned, which it did not.

562.     The Detail Specification stated that LOT's 737 MAX aircraft being delivered would comply with its Type Certificate, which it did not because that Type Certificate was procured by Boeing's fraudulent misconduct.

563.     The Detail Specification also stated that the operations and characteristics of the 737 MAX aircraft being delivered would be set forth in the FCOM being given to LOT, which was untrue because Boeing had convinced the FAA to allow MCAS to be scrubbed from that document.

564.     Boeing also provided to LOT an Export Certificate of Airworthiness that also was fraudulently obtained, and was invalid because the aircraft was not airworthy.

565.     Boeing also provided LOT 737 MAX manuals that did not mention MCAS.

566.     At the time of delivery, Boeing also induced LOT to accept delivery of the aircraft through the Warranties that Boeing knew would be assigned from its lessor to LOT that warranted that the aircraft would conform to its Detail Specification, which it did not.

567.     Boeing, LOT and LOT's lessor executed an assignment of rights at this time.

568.     But Boeing knew that the Warranties that LOT's lessor was passing to LOT were useless because they failed their essential purpose.

569.     The Warranties were for an aircraft other than what LOT actually would be receiving because Boeing hid the key defects in the 737 MAX and misrepresented its similarities to prior 737 models.

-92-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

570.   On December 12, 2018, LOT representatives traveled to a Boeing facility in Washington State to take delivery of the aircraft MSN 43320.

571.   LOT sent a technical team to Boeing, including Pawel Kątnik and Władysław Metelski, to take delivery of the aircraft and to ensure that the aircraft was in conformance with the promises and representations that Boeing had made to LOT as well as in public statements.

572.   During this time, Boeing continued its pattern of material misrepresentations and omissions set forth above.

573.   This delivery date was unique as it occurred after the Lion Air crash.

574.   Instead of telling the truth about MCAS's involvement with the crash, and correcting its prior material misrepresentations and omissions, Boeing continued make material misrepresentations and omissions about the 737 MAX at the delivery.

575.   During this time, Boeing was also under a legal duty to correct its prior misrepresentations that created LOT's belief that the 737 MAX was essentially a re-engined 737 NG except more fuel-efficient and with limited design changes.

576.   Boeing was under that legal duty because it knew that the 737 MAX was profoundly different than prior 737 models.

577.   At the time of this delivery, Boeing also induced LOT to accept delivery of the aircraft by providing to LOT Detail Specifications that knowingly and purposefully omitted any reference to MCAS, the need for MCAS, and its effects, as well as that the aircraft's AOA sensor Disagree Warning system functioned, which it did not.

578.   The Detail Specification stated that LOT's 737 MAX aircraft being delivered would comply with its Type Certificate, which it did not because that Type Certificate was procured by Boeing's fraudulent misconduct.

-93-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

579.    The Detail Specification also stated that the operations and characteristics of the 737 MAX aircraft being delivered would be set forth in the FCOM being given to LOT, which was untrue because Boeing had convinced the FAA to allow MCAS to be scrubbed from that document.

580.    Boeing also provided to LOT an Export Certificate of Airworthiness that also was fraudulently obtained, and was invalid because the aircraft was not airworthy.

581.    Boeing also provided LOT 737 MAX manuals that did not mention MCAS.

582.    At the time of delivery, Boeing also induced LOT to accept delivery of the aircraft through the Warranties that Boeing knew would be assigned from its lessor to LOT that warranted that the aircraft would conform to its Detail Specification, which it did not.

583.    Boeing, LOT and LOT's lessor executed an assignment of rights at this time.

584.    But Boeing knew that the Warranties that LOT's lessor was passing to LOT were useless because they failed their essential purpose.

585.    The Warranties were for an aircraft other than what LOT actually would be receiving because Boeing hid the key defects in the 737 MAX and misrepresented its similarities to prior 737 models.

586.    Before LOT put its first-delivered 737 MAX aircraft into service, its newly-trained pilots conducted sector instruction with Boeing's own 737 MAX pilots.

587.    In other words, Boeing's pilots were directly training LOT's to ensure that LOT would properly fly the 737 MAX.

588.    Yet, in this last opportunity for Boeing to correct all of its prior material misrepresentations and omissions to LOT concerning the 737 MAX, Boeing elected, despite

-94-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

knowing that LOT's pilots were clearly relying on Boeing for training, not to disclose MCAS, the need for MCAS on the 737 MAX, or how it functions.

589.    On the basis of the foregoing, LOT put its 737 MAX aircraft into revenue service.

590.    LOT operated aircraft MSN Nos. 64067, 64068, 43347, 64069, and 43320 from the time of their respective deliveries through the worldwide grounding of 737 MAX aircraft.

591.    LOT did so without the knowledge of the existence of MCAS, its functions, how to counteract it, or any of the other problems, including but not limited to those set forth in paragraphs 249, 318, 374, 437, and 484, *supra*.

592.    Doing so exposed LOT to the risk of the same kind of crash that Lion Air and Ethiopian Airlines experienced.

**A.  LOT's Additional 737 MAX Acquisitions**

593.    In reliance on Boeing's material misrepresentations and omissions concerning the 737 MAX, LOT signed leases to acquire additional 737 MAX aircraft from other leasing companies.

594.    Those 737 MAX aircraft were supposed to be delivered to LOT subsequent to the beginning of the 737 MAX grounding.

595.    LOT made the decision to acquire more 737 MAX aircraft rather than more 737 NG aircraft, as was its original intention, based on Boeing's material misrepresentations and omissions concerning the 737 MAX, including but not limited to those set forth in 249, 318, 374, 437, and 484, *supra*.

596.    The false and incomplete information Boeing had provided to LOT had induced LOT into believing that the 737 NG and 737 MAX were essentially the same aircraft except that

-95-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

the 737 MAX was more fuel efficient and thus had a longer range, and that the training and operating costs for the two aircraft would be nearly identical.

597.    LOT leased nine (9) additional 737 MAX aircraft through two additional lessors, six (6) from Alafco, and three (3) from SMBC Aviation.

598.    The leases for the 737 MAX aircraft to be acquired from Alafco were signed on May 8, 2018.

599.    The leases for the 737 MAX aircraft to be acquired from SMBC Aviation were signed on December 6, 2018.

600.    The aircraft were supposed to be delivered in the following months:

    a.      MSN 43973 – March 2019

    b.      MSN 43975 – April 2019

    c.      MSN 43974 – May 2019

    d.      MSN 61862 – August 2019

    e.      MSN 62533 – August 2019

    f.      MSN 61864 – September 2019

    g.      MSN 43957 – November 2019

    h.      MSN 43959 – December 2019

    i.      MSN 43960 – January 2020

601.    LOT also was supposed to take delivery in May 2019 of a sixth 737 MAX aircraft from the initial six (6) aircraft Lease Agreement that it executed in September 2016, MSN 60388.

602.    Each of the leases for the additional 737 MAX aircraft contemplated that the lessors would execute an Assignment of Rights with LOT and Boeing, whereby the lessors would transfer the rights set forth above, including the Warranties, to LOT.

-96-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

603.   As Boeing would have participated in the execution of these Assignments of Rights, and because the execution of such Assignments of Rights are standard practice when Boeing delivers aircraft owned by lessors to lessees such as LOT, Boeing was aware that an Assignment of Rights with respect to each of the additional 737 MAX aircraft would take place.

604.   As a result of the worldwide grounding of the 737 MAX, deliveries of all of those aircraft were cancelled and the leases for them terminated.

605.   As a result, LOT has been deprived of the right to operate and earn profits from those aircraft.

## VI.   LOT INCURRED SUBSTANTIAL LOSSES IN CONNECTION WITH THE WORLDWIDE 737 MAX GROUNDING

606.   As a result of the grounding, LOT has sustained at least $250 million dollars in damages through the date of this Complaint, after mitigation.

607.   Due to the grounding, LOT incurred and is continuing to incur losses such as lost revenue from canceled flights for which it had to pay passengers, storage costs, payment of employees who were not working MAX flights but whom LOT was still required to pay, insurance costs, reputational damage, operational inefficiencies, the cost to acquire less suitable replacement aircraft, and other categories of associated losses to be proven at trial.

608.   The foregoing has caused LOT damages that LOT would not otherwise had but for Boeing's material misrepresentations and omissions set forth in this Complaint that induced LOT to acquire 737 MAX aircraft.

609.   LOT is continuing to suffer damages as a result of Boeing's material misrepresentations and omissions.

610.   For example, LOT's ability to deploy its 737 MAX aircraft is greatly diminished

-97-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

despite EASA's re-certification of the aircraft.  Due to the highly publicized nature of the 737 MAX crisis that arose from Boeing's misconduct, many potential passengers are delaying flying on a LOT 737 MAX aircraft, or refusing to do so altogether.  Thus LOT will continue suffer damages into the future.

611.    LOT sought full compensation from Boeing for all of its losses.

612.    Boeing refused to fully compensate LOT for its losses.

## FIRST CLAIM FOR RELIEF –
## FRAUDULENT MISREPRESENTATION

613.    Plaintiff LOT repeats, reiterates, and realleges each and every allegation in paragraphs 1 through 612 above with the same force and effect as if set forth herein in full.

614.    Boeing marketed the 737 MAX as a variant of the safe, reliable, and time-tested 737 family of aircraft, with new fuel-efficient engines and "very deliberate" design enhancements that posed "minimal risk."

