THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

POLSKIE LINIE LOTNICZE LOT S.A.,

               Plaintiff,

      vs.

THE BOEING COMPANY,

               Defendant.

Case No. 2:21-CV-01449-RSM

**PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

LEGAL STANDARD ............................................................................................2

ARGUMENT .........................................................................................................3

I.    LOT's Claims for Fraudulent and Negligent Misrepresentation and Omission Adequately Allege the Elements of Knowledge, Materiality, and Reliance ..............3

    A.    LOT sufficiently alleges that Boeing knew that its misrepresentations were false at the time they were made ............................................3

    B.    Boeing's misrepresentations were not mere "puffery" or future promises—they are actionable ........................................5

    C.    LOT has pled materiality and reliance ............................................8

II.    LOT's Negligent Misrepresentation Claim Is Not Pre-empted by the WPLA Because It Arises, in Part, from Independent Lies About LOT's Operational Costs ................................................................10

III.    Washington Law Entitles LOT to Assert an Independent WPLA Claim Because the 737 MAX Exposed LOT to a Substantial Risk of Harm ....................................12

IV.    Washington Law Does Not Prohibit LOT from Asserting Claims for Mistake as a Basis for Rescinding the Contractual Provisions It Acquired by Assignment ...14

V.    LOT's Claim for Partial Recission Is Allowed Under Washington Law .................16

VI.    LOT Is Entitled to Assert Implied Warranty Claims under the Washington U.C.C. Because There Is No Evidence that Boeing's Warranty Disclaimers Were Negotiated and LOT Sufficiently Alleges that Boeing's Limited Warranties Failed Their Essential Purpose ...................................17

VII.    LOT Is Entitled to Recovery Under the WCPA Because Boeing's Deceptive Acts Are Injurious to the Public Interest ...............................20

VIII.    LOT's Tortious Interference Claims Should Survive Because Boeing Misconstrued the Interference Alleged and LOT's Claims Accord with Washington Law ................................................22

CONCLUSION ...................................................................................................24

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(206) 338-4240

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Huston*,
  94 P.3d 358 (Wash. Ct. App. 2004) ............................................................................9

*Allstate Ins. Co. v. Tacoma Therapy, Inc.*,
  No. C13-5214, 2013 WL 4763607 (W.D. Wash. Sept. 4, 2013) ...................................2

*Anderson v. Spriestersbach*,
  125 P. 166 (Wash. 1912) ...........................................................................................14, 15

*Aventa Learning, Inc. v. K12, Inc.*,
  830 F. Supp. 2d 1083 (W.D. Wash. 2011) ...................................................................9

*Behnke v. Ahrens*,
  294 P.3d 729 (Wash. Ct. App. 2012) ..........................................................................20

*Bremerton Dev. Co. v. Title Tr. Co.*,
  121 P. 69 (Wash. 1912) .............................................................................................14, 15

*Bybee Farms, LLC v. Snake River Sugar Co.*,
  625 F. Supp. 2d 1073 (E.D. Wash. 2007) ...................................................................4

*Carideo v. Dell, Inc.*,
  706 F. Supp. 2d 1122 (W.D. Wash. 2010) ...................................................................6

*Casella v. Webb*,
  883 F.2d 805 (9th Cir. 1989) .......................................................................................7

*Cashatt v. Ford Motor Co.*,
  No. 19-cv-05886-RBL, 2020 WL 1987077 (W.D. Wash. Apr. 27, 2020) ...................14

*Cent. Wash. Refrigeration v. Barbee*,
  913 P.2d 836 (Wash. Ct. App. 1996) ..........................................................................12

*Cutler v. Kirchner*,
  696 F. App'x 809 (9th Cir. 2017) ................................................................................7

*Cypress Ins. Co. v. SK Hynix Am., Inc.*,
  365 F. Supp. 3d 1142 (W.D. Wash. 2019) ..................................................................15

*Eminence Cap., LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) .....................................................................................19

*Est. of Kekona v. Alaska Airlines, Inc.*,
  No. C18-0116-JCC, 2018 WL 1317826 (W.D. Wash. Mar. 14, 2018) .........................5

*Evans v. Cty. of Spokane*,
  112 Wash.App. 1059, 2002 WL 1797485 (2002) ........................................................16

*Floyd v. Myers*,
  333 P.2d 654 (Wash. 1959)...........................................................................................4

*Glacier Northwest, Inc. v. Int'l Brotherhood of Teamsters Local Union No. 174*,
  500 P.3d 119 (Wash. 2021)..........................................................................................24

*Hangman v. Ridge Training Stables, Inc. v. Safeco Title Ins.*,
  719 P.2d 531 (Wash. 1986)..........................................................................................20

*Hein v. Chrysler Corp.*,
  277 P.2d 708 (Wash. 1954)..........................................................................................24

*Holmes v. Apple Inc.*,
  No. 17 CIV. 4557, 2018 WL 3542856 (S.D.N.Y. July 23, 2018) ...............................18

*Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*,
  170 P.3d 10 (Wash. 2007).............................................................................................20

*Jackowski v. Borchelt*,
  278 P.3d 1100 (Wash. 2012).........................................................................................17

*Laisure-Radke v. Par Pharm.*,
  426 F. Supp. 2d 1163 (W.D. Wash. 2006)...............................................................11, 12

*Mañay v. Acad. Exch. of Am.*,
  No. C07-5071, 2008 WL 820097 (W.D. Wash. Mar. 25, 2008) ................................24

*March v. Ethicon, Inc.*,
  No. C20-5032 BHS, 2021 WL 719261 (W.D. Wash. Feb. 24, 2021) .........................12

*Mensonides Dairy, LLC v. Agri-King Nutrition, Inc.*,
  No. 16-cv-03067-SAB, 2017 WL 8777386 (E.D. Wash. Dec. 27, 2017) ...................13

*Merriman v. Am. Guarantee & Liab. Ins. Co.*,
  396 P.3d 351 (Wash. Ct. App. 2017)..............................................................................4

*Milgard Tempering, Inc. v. Selas Corp. of Am.*,
  902 F.2d 703 (9th Cir. 1990) ........................................................................................19

*Moodie v. Remington Arms Co., LLC*,
  No. C13-0172-JCC, 2013 WL 12191352 (W.D. Wash. Aug. 2, 2013)........................14

*Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*,
   191 P.3d 866 (Wash. 2008)....................................................................................19

*Panag v. Farmers Ins. Co.*,
   204 P.3d 885 (Wash. 2009)....................................................................................21

*In re Park West Galleries, Inc.*,
   732 F. Supp. 2d 1181 (W.D. Wash. 2010)..................................................................8

*Renaissance Leasing, LLC v. Vermeer Mfg. Co.*,
   322 S.W.3d 112 (Mo. 2010)....................................................................................19

*Rush v. Blackburn*,
   361 P.3d 217 (Wash. Ct. App. 2015)...............................................................20, 21

*Simonson* v. *Fendell*,
   675 P.2d 1218 (Wash. 1984)..................................................................................14

*Smartwings, A.S.* v. *The Boeing Co.*,
   No. 21-cv-918 (W.D. Wash.).....................................................................................22

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997)....................................................................................6

*Stanton v. Bayliner Marine Corp.*,
   866 P.2d 15 (Wash. 1993)...............................................................................12, 14

*Starr v. Bacca*,
   652 F.3d 1202 (9th Cir. 2011) ...................................................................................2

*Staton Hills Winery Co. v. Collons*,
   980 P.2d 784 (Wash. Ct. App. 1999)......................................................................13

*Syrovy v. Alpine Res., Inc.*,
   841 P.2d 1279 (Wash. Ct. App. 1992)....................................................................15

*Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Const., Inc.*,
   831 P.2d 724 (Wash. 1992)...............................................................................12, 13

*U.S. v. Forkner*,
   No. 4-21CR-268 (N.D. Tex.).....................................................................................24

*In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*,
   No. MDL 2875 (RBK/KW), 2021 WL 364663 (D.N.J. Feb. 3, 2021)........................12

*Wash. Water Power v. Graybar Elec.*,
   774 P.2d 1199 (Wash. 1989)..................................................................................14

LOT's Opposition to Boeing's Motion to Dismiss          -iv-
Case No. 21-cv-1449-RSM

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(206) 338-4240

*Williams v. Gerber Prod. Co.*,
  552 F.3d 934 (9th Cir. 2008) ...........................................................................2, 4, 7

*Wilmington Tr. Co. v. The Boeing Co.*,
  No. C20-0402-RSM-MAT, 2020 WL 8745857 (W.D. Wash. Nov. 4, 2020) ................... *passim*

