1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| POLSKIE LINIE LOTNICZE LOT S.A., | CASE NO. C21-1449RSM |
| Plaintiff, | ORDER GRANTING IN PART DEFENDANT'S MOTION TO DISMISS |
| v. | |
| THE BOEING COMPANY, | |
| Defendant. | |

## I.     INTRODUCTION

This matter is before the Court on Defendant Boeing's Motion to Dismiss, Dkt. #28, and its subsequently filed Motion for Protective Order, Dkt. #34. Plaintiff Polskie Linie Lotnicze LOT ("LOT") has sued Boeing for damages related to its purchase of Boeing's 737 MAX aircraft. The Complaint in this case is 143 pages. Dkt. #1. LOT alleges it was damaged after the crashes of 737 MAX aircraft in 2018 and 2019, Lion Air Flight 610 and Ethiopian Airlines Flight 302. After the second crash, the 737 MAX was grounded by aviation authorities and Boeing acknowledged certain defects. At that point LOT had leased fourteen 737 MAX aircraft, five of which were delivered before the 737 MAX was grounded, and nine of which were never delivered.

Seeking to hold Boeing responsible for its ensuing financial losses, LOT alleges the following causes of action:

1. fraudulent misrepresentation;

ORDER GRANTING IN PART MOTION TO DISMISS - 1

2.  negligent misrepresentation;

3.  fraudulent concealment/omission;

4.  unilateral mistake;

5.  mutual mistake;

6.  rescission;

7.  violation of the implied warranty of merchantability;

8.  violation of the implied warranty of fitness for a particular purpose;

9.  violation of the Washington Consumer Protection Act ("CPA");

10. product liability under the Washington Product Liability Act ("WPLA");

11. tortious interference with contracts; and

12. tortious interference with a business expectancy.

Dkt. #1.

Boeing moves for dismissal of all claims. Having considered the issues, the Court denies this Motion in part, grants the Motion in part with leave to amend, and denies Boeing's Motion for a Protective Order.

## II.    BACKGROUND

For purposes of this Motion to Dismiss, the Court will accept all facts in the Complaint, Dkt. #1, as true. The Court will briefly summarize the allegations.

Plaintiff LOT is a corporation organized and existing under the laws of Poland, and maintains its principal place of business in Poland. LOT is a commercial airline that operates scheduled air services, among other places, between the United States and Poland, pursuant to the terms of a foreign air carrier permit issued by the United States Department of Transportation. Boeing is an aerospace company involved in the design, manufacture, and sale of commercial aircraft.

In August of 2011, Boeing's Board of Directors authorized the launch of a new iteration of 737 aircraft to compete with the Airbus A320 NEO—the "MAX" Series.  In its launch announcement, Boeing emphasized the connection to the 737 product line's service history explaining that "[w]e call it the 737 MAX because it optimizes everything we and our customers have learned about designing, building, maintaining and operating the world's best single-aisle airplane."

Rather than designing a new aircraft from scratch, Boeing launched a new engine variant of the existing 737. To make the new 737 more fuel efficient, and therefore competitive with the A320 NEO, the preexisting 737 NG's engines were to be replaced with the larger, more fuel-efficient CFM International LEAP1-B (the "LEAP1-B") engines.

In its launch announcement Boeing asserted, *inter alia*, that: "The 737 MAX will deliver big fuel savings that airlines will need to successfully compete in the future. Airlines will benefit from a 7 percent advantage in operating costs over future competing airplanes as a result of optimized CFM International LEAP-1B engines, more efficient structural design and lower maintenance requirements;" and "Airlines will continue to benefit from maximum reliability. The 737 MAX will build upon the Next-Generation 737's highest reliability performance of any airplane in the world – 99.7 percent on-time departure rate."

Boeing's 737 MAX launch announcement did not disclose that as compared to the most recent 737 NG, the addition of the LEAP1-B engines would, *inter alia*: change the aircraft's center of gravity; decrease aircraft stability; negatively affect flight handling characteristics to make the aircraft more susceptible to the catastrophic risk of aerodynamic stall; and create inherent safety risks.

LOT alleges, "Boeing eschewed the opportunity to properly engineer the 737 MAX and instead found a way to fit the new, larger engine on an existing airframe, thereby creating inherent risks that Boeing would later attempt and fail to mitigate."