615.    Boeing made these representations publicly, and to LOT directly, such as when Boeing made representations to LOT representatives at Boeing's Washington State facility, when LOT reviewed Boeing-drafted marketing materials as well as flight and aircraft manuals, during presentations to LOT at LOT's facilities, and when Boeing provided other presentations to LOT.

616.    Boeing also made the foregoing representations on its website and in press releases described above, including, but not limited to its statements claiming that Boeing would minimize changes from the 737 NG to the 737 MAX, and that Boeing had only made changes after being assured of their safety.

617.    Boeing also represented that the 737 MAX was accurately described in the Detail Specification, which was part of the Purchase Agreement and AGTA documents, and described

-98-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

the 737 MAX's baseline airplane functions, systems, structures, and operations.  That document made no mention of MCAS.

618.    Boeing's representations concerning the 737 MAX were false in that Boeing did not disclose the facts set forth in paragraphs 249, 318, 374, 437, and 484, *supra*, among other false and material misrepresentations and omissions.

619.    Boeing made these representations knowing that air carriers including LOT were relying on their truth.

620.    Boeing knew that the foregoing representations were false, or recklessly disregarded their lack of truthfulness in making such representations, and the foregoing material misrepresentations and omissions therefore were fraudulent.

621.    Boeing's false representations and omissions related to objectively material facts concerning the 737 MAX.

622.    Boeing concealed all or parts of the truth when it had a legal duty to speak, and when it had already made misrepresentations to LOT concerning 737 MAX.

623.    Boeing had a legal duty to correct these representations once made, but failed to do so until it was too late.

624.    Boeing made the foregoing misrepresentations and omissions for its economic advantage.

625.    Boeing made the foregoing misrepresentations and omissions with the intent to induce LOT's reliance on the representations.

626.    LOT relied on Boeing's representations as true because of Boeing's superior knowledge concerning the 737 MAX, and LOT's inability to acquire its own knowledge concerning Boeing's representations and omissions.

-99-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

627.    LOT's reliance on Boeing's representations and non-disclosures was justifiable in light of LOT and Boeing's long-term relationship that previously did not include any reason to doubt the truthfulness and completeness of Boeing's representations and disclosures, and because certain of Boeing's representations were made to the public at large.

628.    LOT was entitled to rely on Boeing's representations and omissions.

629.    LOT would not have acquired 737 MAX aircraft had it known of the truth about Boeing's misrepresentations, or that Boeing was concealing objectively material information relating to the 737 MAX from LOT.

630.    Boeing's misrepresentations and omissions therefore were the proximate cause and cause in fact of LOT's injuries.

631.    Due to the grounding, LOT incurred and is continuing to incur losses such as lost revenue from canceled flights for which it had to pay passengers, storage costs, payment of employees who were not working MAX flights but whom LOT was still required to pay, insurance costs, reputational damage, operational inefficiencies, the cost to acquire less suitable replacement aircraft, and other categories of associated losses to be proven at trial.

632.    LOT is entitled to damages for those categories of losses in amounts to be determined at trial, but in an amount no less than $250 million.

633.    Additionally, Boeing knew LOT was to receive an assignment of rights relating to LOT's acquiring MAX 737 aircraft, including but not limited to the Warranties.

634.    LOT was therefore an intended third party beneficiary of those rights, as Boeing knew LOT would be the ultimate recipient of the 737 MAX aircraft and would have the right to sue Boeing based on the assignment of parts of the AGTA, or other Purchase Agreements, to LOT.

-100-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

635.    LOT is entitled to sue Boeing upon the rights it received when it acquired the 737 MAX, which come with certain limitations.

636.    As a result of Boeing's misrepresentations and omissions, the limitations of the AGTA and other Purchase Agreements, which relate to a waiver of consequential damages, are void and unenforceable.

637.    Based on Boeing's misrepresentations and omissions, LOT is entitled to rescind those sections of the AGTA and other Purchase Agreements.

638.    Under Washington law, LOT is now entitled to the warranties enumerated in the Washington Uniform Commercial Code, RCW 62A.2-314, and RCW 62A.2-315.

639.    Pursuant to these UCC warranties, there exists an implied warranty of merchantability and an implied warranty of fitness for a particular purpose for the subject aircraft.

640.    Under the doctrine of implied warranty of merchantability Boeing is a merchant of aircraft, and warranted that the 737 MAX was merchantable, *i.e.*, it, *inter alia*, would pass without objection in the trade under the contract description and was fit for flying.

641.    The 737 MAX aircraft that LOT acquired were not merchantable.

642.    Boeing is in violation of the implied warranty of merchantability.

643.    LOT is therefore entitled to damages for Boeing's breach of the implied warranty of merchantability, including consequential damages.

644.    Under the doctrine of implied warranty of fitness, Boeing knew at the time of contracting LOT's particular purpose for which it was acquiring the 737 MAX aircraft.

645.    LOT was relying on Boeing's skill or judgment to select an aircraft suitable for LOT's intended purpose.

646.    The 737 MAX aircraft as delivered to LOT were not fit for LOT's intended

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

purpose of transporting passengers for profit.

647.    Boeing is in violation of the implied warranty of fitness for a particular purpose.

648.    LOT is therefore entitled to damages for Boeing's breach of the implied warranty of fitness for a particular purpose, including consequential damages.

## SECOND CLAIM FOR RELIEF –

## NEGLIGENT MISREPRESENTATION

649.    Plaintiff LOT repeats, reiterates, and realleges each and every allegation in paragraphs 1 through 648 above with the same force and effect as if set forth herein in full.

650.    Boeing marketed the 737 MAX as a variant of the safe, reliable, and time-tested 737 family of aircraft, with new fuel-efficient engines and "very deliberate" design enhancements that posed "minimal risk."

651.    Boeing made these representations publicly, and to LOT directly, such as when Boeing made representations to LOT representatives at Boeing's Washington State facility, when LOT reviewed Boeing-drafted marketing materials as well as flight and aircraft manuals, during discussions between LOT and other Boeing representatives at LOT's facilities, and when Boeing provided other presentations to LOT.

652.    Boeing also made the foregoing representations on its website and in press releases described above, including, but not limited to its statements claiming that Boeing would minimize changes from the 737 NG to the 737 MAX, and that Boeing had only made changes after being assured of their safety.

653.    Boeing also represented that the 737 MAX was accurately described in the Detail Specification, which was part of the Purchase Agreement and AGTA documents, and described the 737 MAX's baseline airplane functions, systems, structures, and operations.  That document

-102-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

made no mention of MCAS.

654.    Boeing's representations concerning the 737 MAX were false in that Boeing did not disclose the facts set forth in paragraphs 249, 318, 374, 437, and 484, *supra*, among other false and material misrepresentations and omissions.

655.    Boeing made these representations when it knew or should have known that air carriers including LOT were relying on their truth.

656.    Boeing knew that the foregoing representations were false, or recklessly disregarded their lack of truthfulness in making such representations.

657.    Boeing made the foregoing representations without exercising reasonable care and competence, and the foregoing material misrepresentations and omissions therefore were fraudulently and negligently made.

658.    Boeing's false representations and omissions related to objectively material facts concerning the 737 MAX.

659.    Boeing knew or should have known that it made representations to LOT for the guidance of LOT in their business.

660.    Boeing concealed all or parts of the truth when it had a legal duty to speak, and when it had already made misrepresentations to LOT concerning the 737 MAX.

661.    Boeing had a legal duty to correct these representations once made, but failed to do so.

662.    Boeing made the foregoing misrepresentations and omissions for its economic advantage.

663.    Boeing knew or should have known that the foregoing misrepresentations and omissions would induce LOT's reliance on the representations.

-103-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

664.   LOT relied on Boeing's representations as true because of Boeing's superior knowledge concerning the 737 MAX, and LOT's inability to acquire its own knowledge concerning Boeing's representations and omissions.

665.   LOT's reliance on Boeing's representations and non-disclosures was justifiable in light of LOT and Boeing's long-term relationship that previously did not include any reason to doubt the truthfulness and completeness of Boeing's representations and disclosures, and because certain of Boeing's representations were made to the public at large.

666.   LOT was entitled to rely on Boeing's representations and omissions.

667.   LOT would not have acquired 737 MAX aircraft if it had known the truth of Boeing's misrepresentations or that Boeing was concealing objectively material information relating to the 737 MAX from LOT.

668.   Boeing's misrepresentations and omissions therefore were the proximate cause and cause in fact of LOT's injuries.

669.   Due to the grounding, LOT incurred and is continuing to incur losses such as lost revenue from canceled flights for which it had to pay passengers, storage costs, payment of employees who were not working MAX flights but whom LOT was still required to pay, insurance costs, reputational damage, operational inefficiencies, the cost to acquire less suitable replacement aircraft, and other categories of associated losses to be proven at trial.

670.   LOT is entitled to damages for those categories of losses in amounts to be determined at trial, but in an amount no less than $250 million.

671.   Additionally, Boeing knew LOT was to receive an assignment of rights relating to LOT's acquiring 737 MAX aircraft, including the Warranties.

-104-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

672.    LOT was therefore an intended third party beneficiary of those rights, as Boeing knew LOT would be the ultimate recipient of the 737 MAX aircraft and would have the right to sue Boeing based on the assignment of parts of the AGTA, or other Purchase Agreements, to LOT.

673.    LOT is entitled to sue Boeing upon the rights it received when it acquired the 737 MAX, which come with certain limitations.