*Wilmington Tr. Co. v. The Boeing Co.*,
  No. C20-0402-RSM-MAT, 2021 WL 754030 (W.D. Wash. Feb. 26, 2021) ..................... *passim*

*Wood v. May*,
  438 P.2d 587 (Wash. 1968)...............................................................................16

**Statutes and Rules**

Fed R. Civ. P. 9(b) ............................................................................................6

Fed R. Civ. P. 12(b)(6) .....................................................................................15

RCW 7.72.010(4) .............................................................................................11

RCW 19.86.920................................................................................................21

RCW 62A.1-201(34) .........................................................................................17

RCW 62A.2A-208 .............................................................................................17

RCW 62A.2-209 ...............................................................................................17

RCW 62A.2A-212 .............................................................................................19

RCW 62A.2A-213 .............................................................................................19

RCW 62A.2-719 ........................................................................................16, 18, 20

RCW 62A.2-302 ...............................................................................................18

**Other Authorities**

Raising Affirmative Defenses by Motion, 5 Fed. Prac. & Proc. Civ. § 1277 (4th ed.) .................15

Restatement (Second) of Torts § 538 (1977) ................................................................9

Restatement (Second) of Torts § 766 (1979) ...............................................................23

W. Page Prosser et al., *Prosser & Keeton on the Law of Torts* § 106 (5th ed. 1984).......................4

1

## **INTRODUCTION**

2

This action, like other criminal and civil actions and government investigations against

3

Boeing arising from the crashes and grounding of its new 737 MAX aircraft, is based upon Boeing's

4

pattern and practice of prioritizing profits over safety by misrepresenting the nature of its product

5

and engaging in fraudulent conduct in the sales, marketing, design, testing, and certification of the

6

737 MAX.  Even after the Lion Air crash, Boeing continued to hide the true nature of the 737

7

MAX's Maneuvering Characteristics Augmentation System ("MCAS")—which Boeing had added

8

to the aircraft so that it could falsely assure regulators, LOT, other 737 MAX operators, and the

9

flying public that a design failure in the 737 MAX had not caused the accident and was safe to fly.

10

Yet, as LOT's Complaint explains in scrupulous detail, Boeing knew all the while that its statements

11

were false and that the continued commercial operation of 737 MAX exposed LOT, other airlines,

12

and their thousands, if not millions of employees and passengers to catastrophic harms.  When a

13

second 737 MAX crashed in March 2019, aviation regulators worldwide, including the European

14

Union Aviation Safety Agency ("EASA") and the U.S. Federal Aviation Administration ("FAA"),

15

grounded the aircraft, and subsequent investigations revealed that Boeing's airworthiness

16

certification had been obtained fraudulently.  Boeing admitted as much in a Deferred Prosecution

17

Agreement ("DPA") with the U.S. Department of Justice ("DOJ") wherein it also pledged not to

18

contradict the DOJ's conclusions that Boeing's tortious conduct was the cause of the 737 MAX's

19

fraudulent certification, and that Boeing also had purposefully made misrepresentations to induce

20

airline customers like LOT to acquire 737 MAX aircraft without the benefit of the information to

21

which they were entitled.

22

Here, Boeing returns to its practice of misrepresentations and avoidance—ignoring the

23

numerous detailed facts alleged in LOT's Complaint, acting as if it did not admit to many of those

24

same exact facts in the DPA, misstating and avoiding Washington Supreme Court precedent and

25

this Court's ruling in *Wilmington Trust* establishing LOT's entitlement to relief, and disclaiming its

26

responsibility for the losses that LOT, like so make others, suffered as a result of the nearly two-

LOT's Opposition to Boeing's Motion to Dismiss
Case No. 21-cv-1449-RSM

1

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(206) 338-4240

year grounding of the 737 MAX.

Boeing's strategy in this litigation fails because the law is clear that Boeing cannot succeed on a Rule 12(b)(6) motion by denying the truth of LOT's allegations or simply ignoring large portions of LOT's Complaint altogether.  Rather, Boeing must confront *all* of LOT's factual allegations and accept them as true, including the abundant details LOT includes in its Complaint regarding Boeing's misrepresentations and omissions to establish the knowledge, materiality, and reliance elements of its first three claims.  Further, Boeing cannot deny that LOT is entitled to enforce *all* of its rights under contract provisions it obtained against Boeing by assignments, including its right to rescind the limitations and warranty disclaimers contained in those clauses on the basis of fraud, mistake, and failure of their essential purpose, and to assert claims and remedies under Washington's Uniform Commercial Code for breach of implied warranties.

Lastly, Boeing cannot escape this Court's holding in *Wilmington Trust* expressly allowing LOT to assert claims for Boeing's violations of the Washington Consumer Protection Act ("WCPA") and Washington Product Liability Act ("WPLA") because its deceptive practices exposed LOT, its passengers and employees, and the flying public to a significant risk of harm. This Court should not permit Boeing's continued attempt to avoid responsibility for its actions and should find that Washington law entitles LOT to seek relief for each cause of action asserted in its Complaint.  Boeing's motion should be denied.

## LEGAL STANDARD

Courts in this District consistently hold that motions to dismiss are disfavored because cases should be decided on their merits.  *See, e.g.*, *Allstate Ins. Co. v. Tacoma Therapy, Inc.*, No. C13-5214, 2013 WL 4763607, at *1 (W.D. Wash. Sept. 4, 2013).  Thus, at this stage of the litigation, the applicable test for determining whether LOT's claims are sufficiently pled asks only whether the allegations allow the Court to infer that Boeing is liable for the conduct alleged.  *See id.*; *see also Starr v. Bacca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011) (the relevant question is whether the allegations suggest entitlement to relief; *Williams v. Gerber Prod. Co.*, 552 F.3d 934, 938-39 (9th

Cir. 2008) (finding plaintiff's complaint suggested that it was entitled to relief for defendant's misrepresentations that defendant claimed, as Boeing does here, were "puffery").

Despite acknowledging that this standard requires the Court to accept LOT's allegations as true, Boeing proceeds to purposely avoid large portions of LOT's Complaint and rely on documents outside the pleadings to advance legal arguments that the ignored allegations refute. The Court should view Boeing's motion through that lens, reject Boeing's arguments as baseless and, if nothing else, premature, and deny the motion on that basis alone.

## **ARGUMENT**

**I. LOT's Claims for Fraudulent and Negligent Misrepresentation and Omission Adequately Allege the Elements of Knowledge, Materiality, and Reliance**

### **A. LOT sufficiently alleges that Boeing knew that its misrepresentations were false at the time they were made**

Boeing argues with respect to LOT's first three claims that LOT failed to allege that Boeing had knowledge that the misrepresentations were false. Boeing neglects entire sections of LOT's Complaint, which contains hundreds of allegations that Boeing knowingly made specific misrepresentations about the 737 MAX, and that Boeing intentionally withheld material information from LOT.

For example, Section V of LOT's Complaint describes in painstaking detail the direct misrepresentations and omissions Boeing made to LOT and explains how Boeing "knew," "hid," and took "purposeful" actions to withhold accurate information about the 737 MAX.[1]  *See, e.g.*, Compl. (ECF No. 1) ¶¶ 249, 281-89, 294, 311-18, 363-74, 431-37, 461, 484, 506, 524, 538-41, 577-85. LOT identifies more than twenty separate interactions with Boeing, including one dozen Boeing presentations containing hundreds of slides, during which Boeing's statements concerning the 737 MAX differed from what Boeing knew to be true at those times. *See, e.g.*, *id.* ¶¶ 245-394, 421-56, 462-507, 511-89, 595-97. The Complaint also cites dozens of instances where Boeing gave

---

[1] Despite Boeing's efforts to minimize LOT's detailed factual allegations of Boeing's misrepresentations, it ultimately cannot—and does not—deny that LOT's Complaint contains allegations of the specific, affirmative lies that Boeing told LOT. *See* Boeing MTD (ECF No. 28), at ECF p. 17.

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(206) 338-4240

misleading responses to LOT's questions about the 737 MAX when it knew its answers were false. *See id.*; *see also Floyd v. Myers*, 333 P.2d 654, 656 (Wash. 1959) (a seller has a legal duty to answer questions truthfully).

Further, LOT identified the numerous facts that Boeing admitted in its DPA with the DOJ, the truth of which Boeing pledged not to "contradict[]" in any litigation. *See* Compl. ¶¶ 1-220; *id.* ¶ 176 & n.3 citing the DPA; *see also* DPA at A-1–A-16 (setting forth the misrepresentations to which Boeing admitted and agreed to accept responsibility for, proving that they were made "knowingly"). Finally, if there were any doubt as to LOT's allegations of Boeing's knowledge, LOT made clear in each of its claims that Boeing "knew that the foregoing representations were false." *See* Compl. ¶¶ 618-20, 654-57, 692-95, 706, 728-29, 779-81, 803-05, 832-34, 858-60, 900-03, 934-36.[2] The argument that LOT did not allege that Boeing "knowingly" made misrepresentations strains credulity and contradicts the 12(b)(6) standard requiring LOT's allegations be accepted as true.