Boeing concealed that the use of LEAP1-B engines, and their placement on the airframe, rendered the 737 MAX distinct from its 737 predecessors, and the design changes advertised did not disclose the full scope of differences between the prior 737 variants and the 737 MAX.

The 737 MAX program's overarching goal and primary design objective was to achieve commonality with the 737 NG, and to ensure that the Federal Aviation Administration ("FAA") would not require a new "type certificate" or require aircraft simulator training for pilots transitioning to the 737 MAX from the 737 NG, which some of Boeing's largest customers were flying at the time.

The FAA approved Boeing's application for an amended type certificate rather than a new type certificate. Under an amended type certificate, as agreed by the FAA and Boeing, only the significant, "new and novel" differences between the 737 NG and the 737 MAX were required to be certified to current regulatory airworthiness standards.

Boeing added a software-based flight control logic called the Maneuvering Characteristics Augmentation System ("MCAS") to the 737 MAX to compensate for the problems caused by using larger engines. Boeing allegedly concealed this system, which did not exist on any other 737 aircraft, from regulators and operators such as LOT. Boeing claimed that it did not need to identify MCAS as "new and novel" because it had been covered under existing regulations relating to flight control systems and were included on the military Boeing 767 refueling tanker. However, the version of MCAS on the 737 MAX was different, relying on one sensor instead of two, and controlling the aircraft's movement in ways that the MCAS on the military tanker did not.

Boeing knew of problems with the 737 MAX MCAS system at the outset of its design and through the certification process. For example, in 2012, it took a Boeing test pilot more than 10 seconds to respond to uncommanded MCAS activation in a flight simulator, which the pilot found to be "catastrophic." In a November 27, 2012, email a Boeing employee noted that an MCAS light indication on the flight control panel had been removed enabling Boeing to hide MCAS's existence. In March of 2016 Boeing revised the MCAS flight control logic; in this second iteration of MCAS, Boeing chose to omit key safeguards that had previously been included in earlier iterations used on the 767 military tanker. The FAA was not informed by Boeing of this change to MCAS. On June 16, 2016, a Boeing employee noted an issue that would prove critical to the 737 MAX crashes: a test pilot was having trouble countering repetitive MCAS activation, and the employee questioned whether such difficulties were a safety or certification issue. Boeing concealed this information, by *e.g.*, continuing to tout the benefits of MAX's LEAP1-B engines without mentioning unintended side effects.

The lengthy Complaint discusses many other issues with the MCAS system, too numerous to recount in this Order. For example, at the time of FAA certification in 2017, Boeing indicated that MCAS could move the horizontal tail a maximum of 0.6 degrees, when the planes that were delivered to customers could actually move the tail 2.5 degrees. Further, MCAS could reset after each time a pilot responded to its "nose-down" command, meaning that when MCAS malfunctioned it would not just cause a single downward movement of 2.5 degrees, but would nose-down command the aircraft 2.5 degrees lower several times in succession as the pilot tried to regain control. Peter Lemme, a former Boeing flight controls engineer, explained that since MCAS could reset each time it was used, "it effectively has unlimited authority." Based on incorrect information, the FAA classified the potential failure of this system as less dangerous than it really was.

Boeing persuaded the FAA to allow it to delete any reference to MCAS from the Flight Crew Operations Manual ("FCOM"), the document that provides procedures, performance and systems information to flight crews to enable their safe and efficient operations of the airplane.

With respect to Boeing's hiding of MCAS from the FAA, the Joint Authorities Technical Review ("JATR"), an organization commissioned by the FAA to evaluate the 737 MAX Crisis, found that the FAA was not informed of "key details of the MCAS function… including architecture, signal inputs, and limits of authority;" and "MCAS should have been considered a novelty (and therefore clearly highlighted to the FAA technical staff)."

An investigation conducted by the U.S. House T&I Committee concluded that "Boeing withheld crucial information from the FAA, [and] its customers . . . " including "concealing the very existence of MCAS from 737 MAX pilots."  The Committee's findings appear to be a source for many of the above facts pled by LOT.