674.    As a result of Boeing's misrepresentations and omissions, the limitations of the AGTA and other Purchase Agreements, which relate to a waiver of consequential damages, are void and unenforceable.

675.    Based on Boeing's misrepresentations and omissions, LOT is entitled to rescind those sections of the AGTA and other Purchase Agreements.

676.    Under Washington law, LOT is now entitled to the warranties enumerated in the Washington Uniform Commercial Code, RCW 62A.2-314, and RCW 62A.2-315.

677.    Pursuant to these UCC warranties, there exists an implied warranty of merchantability and an implied warranty of fitness for a particular purpose for the subject aircraft.

678.    Under the doctrine of implied warranty of merchantability Boeing is a merchant of aircraft, and warranted that the 737 MAX was merchantable, *i.e.*, it, *inter alia*, would pass without objection in the trade under the contract description and was fit for flying.

679.    The 737 MAX aircraft that LOT acquired were not merchantable.

680.    Boeing is in violation of the implied warranty of merchantability.

681.    LOT is therefore entitled to damages for Boeing's breach of the implied warranty of merchantability, including consequential damages.

682.    Under the doctrine of implied warranty of fitness, Boeing knew at the time of

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

contracting LOT's particular purpose for which it was acquiring the 737 MAX aircraft.

683.   LOT was relying on Boeing's skill or judgment to select an aircraft suitable for LOT's intended purpose.

684.   The 737 MAX aircraft as delivered to LOT were not fit for LOT's intended purpose of transporting passengers for profit.

685.   Boeing is in violation of the implied warranty of fitness for a particular purpose.

686.   LOT is therefore entitled to damages for Boeing's breach of the implied warranty of fitness for a particular purpose, including consequential damages.

### THIRD CLAIM FOR RELIEF –

### FRAUDULENT CONCEALMENT/OMISSSION

687.   Plaintiff LOT repeats, reiterates, and realleges each and every allegation in paragraphs 1 through 686 above with the same force and effect as if set forth herein in full.

688.   Boeing marketed the 737 MAX as a variant of the safe, reliable, and time-tested 737 family of aircraft, with new fuel-efficient engines and "very deliberate" design enhancements that posed "minimal risk."

689.   Boeing made these representations publicly, and to LOT directly, such as when Boeing made representations to LOT representatives at Boeing's Washington State facility, when LOT reviewed Boeing-drafted marketing materials as well as flight and aircraft manuals, during presentations to LOT at LOT's facilities, and when Boeing provided other presentations to LOT.

690.   Boeing also made the foregoing representations on its website and in press releases described above, including, but not limited to its statements claiming that Boeing would minimize changes from the 737 NG to the 737 MAX, and that Boeing had only made changes after being assured of their safety.

-106-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

691.    Boeing also represented that the 737 MAX was accurately described in the Detail Specification, which was part of the Purchase Agreement and AGTA documents, and described the 737 MAX's baseline airplane functions, systems, structures, and operations.  That document made no mention of MCAS.

692.    Boeing's representations concerning the 737 MAX were false in that Boeing did not disclose the facts set forth in paragraphs 249, 318, 374, 437, and 484, *supra*, among other false and material misrepresentations and omissions.

693.    Boeing made these representations knowing that air carriers including LOT were relying on their truth.

694.    Boeing knew that the foregoing representations were false, or recklessly disregarded their lack of truthfulness in making such representations, and therefore the foregoing material misrepresentations and omissions were fraudulent.

695.    In making these misrepresentations, Boeing failed to disclose the truth, including but not limited to the facts set forth in paragraphs 249, 318, 374, 437 and 484, *supra*.

696.    Boeing's misrepresentations and omissions related to objectively material facts concerning the 737 MAX.

697.    Boeing concealed and omitted all or parts of the truth when it had a legal duty to speak, and when it had already made partial representations concerning differences between the 737 NG and 737 MAX to LOT.

698.    Boeing had a legal duty to correct these misrepresentations once made, but failed to do so until it was too late.

699.    Boeing made the foregoing misrepresentations and non-disclosures for its economic advantage.

-107-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

700.    Boeing's misrepresentations and non-disclosures concerning the 737 MAX were deliberate.

701.    Boeing made the foregoing misrepresentations and non-disclosures with the intent to induce LOT's reliance on the representations.

702.    LOT relied on Boeing's representations and non-disclosures as true because of Boeing's superior knowledge concerning the 737 MAX and its expertise, and LOT's inability to acquire its own knowledge concerning Boeing's representations and non-disclosures.

703.    LOT's reliance on Boeing's representations and non-disclosures was justifiable in light of LOT and Boeing's long-term relationship that previously did not include any reason to doubt the truthfulness and completeness of Boeing's representations and disclosures.

704.    LOT was entitled to rely on Boeing's misrepresentations and omissions.

705.    LOT was entitled to assume that Boeing's disclosures were complete and accurate, and relied on Boeing for that reason.

706.    Boeing's deliberate non-disclosures were intended to cause LOT to agree to acquire the 737 MAX.

707.    LOT would not have agreed to acquire 737 MAX aircraft had it known of the truth about Boeing's misrepresentations or that Boeing was concealing objectively material information relating to the 737 MAX from LOT.

708.    Boeing's non-disclosures therefore were the proximate cause and cause in fact of LOT's injuries.

709.    Due to the grounding, LOT incurred and is continuing to incur losses such as lost revenue from canceled flights for which it had to pay passengers, storage costs, payment of employees who were not working MAX flights but whom LOT was still required to pay,

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

insurance costs, reputational damage, operational inefficiencies, the cost to acquire less suitable replacement aircraft, and other categories of associated losses to be proven at trial.

710.    LOT is entitled to damages for those categories of losses in amounts to be determined at trial, but in an amount no less than $250 million.

711.    Additionally, Boeing knew LOT was to receive an assignment of rights relating to LOT's acquiring 737 MAX aircraft.

712.    LOT was therefore an intended third party beneficiary of those rights, as Boeing knew LOT would be the ultimate recipient of the 737 MAX aircraft and would have the right to sue Boeing based on the assignment of parts of the AGTA, or other Purchase Agreements, to LOT.

713.    LOT is entitled to sue Boeing upon the rights it received when it acquired the 737 MAX, which come with certain limitations, including the Warranties.

714.    As a result of Boeing's misrepresentations and omissions, the limitations of the AGTA and other Purchase Agreements, which relate to a waiver of consequential damages, are void and unenforceable.

715.    Based on Boeing's misrepresentations and omissions, LOT is entitled to rescind those sections of the AGTA and other Purchase Agreements.

716.    Under Washington law, LOT is now entitled to the warranties enumerated in the Washington Uniform Commercial Code, RCW 62A.2-314, and RCW 62A.2-315.

717.    Pursuant to these UCC warranties, there exists an implied warranty of merchantability and an implied warranty of fitness for a particular purpose for the subject aircraft.

718.    Under the doctrine of implied warranty of merchantability Boeing is a merchant of aircraft, and warranted that the 737 MAX was merchantable, i.e., it, *inter alia*, would pass

-109-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

without objection in the trade under the contract description and was fit for flying.

719.    The 737 MAX aircraft that LOT acquired were not merchantable.

720.    Boeing is therefore in violation of the implied warranty of merchantability.

721.    LOT is therefore entitled to damages for Boeing's breach of the implied warranty of merchantability, including consequential damages.

722.    Under the doctrine of implied warranty of fitness, Boeing knew at the time of contracting LOT's particular purpose for which it was acquiring the 737 MAX aircraft.

723.    LOT was relying on Boeing's skill or judgment to select an aircraft suitable for LOT's intended purpose.

724.    The 737 MAX aircraft as delivered to LOT were not fit for LOT's intended purpose of transporting passengers for profit.

725.    Boeing is in violation of the implied warranty of fitness for a particular purpose.

726.    LOT is therefore entitled to damages for Boeing's breach of the implied warranty of fitness for a particular purpose, including consequential damages.

**FOURTH CLAIM FOR RELIEF –**

**UNILATERAL MISTAKE**

727.    Plaintiff LOT repeats, reiterates, and realleges each and every allegation in paragraphs 1 through 726 above with the same force and effect as if set forth herein in full.

728.    At the time LOT executed the Lease Agreement, it did not know, *inter alia*, the facts set forth in paragraphs 249, 318, 374, 437 and 484, *supra*, among other of Boeing's false misrepresentations and material omissions.

729.    Boeing knew of the foregoing mistakes, had reason to know of the foregoing mistakes, and/or caused LOT's foregoing mistaken beliefs.

-110-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

730.    The foregoing facts relate to the underlying basis of LOT's Lease Agreements and expected rights it would derive from the lessors and the AGTA or other Purchase Agreements.

731.    LOT would not have entered into the Lease Agreements, which it knew would come with an assignment of rights derived from the AGTA or other Purchase Agreements, and/or agreed to their specific terms had it known of the facts set forth in paragraphs 249, 318, 374, 437, and 484, *supra*, among other false and material misrepresentations and omissions.

732.    LOT would not have agreed to any limitations of its rights that derive from the AGTA or other Purchase Agreements had it known the truth about Boeing's misrepresentations.

733.    Additionally, Boeing knew LOT was to receive an assignment of rights relating to LOT's acquiring MAX 737 aircraft.

734.    LOT was therefore an intended third party beneficiary of those rights, as Boeing knew LOT would be the ultimate recipient of the 737 MAX aircraft and would have the right to sue Boeing based on the assignment of parts of the AGTA, or other Purchase Agreements, to LOT.