Moreover, even if Boeing did not know that its misrepresentations were false at the time they were made—which it did—that did not relieve Boeing of the obligation to correct them once it learned the truth. *See Wilmington Tr. Co. v. The Boeing Co.*, No. C20-0402-RSM-MAT, 2020 WL 8745857, at *8-12 (W.D. Wash. Nov. 4, 2020) ("*Wilmington Tr. R&R*"), *report and recommendation adopted in part*, 2021 WL 754030, at *4-5 (W.D. Wash. Feb. 26, 2021) ("*Wilmington Tr. Order*"); *see also Bybee Farms, LLC v. Snake River Sugar Co.*, 625 F. Supp. 2d 1073, 1082 (E.D. Wash. 2007); *Merriman v. Am. Guarantee & Liab. Ins. Co.*, 396 P.3d 351, 361-62 (Wash. Ct. App. 2017).[3] Yet Boeing did not correct a single misrepresentation prior to LOT

---

[2] These paragraphs correspond to the causes of action where Boeing's knowledge is an element of the claim. The other causes of action are for mutual mistake and violation of the WPLA. Mutual mistake assumes that Boeing negligently made false statements. *See* Compl. ¶¶ 751-60. LOT's WPLA claim does not relate to Boeing's knowledge, but rather to its defective 737 MAX. *See id.* ¶¶ 874-94.

[3] *See also* W. Page Prosser et al., *Prosser & Keeton on the Law of Torts* § 106, at 738 (5th ed. 1984) ("One who has made a statement, and subsequently acquires new information which makes it untrue or misleading, must disclose such information to anyone whom he knows to be still acting on the basis of the original statement.").

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(206) 338-4240

signing a 737 MAX lease, taking delivery of a 737 MAX, or deciding to enter into additional leases after the Lion Air crash even though those decisions were based on Boeing's continued deception of LOT, regulators, carriers worldwide, the victims' families, and the flying public about the improper certification and dangers of its aircraft, and the real cause of the crash. *See, e.g.*, Compl. ¶¶ 191-207, 424, 483-84, 499-501, 515-16, 588, 623, 661, 698. Boeing is liable for that failure as well.

Finally, Boeing's attempt to erase its knowledge should be rejected for the additional reason that all evidence of what Boeing knew is in Boeing's possession. *See Wilmington Tr. R&R*, at *10 (noting that the details of Boeing's fraudulent omissions are "within Boeing's exclusive control, not accessible to plaintiffs."); *see also Est. of Kekona v. Alaska Airlines, Inc.*, No. C18-0116-JCC, 2018 WL 1317826, at *2 (W.D. Wash. Mar. 14, 2018). Boeing's argument thus underscores the need for discovery, and why its motion should be denied.

## B. Boeing's misrepresentations were not mere "puffery" or future promises—they are actionable

The notion that LOT alleged only "general descriptions" of misrepresentations that were "puffery" or promises of future performance is incorrect. As set forth above, LOT described over 50 specific slides wherein Boeing made specific misrepresentations of existing facts about the 737 MAX, not false "general descriptions" or vague promises of future performances. These include that, *inter alia*: (a) the 737 MAX had the same operational and safety profile as the 737 NG, which was untrue because Boeing's use of LEAP1-B engines had already caused aerodynamic problems that MCAS had been created to fix; (b) significant changes between the 737 NG and 737 MAX systems were limited to aft body aerodynamic improvements, engines, AT Winglets, the Sky Interior, the Onboard Network System, and advanced flight deck displays/systems—Boeing omitted the most significant difference, MCAS; (c) 737 MAX development was going according to plan when in reality several Boeing employees had already raised critical concerns regarding the safety of MCAS; (d) the documentation Boeing provided to LOT upon 737 MAX delivery contained all

LOT's Opposition to Boeing's Motion to Dismiss
Case No. 21-cv-1449-RSM

-5-

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(206) 338-4240

information necessary to safely operate the aircraft although it omitted MCAS because Boeing's lies to the FAA caused the FAA to allow Boeing to delete MCAS references; (e) there were guaranteed cost-savings associated with the 737 MAX because no simulator training would be required, when Boeing knew that it had secured that level of training through its criminal conduct; and (f) the 737 MAX still was safe to fly after the Lion Air accident because Boeing lied about the accident's cause and misled pilots as to how to respond to an erroneous MCAS activation. *See, e.g.*, Compl. ¶¶ 194-206, 245-394, 421-507, 511-89.

LOT also alleged innumerable omissions that were anything but "general" or "promises of future performance;" Boeing knew the truth about all of the omitted material facts at the time they were concealed. *See, e.g.*, *id.* ¶¶ 249, 318, 374, 437, 462-75, 484 (describing 39 specific facts that Boeing deliberately withheld including in a presentation given by the now-indicted former Boeing employee Mark Forkner who deleted all references to MCAS from his presentation of differences between the 737 NG and 737 MAX after "jedi mind tricking" regulators into deleting all references to MCAS); *see also Wilmington Tr. R&R*, at *8-12 (holding that plaintiff stated a claim for fraudulent omission based on fewer facts than alleged by LOT).[4]

The specific statements and omissions that LOT alleged are thus the kinds of "misdescriptions of specific or absolute characteristics of a product [that] are actionable." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997). The *Southland* court distinguished between nonactionable claims such as "less is more," from actionable claims such as that a product would require "50% less mowing." *Id.* Despite Boeing's halfhearted attempt to analogize LOT's allegations to this type of vague, positive speak, Boeing's misrepresentations were

---

[4] Boeing did not argue that LOT's fraudulent concealment claim should be dismissed for any reason other than its alleged lack of knowledge, and LOT's alleged inability to prove materiality and reliance. As discussed herein, those arguments fail. Even if Boeing adds arguments on reply, such arguments also will fail because: LOT's pleading standard for fraudulent omissions is relaxed under Rule 9(b) (*see Carideo v. Dell, Inc.*, 706 F. Supp. 2d 1122, 1132 (W.D. Wash. 2010)); LOT made dozens of specific allegations of material omissions (*see* Compl. ¶¶ 249, 318, 374, 437, 462-75, 484); and where, as here, "a manufacturer has superior information regarding defects that are not readily ascertainable to customers, it has a duty to disclose that information." *Carideo*, 706 F. Supp. 2d at 1133; *see also* Compl. ¶¶ 695-705 (describing Boeing's superior knowledge and LOT's inability to obtain same).

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(206) 338-4240

specific and fall squarely within the scope of actionable claims.  The cherry-picked statements that Boeing quotes from LOT's Complaint (*see* Boeing MTD, at ECF p. 17) are summaries of LOT's more specific allegations described above and found, for example, in Paragraphs 249, 318, 374, 437, 484, 245-394, 421-56, 462-507, 511-89, and 595-97.  In these 100-plus paragraphs, LOT alleges that—in addition to the specific lies described above—Boeing hid the aerodynamic problems that forced Boeing to create MCAS in the first place, and fraudulently claimed that the aircraft would be properly certified by EASA, despite knowing that EASA's certification would turn on the same lies Boeing told the FAA.  *See* Compl. ¶¶ 185-87.

By way of specific example, Boeing's motion cites to LOT's description of an April 2016 Boeing presentation wherein LOT alleged that Boeing made it appear as if the MAX was just another 737 as opposed to the entirely new aircraft it is.  That statement is actionable.  *See Cutler v. Kirchner*, 696 F. App'x 809, 812-15 (9th Cir. 2017) (holding that statements referencing then-existing capabilities mixed with promises of future performance are actionable).  But Boeing also omitted more specific references in that presentation, which: (1) described a 71% systems commonality between the NG and the MAX yet purposefully hid the most important difference, MCAS; (2) discussed flight crew economics and pilot training requirements at a time Boeing knew training requirements were based on its lies to the FAA; and (3) omitted reference to MCAS although it was demonstrating problems and undergoing revisions to make it more powerful and operate in a far larger flight envelope.  *See id.* ¶¶ 349-58.