The U.S. Department of Justice ("DOJ") investigated Boeing's conduct during certification of the 737 MAX and indicted Boeing on a Charge of Criminal Conspiracy to Defraud the United States.  In a Deferred Prosecution Agreement, Boeing admitted that in the course of the 737 MAX certification process, it knowingly conspired to intentionally defraud the FAA AEG.  Specifically, Boeing acknowledged that two of the Company's 737 MAX Flight Technical Pilots deceived the FAA AEG about MCAS and that, through this deception, Boeing interfered with the FAA AEG's lawful function to evaluate MCAS. In doing so, Boeing obtained from the FAA AEG a differences-training determination for the 737 MAX (*i.e.*, an evaluation of the differences between the 737 MAX and 737 NG) of the Level B it was hoping for, and which was based on incomplete and inaccurate information about MCAS.

In March 2017, the European Aviation Safety Agency ("EASA") (LOT's civil aviation authority), certified the 737 MAX.  The Complaint alleges that EASA relied in part on the misrepresentations and omissions that Boeing made to the FAA; LOT relied on EASA.

After the second crash, Boeing acknowledged the potential involvement of MCAS and aviation authorities grounded the aircraft.  Boeing suspended all 737 MAX deliveries.

The FAA and EASA worked with Boeing to identify problems that would need to be fixed for recertification.  EASA did not recertify the 737 MAX for flight until January 27, 2021.

LOT pleads Boeing communicated direct material misrepresentations as LOT was looking to purchase 737 MAX planes to add to its fleet. Specifically, Herb Wallen, Boeing Regional Director of Boeing Commercial Airplanes, came to LOT's facilities and gave four sales presentations, comparing the 737 MAX to other possible aircraft options.   The first presentation in February 2016 contained "material misrepresentations and omissions regarding the 737 MAX consistent with the misrepresentations Boeing was making to the public, other air carriers, the FAA, and by extension, EASA."  Dkt. #1 at 53.  The presentation placed the 737 MAX in the 737 family, making it appear to be another iteration rather than an entirely new aircraft.  None of the above problems were disclosed; the MCAS system was not disclosed. Boeing assured LOT that the 737 MAX would require no new simulator training, and that it would provide all materials and information necessary to safely operate the aircraft.   LOT pleads facts about this presentation (and other presentations where LOT came to Seattle) in significant detail over many pages.

On June 24, 2016, LOT signed a Letter of Intent with an aircraft lessor, Air Lease Corporation ("ALC") to lease six 737 MAX aircraft. After further presentations from Boeing that allegedly contained misrepresentations, LOT signed the Lease Agreement on September 30, 2016.  LOT representatives travelled to Washington State to take delivery of the first aircraft

on December 1, 2017.  More aircraft were acquired in 2018, up until the grounding.  LOT operated several 737 MAX aircraft from the time of delivery through the worldwide grounding.

LOT leased nine additional 737 MAX aircraft through two additional lessors, six from Alafco, and three from SMBC Aviation. The leases for the 737 MAX aircraft from Alafco were signed on May 8, 2018. The leases for the 737 MAX aircraft from SMBC Aviation were signed on December 6, 2018.  As a result of the worldwide grounding of the 737 MAX, deliveries of those aircraft were cancelled and the leases terminated.

As a result of the grounding, LOT pleads it has sustained at least $250 million dollars in damages, after mitigation.  These damages include lost revenue from canceled flights for which it had to pay passengers, storage costs, payment to employees who were not working MAX flights but whom LOT was still required to pay, insurance costs, reputational damage, operational inefficiencies, the cost to acquire less suitable replacement aircraft, and other categories of associated losses.  LOT claims it is still incurring damages.

### III.    DISCUSSION

#### A.  Legal Standard under Rule 12(b)(6)

In making a 12(b)(6) assessment, the court accepts all facts alleged in the complaint as true, and makes all inferences in the light most favorable to the non-moving party.  *Baker v. Riverside County Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009) (internal citations omitted). However, the court is not required to accept as true a "legal conclusion couched as a factual allegation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Id*. at 678.  This requirement is met when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  The complaint need not include

detailed allegations, but it must have "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Absent facial plausibility, a plaintiff's claims must be dismissed. *Id*. at 570.

Where a complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

**B.  Fraud and Misrepresentation Claims (Claims 1 through 3)**

LOT first pleads fraudulent misrepresentation, negligent misrepresentation, and fraudulent concealment/omission.

To state a claim for fraud, LOT must allege that Boeing had "knowledge of falsity" when it made the alleged misrepresentations on which LOT relied. *See, e.g., Elcon Constr., Inc. v. E. Wash. Univ.*, 273 P.3d 965, 970 (Wash. 2012).  Boeing first argues that the Complaint fails to allege it made knowingly false statements.