735.    LOT is entitled to sue Boeing upon the rights it received when it acquired the 737 MAX, which come with certain limitations.

736.    As a result of Boeing's fraudulent and material misrepresentations and omissions, the limitations of the AGTA and other Purchase Agreements, which relate to a waiver of consequential damages, are void and unenforceable.

737.    Based on Boeing's misrepresentations and omissions, LOT is entitled to rescind those sections of the AGTA and other Purchase Agreements.

738.    Under Washington law, LOT is now entitled to the warranties enumerated in the Washington Uniform Commercial Code, RCW 62A.2-314, and RCW 62A.2-315.

-111-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

739.    Pursuant to these UCC warranties, there exists an implied warranty of merchantability and an implied warranty of fitness for a particular purpose for the subject aircraft.

740.    Under the doctrine of implied warranty of merchantability Boeing is a merchant of aircraft, and warranted that the 737 MAX was merchantable, *i.e.*, it, *inter alia*, would pass without objection in the trade under the contract description and was fit for flying.

741.    The 737 MAX aircraft that LOT acquired were not merchantable.

742.    Boeing is in violation of the implied warranty of merchantability.

743.    LOT is therefore entitled to damages for Boeing's breach of the implied warranty of merchantability, including consequential damages.

744.    Under the doctrine of implied warranty of fitness, Boeing knew at the time of contracting LOT's particular purpose for which it was acquiring the 737 MAX aircraft.

745.    LOT was relying on Boeing's skill or judgment to select an aircraft suitable for LOT's intended purpose.

746.    The 737 MAX aircraft as delivered to LOT were not fit for LOT's intended purpose of transporting passengers for profit.

747.    Boeing is in violation of the implied warranty of fitness for a particular purpose.

748.    LOT is therefore entitled to damages for Boeing's breach of the implied warranty of fitness for a particular purpose, including consequential damages.

749.    Due to the grounding, LOT incurred and is continuing to incur losses such as lost revenue from canceled flights for which it had to pay passengers, storage costs, payment of employees who were not working MAX flights but whom LOT was still required to pay, insurance costs, reputational damage, operational inefficiencies, the cost to acquire less suitable replacement aircraft, and other categories of associated losses to be proven at trial.

750.    LOT is entitled to damages for those categories of losses in amounts to be determined at trial, but in an amount no less than $250 million.

### FIFTH CLAIM FOR RELIEF –

### MUTUAL MISTAKE

751.    Plaintiff LOT repeats, reiterates, and realleges each and every allegation in paragraphs 1 through 750 above with the same force and effect as if set forth herein in full.

752.    At the time LOT executed the Lease Agreement, it did not know, *inter alia*, the facts set forth in paragraphs 249, 318, 374, 437, and 484, *supra*, among other of Boeing's false misrepresentations and material omissions.

753.    If, at the time that LOT executed the Lease Agreements, which came with certain rights derived from the AGTA or other Purchase Agreements, and Boeing offered the aircraft under the AGTA or other Purchase Agreements, both parties were unaware of the foregoing then both parties were therefore mistaken.

754.    LOT would not have entered into the Lease Agreements, which it knew came with certain rights derived from the AGTA or other Purchase Agreements, and/or agreed to their specific terms had it known the facts set forth in paragraphs 249, 318, 374, 437, and 484, *supra*.

755.    LOT would not have agreed to any limitations of its rights that derive from the AGTA or other Purchase Agreements had it known the truth about Boeing's misrepresentations and omissions.

756.    Additionally, Boeing knew LOT was to receive an assignment of rights relating to LOT's acquiring MAX 737 aircraft.

757.    LOT was therefore an intended third party beneficiary of those rights, as Boeing knew LOT would be the ultimate recipient of the 737 MAX aircraft and would have the right to

-113-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

sue Boeing based on the assignment of parts of the AGTA, or other Purchase Agreements, to LOT.

758.    LOT is entitled to sue Boeing upon the rights it received when it acquired the 737 MAX, which come with certain limitations.

759.    As a result of Boeing's fraudulent and material misrepresentations and omissions, the limitations of the AGTA and other purchase agreements, which relate to a waiver of consequential damages, are void and unenforceable.

760.    Based on Boeing's misrepresentations and omissions, LOT is entitled to rescind those sections of the AGTA and other purchase agreements.

761.    Under Washington law, LOT is now entitled to the warranties enumerated in the Washington Uniform Commercial Code, RCW 62A.2-314, and RCW 62A.2-315.

762.    Pursuant to these UCC warranties, there exists an implied warranty of merchantability and an implied warranty of fitness for a particular purpose for the subject aircraft.

763.    Under the doctrine of implied warranty of merchantability Boeing is a merchant of aircraft, and warranted that the 737 MAX was merchantable, *i.e.*, it, *inter alia*, would pass without objection in the trade under the contract description and was fit for flying.

764.    The 737 MAX aircraft that LOT acquired were not merchantable.

765.    Boeing is in violation of the implied warranty of merchantability.

766.    LOT is therefore entitled to damages for Boeing's breach of the implied warranty of merchantability, including consequential damages.

767.    Under the doctrine of implied warranty of fitness, Boeing knew at the time of contracting LOT's particular purpose for which it was acquiring the 737 MAX aircraft.

768.    LOT was relying on Boeing's skill or judgment to select an aircraft suitable for

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

LOT's intended purpose.

769.    The 737 MAX aircraft as delivered to LOT were not fit for LOT's intended purpose of transporting passengers for profit.

770.    Boeing is in violation of the implied warranty of fitness for a particular purpose.

771.    LOT is therefore entitled to damages for Boeing's breach of the implied warranty of fitness for a particular purpose, including consequential damages.

772.    Due to the grounding, LOT incurred and is continuing to incur losses such as lost revenue from canceled flights for which it had to pay passengers, storage costs, payment of employees who were not working MAX flights but whom LOT was still required to pay, insurance costs, reputational damage, operational inefficiencies, the cost to acquire less suitable replacement aircraft, and other categories of associated losses to be proven at trial.

773.    LOT is entitled to damages for those categories of losses in amounts to be determined at trial, but in an amount no less than $250 million.

## SIXTH CLAIM FOR RELIEF –
## RESCISSION

774.    Plaintiff LOT repeats, reiterates, and realleges each and every allegation in paragraphs 1 through 773 above with the same force and effect as if set forth herein in full.

775.    Boeing marketed the 737 MAX to LOT as a variant of the safe, reliable, and time-tested 737 family of aircraft, with new fuel efficient engines and "very deliberate" design enhancements that posed "minimal risk."

776.    Boeing made these representations publicly, and to LOT directly, such as when Boeing made representations to LOT representatives at Boeing's Washington State facility, when LOT reviewed Boeing-drafted marketing materials as well as flight and aircraft manuals, during

-115-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

presentations to LOT at LOT's facilities, and when Boeing provided other presentations to LOT.

777.   Boeing also made the foregoing representations on its website and in press releases described above, including, but not limited to its statements claiming that Boeing would minimize changes from its then most recent 737 model, the 737 NG, to the 737 MAX, and that Boeing had only made changes after being assured of their safety.

778.   Boeing also represented that the 737 MAX was accurately described in the Detail Specification, which was part of the Purchase Agreement and AGTA documents, and described the 737 MAX's baseline airplane functions, systems, structures, and operations.  That document made no mention of MCAS.

779.   Boeing's representations concerning the 737 MAX were false in that Boeing did not disclose the facts set forth in paragraphs 249, 318, 374, 437, and 484, *supra*, among other false and material misrepresentations and omissions.

780.   Boeing made these representations knowing that air carriers including LOT were relying on their truth.

781.   Boeing knew that the foregoing representations were false, or recklessly disregarded their lack of truthfulness in making such representations, and therefore the foregoing misrepresentations and omissions were fraudulently and/or negligently made.

782.   Boeing's false representations and omissions related to objectively material facts concerning the 737 MAX.

783.   Boeing concealed all or parts of the truth when it had a legal duty to speak, and when it had already made misrepresentations to LOT concerning the 737 MAX.

784.   Boeing had a legal duty to correct these representations once made, but failed to do so until it was too late.

-116-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

785.    Boeing made the foregoing misrepresentations and omissions for its economic advantage.

786.    Boeing made the foregoing misrepresentations and omissions with the intent to induce LOT's reliance on the representations.

787.    LOT relied on Boeing's representations as true because of Boeing's superior knowledge concerning the 737 MAX, and LOT's inability to acquire its own knowledge concerning Boeing's representations.

788.    LOT's reliance on Boeing's representations and non-disclosures was justifiable in light of LOT and Boeing's long-term relationship that previously did not include any reason to doubt the truthfulness and completeness of Boeing's representations and disclosures, and because certain of Boeing's representations were made to the public at large.

789.    LOT was entitled to rely on Boeing's representations and omissions.

790.    LOT would not have acquired 737 MAX aircraft had it known of the truth about Boeing's misrepresentations, or that Boeing was concealing objectively material information relating to the 737 MAX from LOT.

791.    Boeing's misrepresentations and omissions therefore were the proximate cause and cause in fact of LOT's injuries.

792.    Due to the grounding, LOT incurred and is continuing to incur losses such as lost revenue from canceled flights for which it had to pay passengers, storage costs, payment of employees who were not working MAX flights but whom LOT was still required to pay, insurance costs, reputational damage, operational inefficiencies, the cost to acquire less suitable replacement aircraft, and other categories of associated losses to be proven at trial.