As the Ninth Circuit has cautioned, a determination of whether misrepresentations amount to "puffery" typically is inappropriate to resolve on a motion to dismiss, particularly when several misrepresentations taken together—like those above—contribute to the deceptive context of the defendant's conduct as a whole.  *See Williams*, 552 F.3d at 938-40; *see also Casella v. Webb*, 883 F.2d 805, 807-08 (9th Cir. 1989) (innocuous puffery must be considered in the context of a presentation as a whole when such puffery is used for emphasis to induce reliance).  This rule of law applies with extra emphasis here, where the party acquiring a good reasonably believes that its

knowledge and selection skill is significantly lesser than the seller's. *See In re Park West Galleries, Inc.*, 732 F. Supp. 2d 1181, 1187-88 (W.D. Wash. 2010).  While LOT may be sophisticated generally, at the time that Boeing's misrepresentations were made, LOT had no way of knowing whether they were true. *See, e.g.*, Compl. ¶¶ 626, 664, 702.  Thus, irrespective of the specific nature of Boeing's lies, Boeing's misrepresentations and omissions combine to make all of LOT's allegations actionable.

Boeing's "promises of future performance" argument also fails because it is premised on two fundamental mistakes.  First, contrary to Boeing's motion, LOT alleged that Boeing completed its final iteration of MCAS in August 2016 (*see id.* ¶ 96.i), and that LOT executed its first 737 MAX lease on September 30, 2016, *after* MCAS was completed.  *See id.* ¶ 456.[5]  Second, LOT made dozens of allegations that Boeing *knew* of the problems with the 737 MAX before August 2016. *See, e.g.*, *id.* ¶¶ 248-49, 317-18, 373-74, 421-34.  In sum, LOT's allegations of misrepresentation and omission relate to statements Boeing knew were false when made.[6]

### C.    LOT has pled materiality and reliance

Boeing's argument that LOT cannot prove materiality and reliance because LOT continued to lease and take delivery of 737 MAX aircraft after Boeing had publicly disclosed the existence of MCAS is based on Boeing's incorrect assumptions and erroneous characterization of LOT's claims.

---

[5] Boeing again mischaracterizes LOT's Complaint.  Boeing argued that LOT elected to lease the 737 MAX in June 2016 (*see* Boeing MTD, at ECF p. 18) when LOT signed a Letter of Intent, but Boeing knows that it was the lease that bound LOT, not the Letter of Intent.  Moreover, LOT alleged dozens of misrepresentations made between the execution of the Letter of Intent and the lease, which fraudulently induced LOT to sign rather than not enter into the lease.  *See* Compl. ¶¶ 418-61.  Further, Boeing's lies after LOT signed the lease in September 2016 "may be considered as providing for an inference of knowledge at an earlier point in time." *Wilmington Tr. R&R*, at *10.

[6] If the Boeing misrepresentations that LOT alleges were nonactionable "general" statements, puffery, or "promises of future performance," that calls into question why Boeing admitted to the same allegations constituting fraud when they were set forth in the DPA, agreed to compensate airlines for their 737 MAX losses as part of that DPA, and settled with dozens of foreign airlines to which it made the same misrepresentations as those made to LOT.  *See, e.g.*, *SpiceJet, Boeing Settle 737 MAX-related claims*, Economic Times, Nov. 17, 2021 (https://economictimes.indiatimes.com/industry/transportation/airlines-/-aviation/spicejet-boeing-settle-737-max-related-claims/articleshow/87751043.cms?from=mdr); Matt Griffin, *Multiple 737 MAX operators agree on compensation settlements with Boeing*, IFN News, Jan. 7, 2020 (https://www.ifn.news/posts/multiple-737-max-operators-agree-on-compensation-settlements-with-boeing/) (settlements with AeroMexico and Turkish Airlines).

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(206) 338-4240

Specifically, Boeing's argument incorrectly assumes that LOT's sole allegation of wrongdoing is that Boeing withheld the existence of MCAS and that the disclosure of MCAS itself was sufficient to correct Boeing's prior misrepresentations.  To the contrary, as Boeing admitted in the DPA, it continued to lie about MCAS for months after the Lion Air crash.

More specifically, Boeing admitted that customer airlines made aircraft acquisition decisions based on Boeing's deliberately fraudulent conduct.  *See Compl.* ¶ 176 & n.73; DPA at 20, ¶ 32; A-13–A-14, ¶¶ 44-52 (stating that Boeing's failure to provide information concerning MCAS to customers was "materially false," which Boeing is not permitted to contradict here).  Such admissions qualify as "material" under Washington law.[7]  *See Aventa Learning, Inc. v. K12, Inc.*, 830 F. Supp. 2d 1083, 1099 (W.D. Wash. 2011) (the test for materiality is whether the fact at issue would affect a reasonable person's decision as to a transaction); *see also Wilmington Tr. R&R*, at *11 ("The omitted information – including, ultimately, the risk that MCAS could cause a deadly airplane crash – is self-evidently material.").

Further, Boeing's contention that LOT could not have relied on Boeing's misrepresentations because LOT continued to lease and take delivery of 737 MAX aircraft after the Lion Air crash is wrong because Boeing continued to mislead LOT, civil aviation regulators worldwide, and other 737 MAX operators about MCAS after its existence was disclosed.  *See* DPA at A-14–A-15, ¶¶ 44-52 (Boeing admitted that it continued to lie to the FAA about MCAS after the Lion Air accident).  Further, the airworthiness bulletin that Boeing issued after the Lion Air crash incorrectly defined the erroneous MCAS activation as a runway stabilizer event, thus continuing to mislead LOT about the true functionality of MCAS and the sufficiency of the 737 MAX training its pilots had received.  *See* Compl. ¶¶ 191-207, 218-20, 570-97.  Boeing appears to seek credit for continuing to deceive

---

[7] Further, materiality cannot be decided now because it is a question of fact unless it is so obvious that the facts alleged could not reasonably have influenced LOT's aircraft acquisition decisions.  *See, e.g.*, *Allstate Ins. Co. v. Huston*, 94 P.3d 358, 364 (Wash. Ct. App. 2004); Comment on Clause (2)(a) Restatement (Second) of Torts § 538 (1977) (explaining that materiality "is a matter of judgement for the jury").  But Boeing cannot argue that a reasonable person in LOT's position would not have been influenced by Boeing's lies given the behavior of regulators and carriers worldwide before and after the Lion Air crash, all of whom were similarly duped.

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(206) 338-4240

regulators and LOT concerning MCAS because those lies convinced regulators and operators to believe that the aircraft could keep flying safely.  But the worldwide grounding after the Ethiopian Airlines crash proves Boeing's lies after the Lion Air crash were material and induced all regulators and customers to continue flying a dangerous aircraft in reliance on Boeing's lies; otherwise, the 737 MAX would have been grounded after the Lion Air crash.  *See Wilmington Tr. R&R*, at *12 (allegations regarding "the complexity of the product [and] Boeing's position as an aircraft manufacturer, [as well as] the numerous facts alleged regarding the design, development, and FAA certification process provide the necessary particularity and plausibility for the pleading of reliance").

LOT also specifically alleged that it continued to lease and take delivery of 737 MAX aircraft after Lion Air only because it was *relying* on Boeing's material fraudulent conduct, had no way of knowing the truth, and because Boeing violated its duty to correct its prior material misrepresentations and omissions about MCAS.  *See id.*  Similarly, Boeing ignored LOT's many allegations that it had foregone its opportunity to get out of leases and letters of intent, or to re-negotiate with its lessors to acquire different aircraft because of Boeing's lies, thereby proving LOT's reliance on those lies.  *See, e.g.*, Compl. ¶¶ 457, 461, 475, 501, 504, 595-96.

In sum, any reasonable reading of LOT's Complaint demonstrates that LOT pleaded that Boeing made numerous specific material misrepresentations and omissions of existing fact with the knowledge that it was doing so, and that LOT relied on Boeing's fraudulent conduct in connection with its decision to lease and take delivery of 737 MAX aircraft.

## II.  LOT's Negligent Misrepresentation Claim Is Not Pre-empted by the WPLA Because It Arises, in Part, from Independent Lies About LOT's Operational Costs

LOT's negligent misrepresentation claim is not pre-empted by the WPLA.  Contrary to Boeing's narrow reading of LOT's allegations, Boeing's lies about the 737 MAX were not limited to "the product" or to Boeing's failure to warn about the 737 MAX's defective design and associated hazards.  Rather, Boeing's negligent misrepresentations—and by extension LOT's claim—extended

to Boeing's false statements regarding the operational cost-savings of the 737 MAX as compared to the other aircraft that Boeing knew LOT was considering and would have acquired but for Boeing's lies.  *See* Compl. ¶¶ 393-94, 405, 410, 527.