The Court disagrees.  Accepting all facts alleged in the complaint as true, and with all inferences in the light most favorable to the non-moving party, LOT easily satisfies this standard with the detailed allegations above.  Boeing allegedly made many knowingly false statements about the 737 MAX to LOT directly over several sales presentations, including that these planes would require no new simulator training and that Boeing would provide all materials and information necessary to safely operate the aircraft.  The falsity of these statements is tied up with Boeing's alleged intentional regulatory subterfuge and could plausibly be proven at trial.  Boeing's argument that "LOT alleges *few* affirmative statements by Boeing, instead relying *heavily* on alleged omissions," Dkt. #28 at 17 (emphasis added), flips the 12(b)(6) standard on its head, asking the Court to demand *substantial* evidence at the pleading

stage while making inferences *against* the non-moving party.  Given the findings of other investigative bodies, Boeing's fraudulent misrepresentation to LOT is entirely plausible.  If Boeing wants to pin down each and every statement it did or did not make to LOT over multiple presentations, it is free to do so at the summary judgment stage or at trial.  LOT adequately pleads knowledge of falsity relying on internal communications and witness statements.

Boeing next argues that LOT fails to allege materiality or reliance on its misrepresentations and that "the Complaint shows that LOT was aware of the very aspects of the 737 MAX it alleges Boeing misrepresented or concealed."  *Id.* at 20.

Under Washington law, claims for fraud or negligent misrepresentation must establish that the misrepresentation was material and that the plaintiff relied on it.  *See Baddeley v. Seek*, 156 P.3d 959, 961–62 (Wash. Ct. App. 2007).  Such a claim must allege facts "establish[ing] that the representation was a moving factor inducing the purchaser [or lessee] to enter the transaction."  *Loehr v. Manning*, 272 P.2d 133, 136 (Wash. 1954).  A plaintiff cannot state a claim if it "was aware" of the facts that were allegedly undisclosed or misrepresented.  *Trimble v. Wash. State Univ.*, 993 P.2d 259, 264 (Wash. 2000).

Again, the Court disagrees with Boeing's application of the 12(b)(6) standard.  Boeing argues LOT was aware of the MCAS system due to a November 10, 2018, communication from Boeing to all 737 NG and 737 MAX customers (the "Multi Operator Message").  Dkt. #28 at 13–14.  This was not pled and is only before the Court due to Boeing's citation to the House Committee report, incorporated by reference in the Complaint.  There are at least two problems with this argument.  First, this message was delivered after LOT leased several if not most of the aircraft in question.  LOT could not have been aware of this information before relying on Boeing's alleged misrepresentations and making decisions that led to at least some of its alleged damages.  Second, the Multi Operator Message merely raises questions of fact as to LOT's

awareness and the adequacy of this disclosure, and all inferences are to be made in favor of the

non-moving party at this stage.  Taking all pled facts as true and drawing inferences in favor of

LOT, it was not aware of the potential problems with the MCAS system on the 737 MAX.  LOT

adequately pleads materiality and reliance despite ordering more planes after the Multi Operator

Message for the same reason.

Boeing argues that LOT's negligent misrepresentation claim is preempted by

Washington's Product Liability Act ("WPLA").  Dkt #28 at 21–22 (citing RCW § 7.72.010(4);

*Laisure-Radke v. Par Pharm.*, 426 F. Supp. 2d 1163, 1168–69 (W.D. Wash. 2006)).  In

response, LOT argues:

> Under Washington law, a negligent misrepresentation claim can
> stand alongside a WPLA claim where, as here, there are allegations
> of independent misrepresentations. *See Cent. Wash. Refrigeration
> v. Barbee*, 913 P.2d 836, 843-44 (Wash. Ct. App. 1996), *rev'd on
> other grounds*, 946 P.2d 760 (Wash. 1997). The cases that Boeing
> cites in its motion exclusively concern misrepresentations about
> "product defects"—not separate misrepresentations about the pilot
> training and fuel savings—and, thus, do not guide the Court's
> analysis of LOT's claims. *See* Boeing MTD, at ECF p. 14.9 Here,
> because LOT's negligent misrepresentation claim also arises from
> those false statements that Boeing knowingly made to LOT,
> separate and apart from Boeing's misrepresentations and failure to
> warn about the aircraft's defects, LOT's claims should be sustained
> as an independent cause of action under Washington law.