-117-

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

793.    Additionally, Boeing knew LOT was to receive an assignment of rights relating to LOT's acquiring MAX 737 aircraft, including the Warranties.

794.    LOT was therefore an intended third party beneficiary of those rights, as Boeing knew LOT would be the ultimate recipient of the 737 MAX aircraft and would have the right to sue Boeing based on the assignment of parts of the AGTA, or other Purchase Agreements, to LOT.

795.    LOT is entitled to sue Boeing upon the rights it received when it acquired the 737 MAX, which come with certain limitations.

796.    As a result of Boeing's misrepresentations, the limitations of the AGTA and other Purchase Agreements, which relate to a waiver of consequential damages, are void and unenforceable.

797.    Based on Boeing's misrepresentations, LOT is entitled to rescind those sections of the AGTA and other Purchase Agreements.

## SEVENTH CLAIM FOR RELIEF-
## BOEING'S VIOLATION OF THE IMPLIED WARRANTY OF MERCHANTABILITY,
### RCW 62A.2-314, *et seq*.

798.    Plaintiff LOT repeats, reiterates, and realleges each and every allegation in paragraphs 1 through 797 above with the same force and effect as if set forth herein in full.

799.    Boeing marketed the 737 MAX to LOT as a variant of the safe, reliable, and time-tested 737 family of aircraft, with new fuel efficient engines and "very deliberate" design enhancements that posed "minimal risk."

800.    Boeing made these representations publicly, and to LOT directly, such as when Boeing made representations to LOT representatives at Boeing's Washington State facility, when

-118-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

LOT reviewed Boeing-drafted marketing materials as well as flight and aircraft manuals, during presentations to LOT at LOT's facilities, and when Boeing provided other presentations to LOT.

801.    Boeing also made the foregoing representations on its website and in press releases described above, including, but not limited to its statements claiming that Boeing would minimize changes from its then most recent 737 model, the 737 NG to the 737 MAX, and that Boeing had only made changes after being assured of their safety.

802.    Boeing also represented that the 737 MAX was accurately described in the Detail Specification, which was part of the Purchase Agreement and AGTA documents, and described the 737 MAX's baseline airplane functions, systems, structures, and operations.  That document made no mention of MCAS.

803.    Boeing's representations concerning the 737 MAX were false in that Boeing did not disclose the facts set forth in paragraphs 249, 318, 374, 437, and 484, *supra*, among other false and material misrepresentations and omissions.

804.    Boeing made these representations knowing that air carriers including LOT were relying on their truth.

805.    Boeing knew that the foregoing representations were false, or recklessly disregarded their lack of truthfulness in making such representations, and therefore the foregoing material misrepresentations and omissions were fraudulently and/or negligently made.

806.    Boeing's false representations and omissions related to objectively material facts concerning the 737 MAX.

807.    Boeing concealed all or parts of the truth when it had a legal duty to speak, and when it had already made representations to LOT concerning the differences between the 737 NG and 737 MAX.

-119-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

808.     Boeing had a legal duty to correct these representations once made, but failed to do so until it was too late.

809.     Boeing made the foregoing misrepresentations and omissions for its economic advantage.

810.     Boeing made the foregoing misrepresentations and omissions with the intent to induce LOT's reliance on the representations.

811.     LOT relied on Boeing's representations as true because of Boeing's superior knowledge concerning the 737 MAX, and LOT's inability to acquire its own knowledge concerning Boeing's representations.

812.     LOT's reliance on Boeing's representations and non-disclosures was justifiable in light of LOT and Boeing's long-term relationship that previously did not include any reason to doubt the truthfulness and completeness of Boeing's representations and disclosures, and because certain of Boeing's representations were made to the public at large.

813.     LOT was entitled to rely on Boeing's representations and omissions.

814.     LOT would not have acquired 737 MAX aircraft had it known of the truth about Boeing's misrepresentations, or that Boeing was concealing objectively material information relating to the 737 MAX from LOT.

815.     Additionally, Boeing knew LOT was to receive an assignment of rights relating to LOT's acquiring MAX 737 aircraft, including the Warranties.

816.     LOT was therefore an intended third party beneficiary of those rights, as Boeing knew LOT would be the ultimate recipient of the 737 MAX aircraft and would have the right to sue Boeing based on the assignment of parts of the AGTA, or other Purchase Agreements, to LOT.

-120-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

817.     LOT is entitled to sue Boeing upon the rights it received when it acquired the 737 MAX, which come with certain limitations.

818.     As a result of Boeing's misrepresentations, the limitations of the AGTA and other Purchase Agreements, which relate to a waiver of consequential damages, are void and unenforceable.

819.     Based on Boeing's misrepresentations, LOT is entitled to rescind those sections of the AGTA and other Purchase Agreements.

820.     Because LOT is entitled to rescind the portions of the AGTA and other Purchase Agreements that disclaim warranties, LOT is entitled to relief pursuant to the Washington implied warranty of merchantability, RCW 62A.2-314.

821.     Under the doctrine of implied warranty of merchantability Boeing is a merchant of aircraft, and warranted that the 737 MAX was merchantable, i.e., it, *inter alia*, would pass without objection in the trade under the contract description and was fit for flying.

822.     The 737 MAX aircraft as delivered to LOT were not merchantable as they have inherent defects, including, but not limited to the fact that they are grounded by the relevant civil aviation authorities.

823.     Boeing is in violation of the implied warranty of merchantability.

824.     LOT is therefore entitled to damages, including consequential damages.

825.     Due to the grounding, LOT incurred and is continuing to incur losses such as lost revenue from canceled flights for which it had to pay passengers, storage costs, payment of employees who were not working MAX flights but whom LOT was still required to pay, insurance costs, reputational damage, operational inefficiencies, the cost to acquire less suitable replacement aircraft, and other categories of associated losses to be proven at trial.

826.   LOT is entitled to damages for those categories of losses in amounts to be determined at trial, but in an amount no less than $250 million.

## EIGHTH CLAIM FOR RELIEF-

## BOEING'S VIOLATION OF THE IMPLIED WARRANTY OF FITNESS FOR A

## PARTICULAR PURPOSE, RCW 62A.2-315, *et seq*.

827.   Plaintiff LOT repeats, reiterates, and realleges each and every allegation in paragraphs 1 through 826 above with the same force and effect as if set forth herein in full.

828.   Boeing marketed the 737 MAX to LOT as a variant of the safe, reliable, and time-tested 737 family of aircraft, with new fuel efficient engines and "very deliberate" design enhancements that posed "minimal risk."

829.   Boeing made these representations publicly, and to LOT directly, such as when Boeing made representations to LOT representatives at Boeing's Washington State facility, when LOT reviewed Boeing-drafted marketing materials as well as flight and aircraft manuals, during presentations to LOT at LOT's facilities, and when Boeing provided other presentations to LOT.

830.   Boeing also made the foregoing representations on its website and in press releases described above, including, but not limited to its statements claiming that Boeing would minimize changes from its then most recent 737 model, the 737 NG to the 737 MAX, and that Boeing had only made changes after being assured of their safety.

831.   Boeing also represented that the 737 MAX was accurately described in the Detail Specification, which was part of the Purchase Agreement and AGTA documents, and described the 737 MAX's baseline airplane functions, systems, structures, and operations.  That document made no mention of MCAS.

832.   Boeing's representations concerning the 737 MAX were false in that Boeing did

-122-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

not disclose the facts set forth in paragraphs 249, 318, 374, 437, and 484, *supra*, among other false and material misrepresentations and omissions.

833.    Boeing made these representations knowing that air carriers including LOT were relying on their truth.

834.    Boeing knew that the foregoing representations were false, or recklessly disregarded their lack of truthfulness in making such representations, and therefore the foregoing material misrepresentations and omissions were fraudulently and/or negligently made.

835.    Boeing's false representations and omissions relate to objectively material facts concerning the 737 MAX.

836.    Boeing concealed all or parts of the truth when it had a legal duty to speak, and when it had already made representations to LOT concerning the differences between the 737 NG and 737 MAX.

837.    Boeing had a legal duty to correct these representations once made, but failed to do so until it was too late.

838.    Boeing made the foregoing misrepresentations and omissions for its economic advantage.

839.    Boeing made the foregoing misrepresentations and omissions with the intent to induce LOT's reliance on the representations.

840.    LOT relied on Boeing's representations as true because of Boeing's superior knowledge concerning the 737 MAX, and LOT's inability to acquire its own knowledge concerning Boeing's representations.

841.    LOT's reliance on Boeing's representations and non-disclosures was justifiable in light of LOT and Boeing's long-term relationship that previously did not include any reason to

-123-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

doubt the truthfulness and completeness of Boeing's representations and disclosures, and because certain of Boeing's representations were made to the public at large.

842.    LOT was entitled to rely on Boeing's representations and omissions.

843.    LOT would not have acquired 737 MAX aircraft had it known of the truth about Boeing's misrepresentations, or that Boeing was concealing objectively material information relating to the 737 MAX from LOT.

844.    Additionally, Boeing knew LOT was to receive an assignment of rights relating to LOT's acquiring MAX 737 aircraft.

845.    LOT was therefore an intended third party beneficiary of those rights, as Boeing knew LOT would be the ultimate recipient of the 737 MAX aircraft and would have the right to sue Boeing based on the assignment of parts of the AGTA, or other Purchase Agreements, to LOT.