Most notably, Boeing repeatedly told LOT that the 737 MAX provided guaranteed cost savings in the form of reduced training expenses for LOT pilots.  *See id.* ¶ 412 ("On the basis of Boeing's material misrepresentations and omissions, LOT believed Boeing that flying the 737 MAX required no additional simulator training[.]"); *see also id.* ¶¶ 56, 63, 236-41, 251-57, 282-83, 308, 321, 353-57, 366, 406-07, 469, 491.[8]  These representations were "critical" to LOT's decision to acquire the 737 MAX.  *Id.* ¶ 407.  In addition, Boeing also made repeated misrepresentations to LOT that the 737 MAX had significantly lower fuel costs as compared to other aircraft.  Boeing knew these representations were hollow and, moreover, that LOT would incur costs to procure alternative aircraft if Boeing's lies about the 737 MAX were exposed, resulting in the aircraft's grounding until it could be properly certified.  *See id.* ¶¶ 35, 255-65, 377-78, 429-31, 596; *see also id.* ¶ 607 (describing LOT's losses from procuring less fuel-efficient aircraft during the grounding).

These misrepresentations stand apart from the false statements that Boeing made about the 737 MAX itself and, thus, are not pre-empted by the WPLA.  The WPLA only pre-empts "product liability claims," defined as "any claim or action brought for harm caused by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage or labelling of the relevant product." RCW 7.72.010(4).  Because there is nothing in this definition that applies to the operational costs of a product, Boeing's false statements on this issue do not constitute the type of "product-related harm[s]" pre-empted by the WPLA.  *Laisure-Radke v. Par Pharm.*, 426 F. Supp. 2d 1163, 1168 (W.D. Wash. 2006) (Martinez, J.).

---

[8] While Boeing may attempt to argue that the misrepresentations it made about the 737 MAX training requirements constitute failure to warn and/or instruct claims, this argument fails because it overlooks the difference between claims arising from the deficiencies in the 737 MAX Flight Operations Manual, training curriculum, and other safety disclosures and claims arising out of Boeing's false statements about training costs.

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(206) 338-4240

Under Washington law, a negligent misrepresentation claim can stand alongside a WPLA claim where, as here, there are allegations of independent misrepresentations.  *See Cent. Wash. Refrigeration v. Barbee*, 913 P.2d 836, 843-44 (Wash. Ct. App. 1996), *rev'd on other grounds*, 946 P.2d 760 (Wash. 1997).   The cases that Boeing cites in its motion exclusively concern misrepresentations about "product defects"—not separate misrepresentations about the pilot training and fuel savings—and, thus, do not guide the Court's analysis of LOT's claims.  *See* Boeing MTD, at ECF p. 14.[9]  Here, because LOT's negligent misrepresentation claim also arises from those false statements that Boeing knowingly made to LOT, separate and apart from Boeing's misrepresentations and failure to warn about the aircraft's defects, LOT's claims should be sustained as an independent cause of action under Washington law.

## III.   Washington Law Entitles LOT to Assert an Independent WPLA Claim Because the 737 MAX Exposed LOT to a Substantial Risk of Harm

Boeing's argument that LOT cannot recover under the WPLA because it seeks economic damages and did not experience a MCAS malfunction during a LOT flight is contrary to the Washington Supreme Court's well-established precedent and this Court's recent decision on the exact same issue.  The Washington Supreme Court has repeatedly held that "whether economic losses are recoverable within the context of the WPLA is determined by applying a 'risk of harm' analysis, rather than by assessing damages actually sustained."  *Stanton v. Bayliner Marine Corp*., 866 P.2d 15, 19 (Wash. 1993); *see Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Const., Inc*., 831 P.2d 724, 734-35 (Wash. 1992).  Boeing's characterization of LOT's damages as purely economic is irrelevant to the analysis.  Rather, the relevant question is whether "the nature of [the 737 MAX] defect is such that [LOT] has been exposed through a hazardous product, to an

---

[9] Boeing cites: *March v. Ethicon, Inc.*, No. C20-5032 BHS, 2021 WL 719261, at *3 (W.D. Wash. Feb. 24, 2021), involving negligence claims for injuries caused by an implant; *Laisure-Radke*, 426 F. Supp. 2d at 1168, involving "common law liability claims" arising from a defective pharmaceutical product; and *In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, No. MDL 2875 (RBK/KW), 2021 WL 364663, at *2 (D.N.J. Feb. 3, 2021), involving claims arising out of a contaminated drug product.  Unlike LOT's allegations against Boeing, none of these cases involve separate misrepresentations of guaranteed cost savings.

unreasonable risk of harm to [its] . . . property." *Touchet Valley*, 831 P.2d at 734.[10]  Taking LOT's allegations as true, there can be no doubt that the Complaint adequately pleads a WPLA claim.

It is indisputable that Boeing's 737 MAX was a hazardous product within the meaning of the WPLA.  As discussed above, LOT's Complaint identifies numerous defects in Boeing's design of the 737 MAX, including the significant risk of aerodynamic stalls, and MCAS, a single-point failure system that could override a pilot's command of the aircraft and push it into an uncontrollable and unrecoverable dive.  *See* Compl. ¶¶ 191-209; *Wilmington Tr. Order*, at *8 (indicating that exposure to "possible failure of the MCAS system" qualified as hazard under the WPLA).  The two 737 MAX crashes and nearly two-year worldwide grounding confirm that Boeing delivered a perilous product to LOT and exposed LOT, its employees, and its passengers to the type of harm that the WPLA, rather than a contract, is intended to address.  *See, e.g.*, *Touchet Valley*, 831 P.2d at 733-35 (risk of collapse of a hazardous building satisfied first factor of evaluative test because collapse could have injured anyone nearby and, in addition, plaintiff's damages "arose in a tortious manner, rather than through some disappointment of [the plaintiff]'s expectations under the contract"); *see also Staton Hills Winery Co. v. Collons*, 980 P.2d 784, 788-89 (Wash. Ct. App. 1999) ("a significant risk to persons would likely always implicate tort policy").  As the *Touchet Valley* court stated, it is "difficult to see how [an aircraft] falling to the ground c[ould] be characterized as anything but a sudden and dangerous event." 831 P.2d at 734.

The fact that none of LOT's 737 MAX aircraft crashed does not negate the substantial risk of harm to which it and its employees and passengers were exposed.  Indeed, this Court made clear

---

[10] Washington courts refer to this inquiry as the "evaluative test." *Id.* at 734.  In applying the "risk of harm" analysis, Washington courts also utilize an alternative test that considers whether the product's failure would be "sudden and dangerous." *Id.* at 733.  Because the third factor of the "evaluative test" mirrors the "sudden and dangerous" test, (*see id.* at 733-35; *see also e.g.*, *Mensonides Dairy, LLC v. Agri-King Nutrition, Inc.*, No. 16-cv-03067-SAB, 2017 WL 8777386, at *5 (E.D. Wash. Dec. 27, 2017)), a stand-alone analysis of the latter is not included here.

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(206) 338-4240

in *Wilmington Trust* that the critical factor is whether the defendant was *exposed* to harm.[11]  *See Wilmington Tr. Order*, at *7 (plaintiff need not "have suffered personal injury or even damage to the product," it only had to be exposed, as here, to the risk harm).[12]  Here, LOT operated the 737 MAX for more than fifteen months and, thus, was repeatedly exposed to a MCAS malfunction and its attendant risks of harm—including, a fatal crash.  *See* Compl. ¶¶ 590-92.  For that reason, LOT's allegations satisfy the requirements of a WPLA claim and Boeing's argument fails.  *See Wilmington Tr. Order*, at *7; *Wilmington Tr. R&R*, at *15-16; *Moodie v. Remington Arms Co., LLC*, No. C13-0172-JCC, 2013 WL 12191352, at *7 (W.D. Wash. Aug. 2, 2013) (permitting a WPLA claim for a defective gun that exposed the owners to an unreasonable risk of harm that their guns would fire without a trigger pull).

## IV.   Washington Law Does Not Prohibit LOT from Asserting Claims for Mistake as a Basis for Rescinding the Contractual Provisions It Acquired by Assignment

Washington law does not bar LOT from asserting mistake as a basis for seeking to rescind the Boeing warranty limitations and disclaimers that LOT acquired by assignment and has the exclusive right to enforce.  Boeing's contention that *Bremerton Dev. Co. v. Title Tr. Co.*, 121 P. 69, 70 (Wash. 1912), sets forth a general rule requiring a contract or direct contractual privity between LOT and Boeing for claims of mistake[13] ignores the Washington Supreme Court's subsequent decision rejecting the *per se* application of such a rule.  *See Anderson v. Spriestersbach*, 125 P. 166, 166 (Wash. 1912).