Dkt. #29 at 18.

The Court agrees with LOT that, contained within its substantially detailed Complaint

are at least some claims related to misrepresentations separate from product defects and that

therefore this claim, in some form, can survive dismissal at this stage.

**C. Mistake (Claims 4 and 5)**

Under applicable contract law, a mistake, whether mutual or unilateral, has four basic

elements: "(1) [the mistaken understanding] must be held at the time the contract is made, (2) it

must relate to a basic assumption of the contract, (3) it must have a material effect on the agreement, and (4) the party seeking avoidance must not have borne the risk of the mistake." *In re P'ship of Rhone & Butcher*, 166 P.3d 1230, 1234 (Wash. Ct. App. 2007).

Boeing argues that "LOT does not identify any contract between it and Boeing that it seeks to void. Instead, both mistake claims focus on LOT's 'Lease Agreements,' which are with third-party lessors—not Boeing—and the 'certain rights' found in 'the AGTA' and 'Purchase Agreements,' which are between Boeing and the lessors—not Boeing and LOT." Dkt. #28 at 23 (citing Dkt. #1 at ¶¶ 730–33, 752–55). Boeing contends that "the mistake doctrine applies only when there is a contract between the parties that can be made voidable by the alleged mistake." *Id.* (citing 2d Rest. Contracts §§ 152(1), 153; *Bremerton Dev. Co. v. Title Tr. Co.*, 121 P. 69, 70 (Wash. 1912)).

The Court agrees with Boeing only as to this reason to dismiss the mistake claims. Mistake does not appear to be a valid claim LOT can bring against Boeing due to the lack of privity between LOT and Boeing. *Anderson v. Spriestersbach*, 125 P. 166 (Wash. 1912), cited by LOT, does not state otherwise. Accordingly, LOT's unilateral and mutual mistake claims are dismissed.

**D. Rescission, (Claim 6)**

Boeing first states that "rescission is only a remedy, not a separate cause of action" under Washington law. Dkt. #28 at 24 (citing *Kwai Ling Chan v. Chase Home Loans Inc.*, 2012 WL 1252649, at *4 (W.D. Wash. Apr. 13, 2012) (alterations omitted); *McLauchlan v. Aurora Loan Servs. LLC*, 2011 WL 2650203, at *2 (W.D. Wash. July 6, 2011)). Boeing also argues, under Washington law, "one cannot cancel an agreement to which he is not a party." *Id.* (citing *Henry v. Lind,* 455 P.2d 927, 930 (Wash. 1969)). Because LOT is not a party to the AGTAs and Purchase Agreements between Boeing and LOT's lessors, LOT would have no right to rescind

those agreements.  Boeing points out that The Assignment Agreements do not change this conclusion "because the Complaint does not allege that they assign to LOT any right to seek rescission." *Id.*

The Court agrees with Boeing's analysis and will dismiss this claim.

### E. Implied Warranties (Claims 7 and 8)

LOT also brings claims for breach of the implied warranties of merchantability and fitness for a particular use. Dkt. #1 at ¶¶ 798–856.  Both claims are premised on the same theory: Boeing's alleged misrepresentations allow LOT to rescind the AGTAs' and Purchase Agreements' express limitations on remedies and disclaimers of warranties and thereby trigger implied warranties of merchantability and fitness under Article 2 of Washington's UCC. *See id.* at ¶¶ 818–20, 847–49.

Boeing cites *McInnis & Co. v. W. Tractor & Equip.*, 388 P.2d 562, 565 (Wash. 1964) for the proposition that "parties cannot reinstate disclaimed warranties merely by claiming fraudulent misrepresentation." Dkt. #28 at 25.  This case held that if a contract expressly disclaims any implied warranties, and the plaintiff claims fraud, "[n]o action can be maintained on breach of warranty," and the plaintiff is limited to proceeding on the fraud theory. *Id.*

In Response, LOT cites to an inapplicable line of cases dealing with disclaimers in contracts involving noncommercial entities. Dkt. #29 at 24.  LOT also argues that such claims can proceed despite the above law because "it has alleged that Boeing's warranty disclaimer is unconscionable… and that Boeing's limited warranties failed their essential purpose." *Id.* (citing Dkt. #1 at ¶¶ 249, 447, 524, 540, 554, 568, 584; RCW 62A.2–719(2)).