846.    LOT is entitled to sue Boeing upon the rights it received when it acquired the 737 MAX, which come with certain limitations.

847.    As a result of Boeing's misrepresentations, the limitations of the AGTA and other Purchase Agreements, which relate to a waiver of consequential damages, are void and unenforceable.

848.    Based on Boeing's misrepresentations, LOT is entitled to rescind those sections of the AGTA and other Purchase Agreements.

849.    Because LOT is entitled to rescind the portions of the AGTA and other purchase agreements that disclaim warranties, LOT is entitled to relief pursuant to the Washington implied warranty of fitness for a particular purpose, RCW 62A.2-315.

850.    Under the doctrine of implied warranty of fitness, Boeing knew at the time of

-124-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

contracting LOT's particular purpose for which it was acquiring the 737 MAX aircraft.

851.   LOT was relying on Boeing's skill or judgment to select an aircraft suitable for LOT's intended purpose.

852.   The 737 MAX aircraft as delivered to LOT were not fit for LOT's intended purpose of transporting passengers for profit, as the aircraft contain inherent defects, including but not limited to the fact that they are grounded by the relevant civil aviation authorities.

853.   Boeing is in violation of the implied warranty of fitness for a particular purpose.

854.   LOT is therefore entitled to damages, including consequential damages.

855.   Due to the grounding, LOT incurred and is continuing to incur losses such as lost revenue from canceled flights for which it had to pay passengers, storage costs, payment of employees who were not working MAX flights but whom LOT was still required to pay, insurance costs, reputational damage, operational inefficiencies, the cost to acquire less suitable replacement aircraft, and other categories of associated losses to be proven at trial.

856.   LOT is entitled to damages for those categories of losses in amounts to be determined at trial, but in an amount no less than $250 million.

**NINTH CLAIM FOR RELIEF –**

**BOEING'S VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT,**

**RCW 19.86 *et seq.***

857.   Plaintiff LOT repeats, reiterates, and realleges each and every allegation in paragraphs 1 through 856 above with the same force and effect as if set forth herein in full.

858.   Boeing committed false and deceptive acts within the meaning of the Washington Consumer Protection Act, RCW 19.86 *et seq.*

859.   Boeing misrepresented and concealed information relating to the 737 MAX,

-125-

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

within the meaning of the Washington Consumer and Protection Act, including but not limited to the facts set forth in paragraphs 249, 318, 374, 437, and 484, *supra*.

860.    Boeing made these representations and concealed these facts from LOT before and after LOT made plain that it believed the 737 MAX was nearly identical to the 737 NG except more fuel efficient.  These statements placed Boeing on notice that contrary to LOT's belief and stated intent, LOT would not be leasing an aircraft with a significant in-service history.

861.    Boeing made these representations before LOT executed the Lease Agreements

862.    Boeing's false and deceptive acts described above took place within trade or commerce within the meaning of the Washington Consumer Protection Act, RCW 19.86 *et seq.* Specifically, such acts occurred while Boeing was attempting to sell a 737 MAX to LOT, a consumer within the meaning of the Washington Consumer Protection Act.  Such representations also were made in Boeing press releases and on Boeing's website, both of which are available to the public and were designed to solicit public interest and trust in the aircraft.

863.    Boeing's false and deceptive acts affected the public interest within the meaning of the Washington Consumer Protection Act because a significant portion of the flying public, including the citizens of this District and of Washington State, have or will fly on a 737 MAX aircraft.

864.    Boeing's false and deceptive acts also affect the public interest within the meaning of the Washington Consumer Protection Act because Boeing is one of the two largest employers within the State of Washington, many of whom were directly affected by Boeing's conduct in connection with the 737 MAX, as well as its worldwide grounding.

865.    LOT would not have entered into the Lease Agreements, that it knew came with an assignment of rights derived from the AGTA and other Purchase Agreements, and/or agreed

-126-

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

to their specific terms had it known that Boeing's representations were false, and of the facts set forth in paragraphs 249, 318, 374, 437, and 484, *supra*, among other of Boeing's false and material misrepresentations and omissions.

866.    LOT would not have agreed to any limitations of its rights that derive from the AGTA or other purchase agreements had it known the truth about Boeing's misrepresentations.

867.    Even now that the 737 MAX has been re-certified, because of the differences between the 737 NG set forth above, it is a fundamentally different from the aircraft that Boeing marketed and LOT bargained for.

868.    The portions of the AGTA and other Purchase Agreements relating to a waiver of consequential damages therefore are void and unenforceable.

869.    LOT is entitled to the rescission of those portions of the AGTA and other Purchase Agreements, and to damages under the Washington Consumer Protection Act.

870.    Boeing's false and deceptive acts caused LOT's damages set forth above within the meaning of the Washington Consumer Protection Act.

871.    LOT has been damaged by Boeing's false and deceptive acts as it incurred and is continuing to incur, losses such as lost revenue from canceled flights for which it had to pay passengers, storage costs, payment of employees who were not working MAX flights but whom LOT was still required to pay, insurance costs, reputational damage, operational inefficiencies, the cost to acquire less suitable replacement aircraft, and other categories of associated losses to be proven at trial  in the amount of at least $250 million.

872.    Boeing's false and deceptive acts thus constitute violations of the Washington Consumer Protection Act.

873.    LOT is entitled to damages for its losses under the Washington Consumer

-127-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

Protection Act.

## TENTH CLAIM FOR RELIEF –

## PRODUCT LIABILITY UNDER THE WASHINGTON PRODUCT LIABILITY ACT, RCW 7.72

874.    Plaintiff LOT repeats, reiterates, and realleges each and every allegation in paragraphs 1 through 873 above with the same force and effect as if set forth herein in full.

875.    Boeing is the product seller and manufacturer as those terms are defined in RCW 7.72.010.  The relevant product is the 737 MAX aircraft as well as its systems and components, all of which were designed, manufactured, tested, certified and/or incorporated by Boeing in Washington State.

876.    LOT is entitled to bring a product liability claim, as that term is defined in RCW 7.72.010, and LOT's claims are not affected by any of the disclaimers or limitations in the Warranties assigned to LOT, or any other agreements between Boeing and LOT because Boeing's practice of selling 737 MAX aircraft for the purpose of commercial passenger air travel is an important public business within this State and elsewhere, suitable for public regulation, and because Boeing has a considerable advantage in bargaining strength and imposes standardized contracts of adhesion on 737 MAX purchasers and lessees.

877.    The 737 MAX aircraft was not reasonably safe as designed because at the time of manufacture and delivery to LOT, and the likelihood that the defects described in this Complaint would cause serious harms outweighed the burden on Boeing to design and manufacture the 737 MAX aircraft in a manner that would have avoided those harms.

878.    Indeed, the defects described within this Complaint did indeed cause serious bodily harm to others, and caused serious pecuniary harm to LOT.

-128-

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

879.     An alternative design of the 737 MAX aircraft was available, practical and feasible, and would not have reduced the usefulness of the 737 MAX in any way.

880.     Indeed, subsequent to the worldwide grounding of 737 MAX aircraft, Boeing re-designed the defects set forth in this Complaint and achieved re-certification of the aircraft, demonstrating the availability of alternative designs that did not affect the usefulness of the aircraft.

881.     The 737 MAX was not reasonably safe because adequate warnings and instructions were not provided to regulators, and customers, including LOT.

882.     The likelihood that the 737 MAX would cause serious harms, including but not limited to the pecuniary harms that LOT has suffered, rendered Boeing's warnings and instructions inadequate.

883.     Boeing easily could have – and indeed subsequently has – provided purportedly adequate warnings and instructions.

884.     Both prior to and at the time that LOT's 737 MAX aircraft were delivered, Boeing knew or should have known of the dangers associated with the 737 MAX aircraft, including those described within this Complaint, but neglected to fulfill its duty to LOT and others to act reasonably and prudently with respect to the warnings and instructions issued.

885.     Boeing did not exercise reasonable care in neglecting to inform LOT and others, including customers and regulators, of the dangers associated with the 737 MAX described within this Complaint, or to issue the necessary warnings and instructions associated with those dangers.

886.     The 737 MAX aircraft provided to LOT, as well as to other Boeing customers, were not reasonably safe because they did not conform to Boeing's express and implied warranties provided to LOT.

-129-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

887.     The 737 MAX aircraft, including those delivered to LOT, also were not reasonably safe because they materially deviated from Boeing's Design Specifications and performance standards.

888.     The 737 MAX aircraft, including those delivered to LOT, also were not reasonably safe because Boeing made express warranties of material facts concerning the safety of the aircraft publicly and directly to LOT that proved to be untrue.

889.     Similarly, the 737 MAX aircraft, including those delivered to LOT, were not reasonably safe because Boeing purposefully omitted in a misleading manner, material information concerning the design, operation and safety of the aircraft.

890.     The defects in the 737 MAX were sudden and dangerous conditions that created sudden and calamitous events, and the safety and insurance interests of the applicable tort law are applicable to LOT's claims within.

891.     Boeing's design and manufacture of the 737 MAX was defective causing LOT's aircraft to be inherently dangerous when operated as was recognized by the FAA, EASA, and many other national civil aviation authorities around the world that grounded the 737 MAX for nearly two years.

892.     Boeing's product defects and failures placed LOT's employees, agents, passengers, and persons on the ground in sufficient danger so as to incur a significant risk of harm.