In *Anderson*, the Washington Supreme Court ruled that *Bremerton* did not, and should not,

---

[11] Boeing's argument undermines the purpose of the "risk of harm" analysis, which is "to determine whether a defect is so hazardous that a plaintiff's tort claim is justified even when the product has *yet to injure* persons or property." *Stanton*, 866 P.2d at 19 (emphasis added); *see also Wash. Water Power v. Graybar Elec.*, 774 P.2d 1199, 1210 (Wash. 1989) ("product user should not have to suffer a calamitous event before earning his [WPLA] remedy").

[12] The sole case on which Boeing relies for the argument that an actual accident is required to satisfy the WPLA was dismissed because the plaintiffs provided "almost no detail" regarding their injurious experiences.  *Cashatt v. Ford Motor Co.*, No. 19-cv-05886-RBL, 2020 WL 1987077, at *3 (W.D. Wash. Apr. 27, 2020). That is not the case here.

[13] Although Boeing also cites *Simonson* v. *Fendell*, 675 P.2d 1218, 1221 (Wash. 1984), for this proposition, *Simonson* does not address the requirements for claiming mistake under Washington law.

apply to all claims of mistake.  *See id.* at 167.  Rather, the court recognized circumstances where a mistake could be asserted between parties who did not have a contract or contractual privity.  *See id.*  Moreover, the court specifically found that such circumstances exist where the defendant (a party to the contract) provided the plaintiff (a non-party to the contract) with incorrect information and knew that the plaintiff would rely on the information in connection with a known transaction. *See id.* at 166-67.  That is precisely what happened here.

Like the *Anderson* defendant, Boeing knowingly supplied LOT with misinformation about the 737 MAX "for the particular purpose of inducing" LOT to acquire the 737 MAX with full knowledge that LOT would rely on it.  *Id.* at 167 (reasoning "it was the understanding of all the parties that the service was to be rendered for the use and benefit of the [plaintiff], the particular person who was to loan his money in reliance upon what the [defendant] should do and represent in the premises"); *see, e.g.*, Compl. ¶¶ 245-46, 256, 293, 391, 432.  Boeing also knew that LOT's leasing of 737 MAX aircraft would be conditioned upon LOT agreeing to the limited contractual warranty rights it would acquire against Boeing by assignment from the lessors. *See id.* ¶ 249.n, 447, 459-61, 522-25, 731-37, 753-60.  LOT would not have agreed to such lease conditions had it known the truth about the 737 MAX and that Boeing's limited warranties would fail their essential purpose. *See, e.g., id.* ¶¶ 447-56.

Boeing's assertion that the foreseeability of a product defect precludes LOT from satisfying the "basic assumption" element of a mistake claim makes no sense in the context of the 737 MAX's grounding.[14]   Indeed, the fact that Boeing's limited warranties became useless when EASA prohibited LOT from operating the 737 MAX for nearly two years (*see* Compl. ¶¶ 216-29, 249.n, 447, 524), confirms that LOT could not have foreseen that Boeing would deliver to it aircraft that

---

[14] Moreover, as Boeing concedes in its brief, its foreseeability argument is not based on any Washington authority concerning the elements of a mistake claim (*see* Boeing MTD, at ECF p. 23 n.5, 24); rather, it is based the defense of impracticability at issue in *Syrovy v. Alpine Res., Inc.*, 841 P.2d 1279, 1283 (Wash. Ct. App. 1992) and *Cypress Ins. Co. v. SK Hynix Am., Inc.*, 365 F. Supp. 3d 1142 (W.D. Wash. 2019).  To the extent that Boeing's argument is based on a defense that it has not yet pled, it is not grounds for dismissal under Rule 12(b)(6).  *See* § 1277 Raising Affirmative Defenses by Motion, 5 Fed. Prac. & Proc. Civ. § 1277, at 328-30 (4th ed.).

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(206) 338-4240

had been improperly certified, was not airworthy and would be banned for nearly two years. *See Evans v. Cty. of Spokane*, 112 Wash.App. 1059, 2002 WL 1797485, at *8 (2002) (finding mistake where there was no evidence that the parties contemplated the situation created by a sewage system that never received proper approval).

Further, LOT's allegations—which extend beyond Boeing's defective design of MCAS[15]—go to the fundamental premise that the 737 MAX would be properly certified before LOT would accept delivery. *See* Compl. ¶¶ 1, 3, 420. However, Boeing has admitted that the 737 MAX's certification was not properly obtained because it was the product of Boeing's fraud and misinformation during the certification process. *See id.* ¶¶ 175-78. Thus, LOT and Boeing were mistaken as to a basic assumption of its decision to add 737 MAX to its fleet.

## V.   LOT's Claim for Partial Recission Is Allowed Under Washington Law

Contrary to how Boeing frames LOT's recission claim, LOT does not seek to rescind the entirety of the Purchase Agreements and Aircraft General Terms Agreements ("AGTAs") between Boeing and its lessors. LOT's recission claim is limited to the limitations and disclaimers in the contractual provisions expressly assigned to it, which Boeing does not dispute are LOT's to enforce. LOT therefore is entitled to assert its rights under those provisions, including rescission of those limitations and disclaimers, so that LOT can recover damages under Washington's U.C.C.

LOT is unaware of any Washington law that prohibits it from asserting a claim for partial recission of its contractual rights in the context of complex, multi-party aircraft acquisition transactions. Indeed, the Washington U.C.C. expressly allows rescission of "any clause" that modifies or limits a party's right to damages under the statute, including Boeing's disclaimer of implied warranties. *See* RCW 62A.2-719 cmt. 1 ("Thus any clause purporting to modify or limit the remedial provisions of this Article … is subject to deletion."); *see also Wood v. May*, 438 P.2d

---

[15] Contrary to Boeing's argument, LOT's mistake claims do not solely relate to a foreseeable defect in the design of MCAS. And even if LOT's allegations were limited to MCAS, LOT could not have anticipated any MCAS-related defects because Boeing did not disclose the existence of this software until after the Lion Air crash, at which point Boeing continued to deny any defect in MCAS specifically and the 737 MAX generally. *See* Compl. ¶¶ 191-207.

587, 591 (Wash. 1968) (recognizing that partial rescission is permissible under Washington law so long as it does not impose an "injustice to the parties").  LOT's claim for partial recission is permissible because it is limited to the contractual provisions that govern the specific 737 MAX aircraft acquired by LOT pursuant to the terms of its lease agreements and assignments with ALC, ALFACO, and SMBC.  *See* Compl. ¶¶ 793-97.  LOT's claim does not affect any other aircraft purchased by those lessors or any provisions of the Purchase Agreements and AGTAs that were not assigned to or made for the benefit of LOT.

Additionally, Boeing's assertion that rescission is a remedy and cannot be asserted as an affirmative cause of action ignores the Washington Supreme Court's decision in *Jackowski v. Borchelt*, 278 P.3d 1100, 1108-09 (Wash. 2012), wherein the court approved the assertion of recission as a common-law or statutory claim when it is brought alongside a claim for misrepresentation.  *See* RCW 62A.1-201(34), 62A.2-209, 62A.2A-208 (Washington's U.C.C. broadly defining rescission as a "right," a "remedy," and a "claim").  This is precisely how LOT asserts its recission claim here—alongside its claims for misrepresentation, omission, mistake, and the WPLA.[16]  *See* Compl. ¶¶ 673-76.

## VI.   LOT Is Entitled to Assert Implied Warranty Claims under the Washington U.C.C. Because There Is No Evidence that Boeing's Warranty Disclaimers Were Negotiated and LOT Sufficiently Alleges that Boeing's Limited Warranties Failed Their Essential Purpose

Boeing's argument that the express limitations and warranty disclaimers in its Purchase Agreement and AGTAs prohibit LOT from asserting claims under Washington's U.C.C. for breach of implied warranties fails because Boeing misstates the applicable law and ignores LOT's statutory right to recover under the U.C.C.'s implied warranty provisions where, as here, Boeing's limited warranties failed their essential purpose.

While Boeing correctly notes that the Washington Supreme Court held in 1964 that parties

---

[16] Even if the Court determines that recission cannot be pled as a cause of action, LOT is still entitled to seek recission as a remedy in connection with these claims.