Specifically responding to this last point, Boeing replies:

> As LOT's cited authority establishes, a disclaimer of warranties is "prima facie conscionable" absent evidence put forth by the plaintiff establishing "unfair surprise." *Puget Sound Fin., L.L.C. v.*

*Unisearch, Inc.*, 47 P.3d 940, 945 (Wash. 2002). LOT alleges no facts to support a finding of "unfair surprise," instead basing its claims on conclusory recitations of the word "unconscionable" and an inapplicable test that only applies to noncommercial transactions. Opp. 17–18. Nor could LOT reasonably claim unfair surprise. It is a sophisticated party experienced in complex aircraft negotiations. *See Pagecom, Inc. v. Sprint Sols., Inc.*, 14 Wash. App. 2d 1062 (2020) (unpublished). And LOT "did not lack a meaningful choice" among aircraft, *id.*, given its own allegation that it had several options to choose from in leasing an aircraft, *see, e.g.*, Compl. ¶¶ 315–16.

….

Even if the doctrine [of failure of essential purpose] could apply to disclaimed warranties, LOT's implied warranty claims would still fail. The repair and recertification of 737 MAX aircraft, *see* Compl. nn. 99–100, refutes LOT's argument that the available remedies failed their essential purpose. LOT cites nothing to support this, but relies on a single conclusory allegation that it repeats five times: "Boeing knew that the Warranties that LOT's lessor was passing to LOT were useless because they failed their essential purpose." *Id*. ¶¶ 524, 540, 554, 568, 584.

Dkt. #31 at 13–14.

The Court finds *McInnis, supra* on point.  LOT is limited to proceeding on its fraud claims.  Further, it's claims of unconscionability and failure for essential purpose are dismissed as conclusory and not plausible for the reasons stated by Boeing above.  More facts are clearly needed to support these claims, which will be dismissed.

### F. Washington Consumer Protection Act ("WCPA") (Claim 9)

A WCPA claim requires an "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; [and] (5) causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins.*, 719 P.2d 531, 533 (Wash. 1986).

Boeing maintains that LOT is unable to show a "public interest impact," citing a recent Order in a parallel 737 MAX case in this District.  *Wilmington Tr. Co. v. Boeing Co.*, 2021 WL

754030, at *6 (W.D. Wash. Feb. 26, 2021) (adopting Report & Recommendation).   In *Wilmington Trust*, this Court dismissed the WCPA claim for failure to satisfy the public interest requirement based on its determination that sales of 737 MAX aircraft are multi-million-dollar transactions that "do not have the capacity to deceive a substantial portion of the public, thereby affecting the public interest," and thus fall "outside the scope of the WCPA," because "the parties to those transactions are sophisticated parties with equal bargaining power." *Id.*

The Court agrees with the analysis from *Wilmington Trust* and finds that the factual record here is sufficiently analogous.  Some of Boeing's actions with regard to the 737 MAX clearly affect the public interest—hence Congressional hearings.  However, LOT's CPA claims in the Complaint deal with the multi-million-dollar sale of planes—not the kind of transactions that the ordinary consumers would be engaged in.  This claim is properly dismissed.

**G. Washington Product Liability Act ("WPLA") (Claim 10)**

The WPLA provides a cause of action for harm caused by products that are not designed, constructed, or labeled in a reasonably safe manner. RCW § 7.72.030. A plaintiff may bring a product liability claim under the WPLA against the manufacturer for harm caused by a product. RCW § 7.72.010(4). "Harm" for purposes of the statute "does not include direct or consequential economic loss." RCW § 7.72.010(6). "The WPLA explicitly confines recovery to physical harm suffered by persons and property and leaves purely economic loss to [contract law]." *Hofstee v. Dow*, 109 Wn. App. 537, 543, 36 P.3d 1073 (2001) (citing RCW § 7.72.010(6); *Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc.*, 119 Wn.2d 334, 351, 831 P.2d 724 (1992)). *See also Wash. Water Power Co. v. Graybar Elec. Co.*, 112 Wn.2d 847, 857-60, 774 P.2d 1199 (1989).  Washington courts refer to this as the WPLA's "economic loss" exclusion. *Touchet Valley Grain Growers, Inc.*, 119 Wn.2d at 351.