893.     The foregoing harm, includes, but is not limited to: lost revenue from canceled flights for which it had to pay passengers, storage costs, payment of employees who were not working MAX flights but whom LOT was still required to pay, insurance costs, reputational damage, operational inefficiencies, the cost to acquire less suitable replacement aircraft, and other

-130-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

categories of associated losses to be proven at trial.

894.    As a result of Boeing's conduct described above, LOT is entitled to all remedies, including reimbursement for pecuniary harm suffered of at least $250 million, rescission of the Boeing Warranties provided to LOT, the benefits of the warranties afforded to LOT under the Washington Uniform Commercial Code, and all other damages allowed under the Washington Product Liability Act.

## ELEVENTH CAUSE OF ACTION –
## TORTIOUS INTERFERENCE WITH CONTRACTS

895.    Plaintiff LOT repeats, reiterates, and realleges each and every allegation in paragraphs 1 through 894 above with the same force and effect as if set forth herein in full.

896.    Boeing marketed the 737 MAX as a variant of the safe, reliable, and time-tested 737 family of aircraft, with new fuel-efficient engines and "very deliberate" design enhancements that posed "minimal risk."

897.    Boeing made these representations publicly, and to LOT directly, such as when Boeing made representations to LOT representatives at Boeing's Washington State facility, when LOT reviewed Boeing-drafted marketing materials as well as flight and aircraft manuals, during discussions between LOT and other Boeing representatives at LOT's facilities, and when Boeing provided other presentations to LOT.

898.    Boeing also made the foregoing representations on its website and in press releases described above, including, but not limited to its statements claiming that Boeing would minimize changes from the 737 NG to the 737 MAX, and that Boeing had only made changes after being assured of their safety.

899.    Boeing also represented that the 737 MAX was accurately described in the Detail

-131-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

Specification, which was part of the Purchase Agreement and AGTA documents, and described the 737 MAX's baseline airplane functions, systems, structures, and operations.  That document made no mention of MCAS.

900.    Boeing's representations concerning the 737 MAX were false in that Boeing did not disclose the facts set forth in paragraphs 249, 318, 374, 437, and 484, *supra*, among other false and material misrepresentations and omissions.

901.    Boeing made these representations when it knew or should have known that air carriers including LOT were relying on their truth.

902.    Boeing knew that the foregoing representations were false, or recklessly disregarded their lack of truthfulness in making such representations, and the material misrepresentations and omissions therefore were fraudulently made.

903.    Boeing made the foregoing representations without exercising reasonable care and competence, and the material misrepresentations and omissions therefore were also negligently made.

904.    Boeing's false representations and omissions related to objectively material facts concerning the 737 MAX.

905.    Boeing knew or should have known that it made representations to LOT for the guidance of LOT in their business.

906.    Boeing concealed all or parts of the truth when it had a legal duty to speak, and when it had already made misrepresentations to LOT concerning the 737 MAX.

907.    Boeing had a legal duty to correct these representations once made, but failed to do so.

908.    Boeing made the foregoing misrepresentations and omissions for its economic

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

advantage.

909.    Boeing knew or should have known that the foregoing misrepresentations and omissions would induce LOT's reliance on the representations.

910.    LOT relied on Boeing's representations and omissions as true because of Boeing's superior knowledge concerning the 737 MAX, and LOT's inability to acquire its own knowledge concerning Boeing's representations.

911.    LOT's reliance on Boeing's representations and non-disclosures was justifiable in light of LOT and Boeing's long-term relationship that previously did not include any reason to doubt the truthfulness and completeness of Boeing's representations and disclosures, and because certain of Boeing's representations were made to the public at large.

912.    LOT was entitled to rely on Boeing's representations and omissions.

913.    LOT would not have acquired 737 MAX aircraft if it had known the truth of Boeing's misrepresentations or that Boeing was concealing objectively material information relating to the 737 MAX from LOT.

914.    Boeing's actions tortiously interfered with five kinds of contracts to which LOT was a party:

    a.    LOT's lease with its first lessor for six (6) 737 MAX aircraft from Air Lease Corporation, only five (5) of which were delivered because of the grounding;

    b.    LOT's second lease with SMBC for three (3) additional 737 MAX aircraft, which was terminated because of the grounding;

    c.    LOT's third lease with Alafco for six (6) 737 MAX aircraft, which also was terminated because of the grounding; and

    d.    LOT's tickets issued for passenger flights on the five (5) 737 MAX aircraft that it was operating at the time of the grounding, and which had to be cancelled/terminated because of the grounding; and

    e.    LOT's contracts with its employees, which required that LOT pay those

-133-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

employees in full during the 737 MAX grounding, even though certain of those employees were doing far less work than anticipated because of the grounding.

915.    All of the foregoing were valid and existing contracts at the time that Boeing made its material misrepresentation and omissions, and at the time of the worldwide 737 MAX grounding.

916.    Boeing was aware of the existence of each of the foregoing contracts at the time that it made its material misrepresentations and omissions, and at the time of the worldwide 737 MAX grounding.

917.    It was aware of the leases for 737 MAX aircraft because, among other things, Boeing guided LOT through the lease process, offered LOT incentives to lease 737 MAX aircraft, and all deliveries were to take place at Boeing's facilities, at which time, Boeing knew that it would be executing an assignment of rights to pass certain guarantees and the Warranties from the lessors to LOT.

918.    Boeing was aware that LOT issued tickets for travel on 737 MAX aircraft because it knew that LOT is a commercial airline, and that LOT intended to put its 737 MAX aircraft into revenue service.

919.    Boeing knew that LOT has employees who were scheduled operate and work on 737 MAX flights but for the grounding because it knew that LOT is a commercial airline, and that LOT intended to put its 737 MAX aircraft in revenue service.

920.    Boeing's conduct was tortious, improper, caused the grounding, and interfered with LOT's contractual relationships with ALC, SMBC, Alafco, passengers with tickets for travel on LOT's 737 MAX aircraft, and with LOT's employees who were scheduled to operate and work on 737 MAX flights.

921.    The grounding caused: (a) certain of those leases to be terminated; (b) LOT to be

-134-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

unable to operate its 737 MAX aircraft already delivered in revenue service, which terminated the contracts with passengers; (c) LOT to be unable to operate its 737 MAX aircraft already delivered because they did not possess a valid Certificate of Airworthiness, and were grounded by EASA; and (4) LOT to be required to pay certain LOT employees in full for flights that did not occur, and for which LOT earned no revenue.

922.    Boeing's conduct induced or caused the foregoing breaches and/or contract terminations of LOT's contractual relations set forth above.

923.    Boeing's conduct made LOT's performance of each of the foregoing contracts more expensive and burdensome.

924.    Boeing's misrepresentations and omissions therefore were the proximate cause and cause in fact of LOT's injuries.

925.    Boeing's conduct in intentionally interfering with the foregoing contracts was motivated by Boeing's greed, and desire to achieve financial gain at the expense of LOT.

926.    Boeing's interference with the foregoing contracts was by improper means because it had a duty not to interfere with the foregoing contracts, and to make truthful and honest representations to LOT concerning the 737 MAX, and Boeing instead made material fraudulent misrepresentations and omissions to LOT, and its actions were arbitrary and capricious in that they were made willfully and without regard to LOT's rights and contractual obligations when considering all facts and circumstances surrounding Boeing's actions.

927.    Due to the grounding, LOT incurred and is continuing to incur losses such as lost revenue from canceled flights for which it had to pay passengers, storage costs, payment of employees who were not working MAX flights but whom LOT was still required to pay, insurance costs, reputational damage, operational inefficiencies, the cost to acquire less suitable

-135-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

replacement aircraft, and other categories of associated losses to be proven at trial.

928.   LOT is entitled to damages for those categories of losses in amounts to be determined at trial, but in an amount no less than $250 million.

## TWELFTH CAUSE OF ACTION –

## TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY

929.   Plaintiff LOT repeats, reiterates, and realleges each and every allegation in paragraphs 1 through 930 above with the same force and effect as if set forth herein in full.

930.   Boeing marketed the 737 MAX as a variant of the safe, reliable, and time-tested 737 family of aircraft, with new fuel-efficient engines and "very deliberate" design enhancements that posed "minimal risk."

931.   Boeing made these representations publicly, and to LOT directly, such as when Boeing made representations to LOT representatives at Boeing's Washington State facility, when LOT reviewed Boeing-drafted marketing materials as well as flight and aircraft manuals, during discussions between LOT and other Boeing representatives at LOT's facilities, and when Boeing provided other presentations to LOT.

932.   Boeing also made the foregoing representations on its website and in press releases described above, including, but not limited to its statements claiming that Boeing would minimize changes from the 737 NG to the 737 MAX, and that Boeing had only made changes after being assured of their safety.

933.   Boeing also represented that the 737 MAX was accurately described in the Detail Specification, which was part of the Purchase Agreement and AGTA documents, and described the 737 MAX's baseline airplane functions, systems, structures, and operations.  That document made no mention of MCAS.

-136-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

Case 2:21-cv-01449-RSM   Document 1   Filed 10/25/21   Page 137 of 143

934.   Boeing's representations concerning the 737 MAX were false in that Boeing did not disclose the facts set forth in paragraphs 249, 318, 374, 437, and 484, *supra*, among other false and material misrepresentations and omissions.

935.   Boeing made these representations when it knew or should have known that air carriers including LOT were relying on their truth.

936.   Boeing knew that the foregoing representations were false, or recklessly disregarded their lack of truthfulness in making such representations, and therefore the material misrepresentations and omissions were fraudulently made.