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(206) 338-4240

cannot reinstate disclaimed warranties based on fraudulent misrepresentations, the law has significantly changed since then. *See Holmes v. Apple Inc.*, No. 17 CIV. 4557, 2018 WL 3542856, at *11 (S.D.N.Y. July 23, 2018), *aff'd*, 797 F. App'x 557 (2d Cir. 2019) (applying Washington law and explaining that, since *McInnis & Co. v. W. Tractor & Equip.*, 388 P.2d 562 (Wash. 1964), "subsequent Washington Supreme Court cases [] altered this landscape" on warranty disclaimers). As *Holmes* explained, under current Washington law, warranty disclaimers are disfavored and will not be enforced unless there is proof that they were "explicitly negotiated" and are "set forth with particularity." *Id.* (citing *Berg v. Stromme*, 484 P.2d 380 (Wash. 1971); *Cozumel Leasing, LLC v. Int'l Jets Inc.*, No. 16 Civ. 5089, 2018 WL 1737778, at *15 (W.D. Wash. Apr. 11, 2018); *Puget Sound Fin., L.L.C. v. Unisearch, Inc.*, 47 P.3d 940, 945 (Wash. 2002)).  Boeing has not submitted any proof that the disfavored warranty disclaimers in the Purchase Agreements, AGTAs, and assignments were negotiated with LOT or its lessors.[17]  Nor could it, as LOT has alleged that these agreements were standardized adhesion contracts and not subject to negotiations. *See* Compl. ¶ 18. Even if Boeing argues otherwise in reply, such argument would require information outside the pleadings and, thus, denial of Boeing's motion.

Boeing's argument also ignores LOT's statutory right to assert claims under the U.C.C. where, as here, it has alleged that Boeing's warranty disclaimer is unconscionable (*see id.*; RCW 62A.2-302)[18] and that Boeing's limited warranties failed their essential purpose. *See, e.g.*, Compl. ¶¶ 249.n, 447, 524, 540, 554, 568, 584; *see also* RCW 62A.2–719(2) ("Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Title.").  Boeing's contention that the Court should ignore LOT's rights under the U.C.C. because LOT is a 737 MAX lessee rather than a purchaser is nothing more than a misguided

---

[17] Similarly, Boeing made no argument concerning the circumstances of the Purchase Agreements or the lessors' perception of the disclaimers and should not be permitted to do so on reply.

[18] Under this section of the U.C.C, "it is claimed …that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court" in determining the enforceability of the clause.  RCW 62A.2-302(2).

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(206) 338-4240

distraction.  As a lessee, LOT is entitled to the warranties under RCW 62A.2A-212 and -213, which apply to leases.[19]

Moreover, Boeing is wrong because LOT can recover under U.C.C. Article 2.  The warranties were assigned to LOT with Boeing's approval.  *See* Boeing MTD, at ECF p. 13.  As an assignee of part of Boeing's agreements with its lessors, LOT is entitled to exactly the rights Boeing provided to those lessors.  *See Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 191 P.3d 866, 874-75 (Wash. 2008) ("'An assignee steps into the shoes of the assignor, and has all of the rights of the assignor.'") (quoting *Estate of Jordan v. Hartford Accident & Indem. Co.*, 844 P.2d 403, 407 (Wash. 1993)); *see also Renaissance Leasing, LLC v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 123-31 (Mo. 2010) (when a manufacturer gives a buyer a warranty, and the buyer leases the good and assigns the warranty to a third-party, under the U.C.C., the lessee's warranty is the same as the buyer's).

Boeing also argues that LOT could not be an intended third-party beneficiary of the warranties Boeing provided to LOT's lessors because intent to create that relationship must exist at the time that the contracts were formed, and Boeing sold MAX aircraft to LOT's lessors before LOT leased them.  Yet Boeing provides no proof that LOT's lessors did not buy those aircraft with the intention of leasing some of them to LOT.  Only discovery could do so.  The foregoing applies equally to Boeing's third-party beneficiary argument—the disclaimers are disfavored and could only be enforced after discovery.  The need for this discovery alone is reason enough to deny Boeing's motion to dismiss.

Finally, Boeing failed to address that warranty disclaimers and limitations can be rescinded where, as LOT alleged, Boeing knew that they would fail their essential purpose (*see, e.g.*, Compl. ¶¶ 524, 540, 554, 568, 584), entitling LOT to consequential damages.  *See Milgard Tempering, Inc.*

---

[19] If the Court holds that LOT's warranties exist under RCW 62A.2A-212 – 213 rather than Article 2, LOT should be permitted to amend its Complaint to assert those claims.  *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051-53 (9th Cir. 2003); *Wilmington Tr. Order*, at *2-4 (this Court granting leave to amend in a MAX case given unprecedented nature of the facts).

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(206) 338-4240

*v. Selas Corp. of Am.*, 902 F.2d 703, 707-09 (9th Cir. 1990); RCW 62A.2-719.

## VII.  LOT Is Entitled to Recovery Under the WCPA Because Boeing's Deceptive Acts Are Injurious to the Public Interest

While an evaluation of a claim for a violation of the WCPA considers five elements (*see Hangman v. Ridge Training Stables, Inc. v. Safeco Title Ins.*, 719 P.2d 531, 533 (Wash. 1986)), Boeing argues only that LOT cannot prove the "public interest impact" element, thereby conceding that LOT has satisfied the other four.  But as shown below, it should be beyond dispute that LOT has satisfied this fifth requirement too because the Complaint alleges that the certification of the 737 MAX was based on fraudulent conduct for which Boeing has admitted criminal liability and which resulted in all those who purchased, leased, operated, or flew on a 737 MAX sustaining or, at the very least, being exposed to, physical and financial harms.  *See* Compl. ¶¶ 45-229, 589-92, 610.

As an initial matter, Boeing's argument fails to consider LOT's WCPA claim in the context of a "consumer transaction" and frames LOT's claim solely as a "private dispute."  But as explained in *Rush v. Blackburn*, 361 P.3d 217, 228 (Wash. Ct. App. 2015), "a neat distinction between consumer and private disputes is not workable" and a plaintiff can satisfy the public interest element of a WCPA claim in both contexts by showing the broad effect of the defendant's duplicitous conduct on the public as a whole.  *See id.* at 227-29 (citing *Hangman Ridge*, 719 P.2d at 531); *see also Indoor Billboard/Wash., Inc. v. Integra Telecom of Wash., Inc.*, 170 P.3d 10, 17-20 (Wash. 2007) (reversing dismissal of WCPA claim because defendant's act of labeling its surcharge "had the capacity to deceive a substantial portion of the public"); *Behnke v. Ahrens*, 294 P.3d 729, 736 (Wash. Ct. App. 2012) (even in the context of a private dispute, the public interest element is met when the plaintiff demonstrates that the deceitful effects of the private transaction could repeat themselves in a manner that touches the public).

CONDON & FORSYTH, LLP
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(206) 338-4240

Here, Boeing's deceptive practices were not solely aimed at LOT;[20] Boeing's deception extended to all stakeholders in the commercial aviation industry, including the FAA, EASA, all 737 MAX customers and potential customers, and the flying public at large. *See* Comp. ¶¶ 7-8, 45-229. If there were any question as to the reach of Boeing's deception, the various government investigations, the criminal proceedings by the DOJ, the numerous lawsuits that have been filed against Boeing by the victims of the Lion Air and Ethiopian Airlines crashes, Boeing shareholders, 737 MAX purchasers and lessees, pilots, and 737 MAX passengers,[21] all demonstrate that Boeing was engaged in a pattern of deceptive conduct that affected thousands of transactions—including LOT's own transactions with its passengers. Indeed, Boeing used LOT, as well as aviation regulators and other commercial airlines as pawns to deceive the public into believing that the 737 MAX on which they were flying had been properly certified and had the safety approval of the airline that sold them their tickets. Thus, construing the WCPA broadly, as required under RCW 19.86.920, it is clear that members of the public generally were "likely [] vulnerable to abuse." *Rush*, 361 P.3d at 228.

The public interest is further demonstrated by FAA regulations intended to protect the public,[22] which Boeing has admitted it violated. *See* DPA at A-1 ¶ 1, A-13–A-15 ¶¶ 42-51. The purpose of these regulations would be undermined if consumer protection statutes like the WCPA do not hold Boeing to account when its conduct has endangered the public and caused entities like LOT to suffer millions of dollars in losses. *See Rush*, 361 P.3d at 227-28; *Panag v. Farmers Ins.*

---

[20] Boeing's claim that LOT is a sophisticated purchaser that solicited aircraft from Boeing is yet another instance where Boeing refused to accept LOT's allegations as true. LOT specifically alleged that it asked Boeing specific questions about the 737 MAX, the answers to which only Boeing knew, and that LOT was therefore deceived by Boeing. *See, e.g.*, Compl. ¶¶ 276-89, 301-14, 359-72, 431-34, 450-55. Moreover, as this Court has recognized, as the manufacturer of the 737 MAX, Boeing was in a superior position (*see Wilmington Tr. Order*, at *5), a position that Boeing abused—not only with respect to LOT and other 737 MAX operators, but also with the FAA and EASA.

[21] *See, e.g.*, Compl. ¶¶ 169-76; *see* Sinead Baker, *Here Are All the Investigations and Lawsuits that Boeing and the FAA Are Facing After the 737 Max Crashes Killed Almost 350 People*, Business Insider, June 24, 2019 (https://www.businessinsider.com/boeing-737-max-crisis-list-lawsuits-investigations-faces-faa-2019-5).