1    LOT cites *Wilmington Trust, supra,* at *6, where a similar WPLA claim involving the

2    737 MAX was permitted by a Report and Recommendation. However, that portion of the R&R

3    was not adopted by the Court. *See* Case No. 2:20-cv-402-RSM, Dkt. #20 at 14. The Court

4    agrees with its prior analysis from *Wilmington Trust* and finds that the factual record here is

5    sufficiently analogous. LOT's harms are contractual in nature, Plaintiff is barred by the

6    economic loss rule from pursuing this claim, and has otherwise not plausibly pled this claim

7    under a "risk of harm" analysis. Dismissal is warranted under Rule 12(b)(6).

8    **H. Tortious Interference with Contract and Business Expectancy (Claims 11 and 12)**

9        LOT's final two claims are for "tortious interference with contracts" and "tortious

10   interference with business expectancy." Essentially LOT pleads that Boeing "interfered" with

11   LOT's leasing contracts, sales of tickets to passengers, and employee contracts by misleading

12   LOT and delivering the 737 MAX under the above circumstances.

13       "A party claiming tortious interference with a contract must establish five elements: (1)

14   the existence of a valid contractual relationship or business expectancy; (2) that defendants had

15   knowledge of that relationship; (3) an intentional interference inducing or causing a breach or

16   termination of the relationship or expectancy; (4) that defendants interfered for an improper

17   purpose or used improper means; and (5) resultant damage." *Kaiser Found. Health Plan, Inc. v.*

18   *Maylone*, 2022 Wash. App. LEXIS 1751, *27 (Wash. Ct. App. 2022) (citing *Leingang v. Pierce*

19   *County Med. Bureau, Inc.*, 131 Wn.2d 133, 157, 930 P.2d 288 (1997)). A plaintiff must prove

20   five elements to establish a prima facie case of tortious interference with a business expectancy:

21   "'(1) the existence of a valid … business expectancy; (2) that [the defendant] had knowledge of

22   that [expectancy]; (3) an intentional interference inducing or causing … termination of the …

23   expectancy; (4) that [the defendant] interfered for an improper purpose or used improper means;

24

ORDER GRANTING IN PART MOTION TO DISMISS - 16

and (5) resultant damage.'" *Pac. Nw. Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 351, 144 P.3d 276 (2006) (quoting *Leingang*, 131 Wn.2d at 157).

With either claim, the interference must be intentional.  While the Complaint clearly portrays many of Boeing's actions as negligent or fraudulent, intent to harm LOT is not pled. If the Court is missing some hidden statements of intent, such would currently be implausible for the reasons stated by Boeing. *See* Dkt. #31 at 17.  These claims are properly dismissed.

## I.   Leave to Amend

Where a complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber, supra*.  The Court finds that leave to amend is appropriate for all of the above dismissed claims as LOT could possibly amend with other facts to cure the noted deficiencies.

## J.   Boeing's Motion for Protective Order

Boeing has also moved for a protective order staying Boeing's response to LOT's discovery requests until after this Court rules the instant Motion to Dismiss.  Dkt. #34.  Because many of LOT's claims survive, the Court will deny this Motion as moot.  Boeing further seeks an order phasing discovery until the parties have negotiated and entered into an electronically stored information ("ESI") protocol.  The response from LOT indicates that the parties will move forward with that negotiation, if they have not done so already. *See* Dkt. #36 at 10. Accordingly, this request is denied.

## IV.   CONCLUSION

Having reviewed the relevant pleadings and the remainder of the record, the Court hereby finds and ORDERS:

1)  Defendant Boeing's Motion to Dismiss, Dkt. #28, is GRANTED IN PART AND DENIED IN PART as stated above.  Plaintiff's fourth, fifth, sixth, seventh, eighth, ninth, tenth, eleventh, and twelfth causes of action are dismissed with leave to amend.

2)  If Plaintiff wishes to amend these claims, it shall file an amended complaint consistent with the above no later than **thirty (30) days** after the date of this Order.

3)  Defendant Boeing's Motion for a Protective Order, Dkt. #34, is DENIED as MOOT. The parties are encouraged to work together to proceed with discovery in this case.


DATED this 30th day of September, 2022.


RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE

ORDER GRANTING IN PART MOTION TO DISMISS - 18