937.   Boeing made the foregoing representations without exercising reasonable care and competence, and therefore the material misrepresentations and omissions also were negligently made.

938.   Boeing's false representations and omissions related to objectively material facts concerning the 737 MAX.

939.   Boeing knew or should have known that it made representations to LOT for the guidance of LOT in their business.

940.   Boeing concealed all or parts of the truth when it had a legal duty to speak, and when it had already made misrepresentations to LOT concerning the 737 MAX.

941.   Boeing had a legal duty to correct these representations once made, but failed to do so.

942.   Boeing made the foregoing misrepresentations and omissions for its economic advantage.

943.   Boeing knew or should have known that the foregoing misrepresentations and omissions would induce LOT's reliance on the representations.

-137-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

944.    LOT relied on Boeing's representations as true because of Boeing's superior knowledge concerning the 737 MAX, and LOT's inability to acquire its own knowledge concerning Boeing's representations.

945.    LOT's reliance on Boeing's representations and non-disclosures was justifiable in light of LOT and Boeing's long-term relationship that previously did not include any reason to doubt the truthfulness and completeness of Boeing's representations and disclosures, and because certain of Boeing's representations were made to the public at large.

946.    LOT was entitled to rely on Boeing's representations and omissions.

947.    LOT would not have acquired 737 MAX aircraft if it had known the truth of Boeing's misrepresentations or that Boeing was concealing objectively material information relating to the 737 MAX from LOT.

948.    Boeing's actions tortuously interfered with at least nine (9) kinds of LOT's business expectancies:

    a.  LOT's use in revenue service of five (5) 737 MAX aircraft that were delivered to it prior to the grounding pursuant to its first lease for six (6) 737 MAX aircraft;

    b.  LOT's use in revenue service of a the sixth aircraft set forth above, which it cannot now and never will be able to use because, as a result of the grounding, that aircraft never was delivered and the lease for it terminated;

    c.  LOT's use in revenue service of  for three (3) additional 737 MAX aircraft leased from SMBC, which it cannot now and never will be able to use because, as a result of the grounding, those aircraft never were delivered and the lease for them terminated;

    d.  LOT's use in revenue service of six (6) additional 737 MAX aircraft leased from Alafco, which it cannot now and never will be able to use because, as a result of the grounding, those aircraft never were delivered and the lease for them terminated;

    e.  LOT's sale of tickets for flights on the five (5) 737 MAX aircraft that it had acquired prior to the grounding but could not operate during the grounding,

-138-

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

during which time the flights were to have taken place;

f.    LOT's sale of tickets for all 737 MAX aircraft that it would have acquired but for the grounding, and operated in revenue service but for the grounding;

g.    LOT's ability to pay its employees who were scheduled to operate and work on 737 MAX aircraft during the grounding, which was diminished because of the grounding despite LOT's obligation to pay those employees in full during the grounding, although they worked far less during that period; and

h.    LOT's sale of tickets to prospective passengers for the five (5) 737 MAX aircraft that it had acquired prior to the grounding, which it cannot fill to the same capacity that it would have but for Boeing's misrepresentations and omissions, which has caused certain potential LOT passengers to refuse to fly on LOT flights operated with 737 MAX aircraft.

949.    All of the foregoing were valid and existing business expectancies at the time that Boeing made its material fraudulent misrepresentations and omissions concerning the 737 MAX, and at the time of the worldwide 737 MAX grounding.

950.    Boeing was aware of the existence of each of the foregoing business expectancies at the time that Boeing made its material fraudulent misrepresentations and omissions, and at the time of the worldwide 737 MAX grounding.

951.    It was aware of LOT's expectancy to use its leased 737 MAX aircraft because, among other things, Boeing guided LOT through the lease process, offered LOT incentives to lease 737 MAX aircraft, and all deliveries were to take place at Boeing's facilities, at which time, Boeing knew that it would be executing an assignment of rights to pass certain guarantees and the Warranties from the lessors to LOT.

952.    Boeing was aware that LOT issued tickets for travel on 737 MAX aircraft prior to the worldwide grounding because Boeing knew that LOT is a commercial airline, and that LOT intended to put its 737 MAX aircraft into revenue service.

953.    Boeing was aware of LOT's expectancy to sell tickets to prospective passengers

-139-

Complaint for Damages
USDC Case No. 21-cv-1449

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(212) 490-9100

for travel on its 737 MAX aircraft because Boeing knew that LOT is a commercial airline, and that LOT intended to put its 737 MAX aircraft into revenue service.

954.    Boeing was aware based on its own experience, and the experience of other aircraft manufacturers, that passengers are often reluctant to purchase tickets for travel onboard aircraft involved in recent accidents, with a poor in-service history, that has been subject to intense regulatory and government scrutiny, and which has been grounded as a result.

955.    Boeing knew that LOT had an expectancy to schedule and pay is employees to operate and work on 737 MAX flights because Boeing knew that LOT is a commercial airline, and that LOT intended to put its 737 MAX aircraft into revenue service.

956.    Boeing's conduct was tortious, improper, caused the grounding, and interfered with LOT's business expectancy to use its leased 737 MAX aircraft in revenue service, to schedule and pay its employees to operate and work on 737 MAX flights, to operate flights on 737 MAX aircraft that were already scheduled, for passengers who had already purchased tickets, and to sell tickets to prospective passengers on LOT's 737 MAX aircraft.

957.    The grounding caused: (a) certain of those expectancies to be terminated; (b) LOT to be unable to operate its 737 MAX aircraft already delivered in revenue service, which terminated its expectancies with passengers; (c) LOT to be unable to operate its 737 MAX aircraft already delivered because they did not possess a valid Certificate of Airworthiness, and were grounded by EASA; (4) LOT to be required to pay certain LOT employees in full for flights that did not occur, and for which LOT earned no revenue; (5) LOT to be unable to sell tickets for flights onboard each of the 737 MAX aircraft it intended to and did acquire; and (6) LOT to be unable to sell tickets for its existing 737 MAX aircraft to full aircraft capacity even after the grounding.

-140-

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

958.   Boeing's conduct induced or caused the foregoing breaches and/or terminations of LOT's business expectancies as set forth above.

959.   Boeing's conduct made LOT's performance of each of the foregoing business relationships more expensive and burdensome.

960.   Boeing's conduct in intentionally interfering with the foregoing business expectancies was motivated by Boeing's greed, and financial gain at the expense of LOT.

961.   Boeing's interference with the foregoing business expectancies was by improper means because it had a duty not to interfere with the foregoing business expectancies, and to make truthful and honest representations to LOT concerning the 737 MAX, and Boeing instead made material fraudulent misrepresentations and omissions to LOT, and its actions were arbitrary and capricious in that they were made willfully and without regard to LOT's rights and business expectancies when considering all facts and circumstances surrounding Boeing's actions.

962.   Boeing's misrepresentations and omissions therefore were the proximate cause and cause in fact of LOT's injuries.

963.   Due to the grounding, LOT incurred and is continuing to incur losses such as lost revenue from canceled flights for which it had to pay passengers, storage costs, payment of employees who were not working MAX flights but whom LOT was still required to pay, insurance costs, reputational damage, operational inefficiencies, the cost to acquire less suitable replacement aircraft, and other categories of associated losses to be proven at trial.

964.   LOT is entitled to damages for those categories of losses in amounts to be determined at trial, but in an amount no less than $250 million.

-141-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff demands judgment:

A.  That the Warranties Defendant Boeing provided to Plaintiff LOT and/or any other applicable agreements between LOT and Boeing be rescinded in their entirety;

B.  That Plaintiff LOT be afforded all applicable warranties under the Washington Uniform Commercial Code;

C.  That Defendant Boeing pays Plaintiff LOT in an amount no less than $250 million for the lost income, and other categories of pecuniary damages to be proven at trial that LOT has incurred and is continuing to incur;

D.  That Defendant Boeing pays Plaintiff LOT for LOT's attorneys' fees and costs to the maximum extent permitted under the applicable law;

E.  That Defendant Boeing pays Plaintiff LOT pre-judgment interest for the foregoing; and

F.  That Defendant Boeing pays Plaintiff LOT for all other relief to which LOT may be entitled, and which this Court deems just and proper.

-142-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100

1

Dated:  October 25, 2021                    CONDON & FORSYTH LLP

2
                                            By:  /s/      Mirin Park

3
                                            MIRIN PARK (WSBA No. 57983)
4                                           mpark@condonlaw.com
                                            600 Stewart Street
5                                           Suites 300 & 400
                                            Seattle, Washington 98101
6                                           p. 212-490-9100

7                                           ANTHONY U. BATTISTA (*pro hac vice* to be filed)
                                            abattista@condonlaw.com
8
                                            DIANA GURFEL SHAPIRO (*pro hac vice* to be filed)
9                                           dgurfel@condonlaw.com

10                                          EVAN KWARTA (*pro hac vice* to be filed)
                                            ekwarta@condonlaw.com
11
                                            MARY DOW (*pro hac vice* to be filed)
12                                          mdow@condonlaw.com

13                                          CONDON & FORSYTH LLP
                                            7 Times Square, 18th Floor
14                                          New York, New York 10036
                                            p. 212-490-9100
15
                                            Attorneys for Plaintiff
16                                          *POLSKIE LINIE LOTNICZE LOT S.A.*

17

18

19

20

21

22

23

24

25

26

-143-

Complaint for Damages
USDC Case No. 21-cv-1449

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
 (212) 490-9100