[22] *See* FAA, Mission, https://www.faa.gov/about/mission (last visited on Jan. 13, 2022) ("We strive to reach the next level of safety and efficiency[.] … We are accountable to the American public and our aviation stakeholders.").

*Co.*, 204 P.3d 885, 898 (Wash. 2009) (finding "[t]he [W]CPA is applicable to deceptive insurance subrogation collection activities, considering the broad legislative mandate that the business of insurance is vital to the public interest, the public policies favoring honest debt collection, and the statutory mandate to liberally construe the [W]CPA in order to protect the public from inventive attempts to engage in unfair and deceptive business practices.").

Second, Boeing's public interest argument is based on its unpersuasive attempt to analogize LOT's claims to the WCPA at issue in *Wilmington Trust*.[23]  As this Court is aware, *Wilmington Trust* involved the purchase of a 737 MAX personal-use business jet of which Boeing "deliver[s], on average, some nine or ten such jets per year[.]" *Wilmington Tr. R&R*, at *14.  In contrast, LOT's claims concern the commercial 737 MAX, which were intended to fly thousands, if not millions, of airline passengers worldwide.[24]  In this context, LOT's acquisition and operation of the 737 MAX undeniably impacts the public interest.

## VIII. LOT's Tortious Interference Claims Should Survive Because Boeing Misconstrued the Interference Alleged and LOT's Claims Accord with Washington Law

Boeing contends that LOT did not allege intentional interference with its contracts and business expectancies, that the interference LOT alleged was insufficiently specific and thus collateral to LOT's damages, and that LOT's damages are not recoverable because its contracts and expectancies were not breached or terminated.  Boeing's arguments all fail.

First, Boeing mischaracterizes the nature of LOT's "intent" allegations.  LOT did not assert that Boeing intended for its aircraft to be grounded worldwide.  Rather, LOT asserts that Boeing intended to interfere with the contracts that LOT was negotiating (or would negotiate) with its

---

[23] The plaintiffs in *Smartwings, A.S.* v. *The Boeing Co.*, No. 2:21-cv-918 (W.D. Wash.), which also involves a WCPA claim by a commercial airline against Boeing for its deception surrounding the 737 MAX crisis, similarly distinguish the impact that a commercial airline's acquisition and operation of 737 MAX has on the public from a corporation's purchase of a small number of business jets for private use.  For the same reasons articulated by Smartwings in its opposition to Boeing's motion to dismiss (*see* No. 2:21-cv-918-RSM, ECF No. 15, at ECF pp. 23-25), the Court should reject Boeing's WCPA argument here.

[24] *See* Thomas Pallini, *The Boeing 737 Max Has Flown Over 2,700 Flights Since Its November Ungrounding as the EU Gives the Green Light*, Business Insider, Jan. 27, 2021 (https://www.businessinsider.com/boeing-737-max-has-flown-over-2700-flights-since-ungrounding-2021-1).

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(206) 338-4240

lessors, employees, and customers by inducing LOT to acquire 737 MAX aircraft knowing of the substantial likelihood that doing so would harm LOT's contractual and business relationships if Boeing's lies about the 737 MAX were exposed.  *See, e.g.*, Compl. ¶¶ 12, 506, 902-26, 936-61 (explaining that Boeing knew that the MAX could be grounded if Boeing was caught).[25]   Indeed, Boeing must have known there would be consequences if its fraud was discovered because otherwise it would not have hidden the material information from regulators and customer airlines, the discovery of which could have lessened 737 MAX sales.

Boeing's associated claim that LOT's allegations of intent are not adequately pled is yet another example of Boeing refusing to acknowledge and accept the entirety of LOT's allegations. As LOT repeatedly states in its Complaint, Boeing's interference with LOT's contracts and business expectancies was "intentional" and "purposeful." *See, e.g.*, *id.* ¶¶ 256, 293, 432, 468, 517, 925, 960. In addition to that express characterization, LOT's Complaint alleges that Boeing knew of the contracts and expectancies at issue, knew the damage that its interference would cause, and yet went through with the interference anyway. *See id.* ¶¶ 914-26, 948-61.

Second, LOT identified Boeing's conduct aimed at LOT's contracts and expectancies.  The portions of the Restatement that Boeing quotes in its motion make clear that, at this stage, LOT need only have alleged that: (1) the means of Boeing's interference was improper or tortious; and (2) Boeing's conduct was substantially likely to bring about the interference.  *See* 2d Rest. Torts §§ 766A *cmt*. g (addressing interference with a third-party's contract) and 766B *cmts* d & e (addressing interference with a third-party's business expectancy).  Here, LOT alleged that the means of Boeing's interference was tortious and improper in that it was based on Boeing's misrepresentations and was intended to achieve financial gain at LOT's expense.  *See id. cmt e.* (identifying an interest in advancing financial gain at the expense of another an improper purpose, and "injurious falsehoods" as tortious); *see also* Compl. ¶¶ 899-909, 920-26, 933-43, 956-62 (Boeing's

---

[25] LOT clearly alleged that the intent at issue was to induce LOT to acquire defective aircraft.  If the Court disagrees, LOT should be afforded the opportunity to amend its Complaint. *See* n.19, *supra*.

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(206) 338-4240

interference was based on deliberate misrepresentations and motivated by its financial gain at the expense of LOT).  As described above, the Complaint also alleges that if Boeing's lies were discovered, the 737 MAX would be grounded.  *See also* DPA at pp. A-11–A-15, ¶¶ 36-52 (explaining that Boeing knew that it deceived the FAA and its customers, meaning that it knew of the consequences its deception was aimed to avoid, namely that if it were caught, the MAX would be grounded and revisions to the MAX would be required before grounding orders could be lifted); *U.S. v. Forkner*, No. 4-21CR-268-0, Indictment (ECF No. 1), ¶¶ 26-36 (N.D. Tex. Oct. 14, 2021) (same).

LOT's damages are thus anything but collateral to Boeing's tortious interference; they stem directly from Boeing's intent to induce LOT to lease 737 MAX aircraft instead of others.  *See* Compl. ¶¶ 909-13, 921-27, 943-47, 957-63.  Accordingly, this case is nothing like either *Hein v. Chrysler Corp.*, 277 P.2d 708, 714 (Wash. 1954), wherein the appellant alleged no damages arising from the tortious conduct alleged, or *Mañay v. Acad. Exch. of Am.*, No. C07-5071, 2008 WL 820097, at *8 (W.D. Wash. Mar. 25, 2008), wherein the court determined that the claim for tortious interference was really a claim for breach of contract.

Third, as the Washington Supreme Court recently reiterated, tortious interference claims do not require a breach or termination of the contract or business expectancy, only that, as LOT alleged (*see* Compl. ¶¶ 923, 959), the tortious conduct made performance of a contract or expectancy more expensive or burdensome.  *See Glacier Northwest, Inc. v. Int'l Brotherhood of Teamsters Local Union No. 174*, 500 P.3d 119, 137 (Wash. 2021).

## CONCLUSION

For all of the reasons stated above, Boeing's Motion to Dismiss should be denied in its entirety.  Alternatively, LOT should be permitted leave to amend its Complaint for any causes of action requiring additional factual allegations.

LOT's Opposition to Boeing's Motion to Dismiss
Case No. 21-cv-1449-RSM

-24-

**CONDON & FORSYTH, LLP**
600 Stewart Street, Suites 300 & 400
Seattle, Washington 98101
(206) 338-4240

Dated:  January 28, 2022               CONDON & FORSYTH LLP

                                       By: /s/ Mirin Park

                                       Mirin Park, Bar No. 57983
                                       600 Stewart Street, Suites 300 & 400
                                       Seattle, Washington 98101
                                       Phone: (206) 338-4240
                                       Facsimile: (206) 338-4240
                                       Email: mpark@condonlaw.com

                                       Anthony U. Battista (admitted *pro hac vice*)
                                       Diana Gurfel (admitted *pro hac vice*)
                                       Evan Kwarta (admitted *pro hac vice*)
                                       Mary Dow (admitted *pro hac vice*)
                                       7 Times Square, 18th Floor
                                       New York, New York 10036
                                       Phone: (212) 490-9100
                                       Facsimile: (212) 370-4453
                                       Email: abattista@condonlaw.com
                                       Email: dgurfel@condonlaw.com
                                       Email: ekwarta@condonlaw.com
                                       Email: mdow@condonlaw.com

                                       Attorneys for Plaintiff
                                       *POLSKIE LINIE LOTNICZE LOT S.A.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26