1

2

3

4

5

6

7

8

9

10

11

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

POLSKIE LINIE LOTNICZE LOT S.A.,

Plaintiff,

v.

THE BOEING COMPANY,

Defendant.

CASE NO. C21-1449RSM

ORDER RE: DEFENDANT'S
SECOND MOTION TO DISMISS

12

13

14

15

16

17

18

## I.       INTRODUCTION

This matter is before the Court on Defendant Boeing's Second Motion to Dismiss, Dkt. #51.  Boeing seeks only to dismiss claims fours through twelve, leaving the first three claims (fraudulent misrepresentation, negligent misrepresentation, and fraudulent concealment/ omission) unchallenged.  Plaintiff Polskie Linie Lotnicze LOT ("LOT") opposes.  Dkt. # 59. Neither party has requested oral argument.  For the reasons stated below, the Court denies this Motion in part and grants it in part without further leave to amend.

19

20

21

22

23

24

## II.       BACKGROUND

On October 25, 2021, Plaintiff LOT filed suit against Boeing for damages related to its purchase of 737 MAX aircraft.  The original Complaint was 143 pages.  Dkt. #1.  LOT discussed the crashes of 737 MAX aircraft in 2018 and 2019, Lion Air Flight 610 and Ethiopian Airlines Flight 302.  After the second crash, the 737 MAX was grounded by aviation authorities

ORDER RE: DEFENDANT'S SECOND MOTION TO DISMISS - 1

and Boeing acknowledged certain defects.  At that point LOT had leased fourteen 737 MAX aircraft, five of which were delivered before the 737 MAX was grounded, and nine of which were never delivered.

Seeking to hold Boeing responsible for its ensuing financial losses, LOT alleged the following causes of action:

1.  fraudulent misrepresentation;

2.  negligent misrepresentation;

3.  fraudulent concealment/omission;

4.  unilateral mistake;

5.  mutual mistake;

6.  rescission;

7.  violation of the implied warranty of merchantability;

8.  violation of the implied warranty of fitness for a particular purpose;

9.  violation of the Washington Consumer Protection Act ("CPA");

10. product liability under the Washington Product Liability Act ("WPLA");

11. tortious interference with contracts; and

12. tortious interference with a business expectancy.

Dkt. #1.

On September 30, 2022, the Court granted Boeing's first Rule 12 Motion and dismissed claims four through twelve with leave to amend.  Dkt. #39.  The first three claims were not dismissed.

On October 31, 2022, LOT filed its Amended Complaint, pleading eleven of the twelve previous causes of action with the same numbering system.  Dkt. #43.  LOT is no longer proceeding with claim ten under the WPLA.  LOT reasserts without amendment Claims 1-3 and

reasserts as amended Claims 7-8.  LOT states that it "does not amend Claims 4-6 and 9-12 from its original Complaint; however, LOT includes those claims here without amendment to preserve those causes of action for appeal and preclude any arguments of waiver."  *Id.* at 4.

For purposes of this Second Motion to Dismiss, the Court will accept all facts in the Amended Complaint as true.  The Court will briefly summarize the allegations.

Plaintiff LOT is a corporation organized and existing under the laws of Poland, and maintains its principal place of business in Poland.  LOT is a commercial airline that operates scheduled air services, among other places, between the United States and Poland, pursuant to the terms of a foreign air carrier permit issued by the United States Department of Transportation.  Boeing is an aerospace company involved in the design, manufacture, and sale of commercial aircraft.

In August of 2011, Boeing's Board of Directors authorized the launch of a new iteration of 737 aircraft to compete with the Airbus A320 NEO—the "MAX" Series.  In its launch announcement, Boeing emphasized the connection to the 737 product line's service history explaining that "[w]e call it the 737 MAX because it optimizes everything we and our customers have learned about designing, building, maintaining and operating the world's best single-aisle airplane."

Rather than designing a new aircraft from scratch, Boeing launched a new engine variant of the existing 737.  To make the new 737 more fuel efficient, and therefore competitive with the A320 NEO, the preexisting 737 NG's engines were to be replaced with the larger, more fuel-efficient CFM International LEAP1-B (the "LEAP1-B") engines.

In its launch announcement Boeing asserted, *inter alia*, that: "The 737 MAX will deliver big fuel savings that airlines will need to successfully compete in the future. Airlines will benefit from a 7 percent advantage in operating costs over future competing airplanes as a result

of optimized CFM International LEAP-1B engines, more efficient structural design and lower maintenance requirements;" and "Airlines will continue to benefit from maximum reliability. The 737 MAX will build upon the Next-Generation 737's highest reliability performance of any airplane in the world – 99.7 percent on-time departure rate."

Boeing's 737 MAX launch announcement did not disclose that as compared to the most recent 737 NG, the addition of the LEAP1-B engines would, *inter alia*: change the aircraft's center of gravity; decrease aircraft stability; negatively affect flight handling characteristics to make the aircraft more susceptible to the catastrophic risk of aerodynamic stall; and create inherent safety risks.

LOT alleges that "Boeing eschewed the opportunity to properly engineer the 737 MAX and instead found a way to fit the new, larger engine on an existing airframe, thereby creating inherent risks that Boeing would later attempt and fail to mitigate."

Boeing concealed that the use of LEAP1-B engines, and their placement on the airframe, rendered the 737 MAX distinct from its 737 predecessors, and the design changes advertised did not disclose the full scope of differences between the prior 737 variants and the 737 MAX.

The 737 MAX program's overarching goal and primary design objective was to achieve commonality with the 737 NG, and to ensure that the Federal Aviation Administration ("FAA") would not require a new "type certificate" or require aircraft simulator training for pilots transitioning to the 737 MAX from the 737 NG, which some of Boeing's largest customers were flying at the time.

The FAA approved Boeing's application for an amended type certificate rather than a new type certificate.  Under an amended type certificate, as agreed by the FAA and Boeing, only the significant, "new and novel" differences between the 737 NG and the 737 MAX were required to be certified to current regulatory airworthiness standards.

Boeing added a software-based flight control logic called the Maneuvering Characteristics Augmentation System ("MCAS") to the 737 MAX to compensate for the problems caused by using larger engines. Boeing allegedly concealed this system, which did not exist on any other 737 aircraft, from regulators and operators such as LOT. Boeing claimed that it did not need to identify MCAS as "new and novel" because it had been covered under existing regulations relating to flight control systems and were included on the military Boeing 767 refueling tanker. However, the version of MCAS on the 737 MAX was different, relying on one sensor instead of two, and controlling the aircraft's movement in ways that the MCAS on the military tanker did not.

Boeing knew of problems with the 737 MAX MCAS system at the outset of its design and through the certification process. For example, in 2012, it took a Boeing test pilot more than 10 seconds to respond to uncommanded MCAS activation in a flight simulator, which the pilot found to be "catastrophic." In a November 27, 2012, email a Boeing employee noted that an MCAS light indication on the flight control panel had been removed enabling Boeing to hide MCAS's existence. In March of 2016 Boeing revised the MCAS flight control logic; in this second iteration of MCAS, Boeing chose to omit key safeguards that had previously been included in earlier iterations used on the 767 military tanker. The FAA was not informed by Boeing of this change to MCAS. On June 16, 2016, a Boeing employee noted an issue that would prove critical to the 737 MAX crashes: a test pilot was having trouble countering repetitive MCAS activation, and the employee questioned whether such difficulties were a safety or certification issue. Boeing concealed this information, by, *e.g.*, continuing to tout the benefits of MAX's LEAP1-B engines without mentioning unintended side effects.

The lengthy Amended Complaint discusses other issues with the MCAS system, too numerous to recount in this Order. For example, at the time of FAA certification in 2017,

Boeing indicated that MCAS could move the horizontal tail a maximum of 0.6 degrees, when the planes that were delivered to customers could actually move the tail 2.5 degrees.  Further, MCAS could reset after each time a pilot responded to its "nose-down" command, meaning that when MCAS malfunctioned it would not just cause a single downward movement of 2.5 degrees, but would nose-down command the aircraft 2.5 degrees lower several times in succession as the pilot tried to regain control.  Peter Lemme, a former Boeing flight controls engineer, explained that since MCAS could reset each time it was used, "it effectively has unlimited authority."  Based on incorrect information, the FAA classified the potential failure of this system as less dangerous than it really was.

Boeing persuaded the FAA to allow it to delete any reference to MCAS from the Flight Crew Operations Manual ("FCOM"), the document that provides procedures, performance and systems information to flight crews to enable their safe and efficient operations of the airplane.

With respect to Boeing's hiding of MCAS from the FAA, the Joint Authorities Technical Review ("JATR"), an organization commissioned by the FAA to evaluate the 737 MAX Crisis, found that the FAA was not informed of "key details of the MCAS function… including architecture, signal inputs, and limits of authority;" and "MCAS should have been considered a novelty (and therefore clearly highlighted to the FAA technical staff)."

An investigation conducted by the U.S. House T&I Committee concluded that "Boeing withheld crucial information from the FAA, [and] its customers . . . " including "concealing the very existence of MCAS from 737 MAX pilots."  The Committee's findings appear to be a source for many of the above facts pled by LOT.

The U.S. Department of Justice ("DOJ") investigated Boeing's conduct during certification of the 737 MAX and indicted Boeing on a Charge of Criminal Conspiracy to Defraud the United States.  In a Deferred Prosecution Agreement, Boeing admitted that in the

course of the 737 MAX certification process, it knowingly conspired to intentionally defraud the FAA AEG. Specifically, Boeing acknowledged that two of the Company's 737 MAX Flight Technical Pilots deceived the FAA AEG about MCAS and that, through this deception, Boeing interfered with the FAA AEG's lawful function to evaluate MCAS. In doing so, Boeing obtained from the FAA AEG a differences-training determination for the 737 MAX (*i.e.*, an evaluation of the differences between the 737 MAX and 737 NG) of the Level B it was hoping for, and which was based on incomplete and inaccurate information about MCAS.

In March 2017, the European Aviation Safety Agency ("EASA") (LOT's civil aviation authority), certified the 737 MAX. The Complaint alleges that EASA relied in part on the misrepresentations and omissions that Boeing made to the FAA; LOT relied on EASA.

After the second crash, Boeing acknowledged the potential involvement of MCAS and aviation authorities grounded the aircraft. Boeing suspended all 737 MAX deliveries.

The FAA and EASA worked with Boeing to identify problems that would need to be fixed for recertification. EASA did not recertify the 737 MAX for flight until January 27, 2021.

LOT pleads Boeing communicated direct material misrepresentations as LOT was looking to purchase 737 MAX planes to add to its fleet. Specifically, Herb Wallen, Boeing Regional Director of Boeing Commercial Airplanes, came to LOT's facilities and gave four sales presentations, comparing the 737 MAX to other possible aircraft options. The first presentation in February 2016 contained "material misrepresentations and omissions regarding the 737 MAX consistent with the misrepresentations Boeing was making to the public, other air carriers, the FAA, and by extension, EASA." Dkt. #43 at 64. The presentation placed the 737 MAX in the 737 family, making it appear to be another iteration rather than an entirely new aircraft. None of the above problems were disclosed; the MCAS system was not disclosed. Boeing assured LOT that the 737 MAX would require no new simulator training, and that it

would provide all materials and information necessary to safely operate the aircraft. LOT pleads facts about this presentation (and other presentations where LOT came to Seattle) in significant detail over many pages.

On June 24, 2016, LOT signed a Letter of Intent with an aircraft lessor, Air Lease Corporation ("ALC") to lease six 737 MAX aircraft. After further presentations from Boeing that allegedly contained misrepresentations, LOT signed the Lease Agreement on September 30, 2016. LOT representatives travelled to Washington State to take delivery of the first aircraft on December 1, 2017. More aircraft were acquired in 2018, up until the grounding. LOT operated several 737 MAX aircraft from the time of delivery through the worldwide grounding.

LOT leased nine additional 737 MAX aircraft through two additional lessors, six from Alafco, and three from SMBC Aviation. The leases for the 737 MAX aircraft from Alafco were signed on May 8, 2018. The leases for the 737 MAX aircraft from SMBC Aviation were signed on December 6, 2018. As a result of the worldwide grounding of the 737 MAX, deliveries of those aircraft were canceled and the leases terminated.

As a result of the grounding, LOT pleads it has sustained at least $250 million dollars in damages, after mitigation. These damages include lost revenue from canceled flights for which it had to pay passengers, storage costs, payment to employees who were not working MAX flights but whom LOT was still required to pay, insurance costs, reputational damage, operational inefficiencies, the cost to acquire less suitable replacement aircraft, and other categories of associated losses. LOT claims it is still incurring damages.

LOT claims that "as part of the lease transactions by which LOT acquired 737 MAX aircraft… LOT, Boeing, and LOT's lessor executed assignments of rights whereby, *inter alia*, the Warranty, Limited "Remedies," "Disclaimer" and Exclusion of Liabilities" provisions that Boeing drafted and required LOT's lessors to execute…. Would be and were assigned to

ORDER RE: DEFENDANT'S SECOND MOTION TO DISMISS - 8

LOT…" Dkt. #43 at 108–09.  LOT cites to specific language in these provisions and attaches them to the Amended Complaint.  *Id.* at 109–11.  For example, the Aircraft General Terms Agreement ("AGTA"), entered by Boeing and LOT's lessor, included an "exclusive" express warranty that the aircraft would be delivered free from defects in material or design.  *Id.*  In the event of a defect, Boeing limited the remedies available to LOT, including "returning the Boeing Product to Boeing for Correction." *Id.*

LOT's Assignment of Rights also included an exclusion of consequential damages.

## III.    DISCUSSION

### A.  Legal Standard under Rule 12(b)(6)

In making a 12(b)(6) assessment, the court accepts all facts alleged in the complaint as true, and makes all inferences in the light most favorable to the non-moving party.  *Baker v. Riverside County Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009) (internal citations omitted). However, the court is not required to accept as true a "legal conclusion couched as a factual allegation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. at 678.  This requirement is met when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  The complaint need not include detailed allegations, but it must have "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.  Absent facial plausibility, a plaintiff's claims must be dismissed.  *Id*. at 570.

Where a complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the

challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

### B. Fraud and Misrepresentation Claims (Claims 1 through 3)

The Court has previously allowed these claims to proceed, they have not been amended, and neither party addresses them now. They are not dismissed.

### C. Claims 4–6 and 9–12

LOT acknowledges the Court previously dismissed these claims. LOT reasserts them without amendment only to "preserve those causes of action for appeal and preclude any arguments of waiver." Dkt. #43 at 4. Accordingly, the Court dismisses these claims again for the reasons stated in its prior Order. Leave to amend will not be granted.

### D. Implied Warranties (Claims 7 and 8)

Boeing's Motion is really about these two claims for breach of the implied warranties of merchantability and fitness for a particular use. Both claims are initially premised on the theory previously dismissed by the Court: that Boeing's "Fraud and gross negligence," detailed above, allow LOT to rescind the AGTAs' and Purchase Agreements' express limitations on remedies and disclaimers of warranties, thereby triggering implied warranties of merchantability and fitness under Article 2 of Washington's UCC. *See* Dkt. #43 at ¶¶ 875–997. In response to the Court's prior ruling, LOT has added new theories. LOT pleads that under RCW62A.2-719, "if the Warranties as limited by Boeing fail of their essential purpose, then they are voided, and LOT is entitled to all of the implied warranties available under Washington law, including the implied warranty of merchantability." *Id.* at ¶ 895. LOT argues these warranties failed of their essential purpose because of how long the 737 MAX aircraft were grounded and because "Boeing continued to falsely assure operators including LOT that a fix for MCAS was imminent." *Id.* at ¶ 898.

LOT also now pleads that the contracts' exclusion of consequential damages is unconscionable because it was procured by, and a result of Boeing's gross negligence" and "because it does not reflect the parties' intended allocation of risk, or intended benefit of the bargain." *See id.* at ¶ 923 and ¶ 928.  LOT says it did not bargain for planes that would be grounded for so long, or the risk of Boeing taking nearly two years to remedy the MCAS defect while it "continually misled LOT concerning the timing of the remedy…" *Id.* at ¶¶ 924–927.

LOT pleads Boeing knew LOT was to receive an assignment of rights relating to LOT's acquiring MAX 737 aircraft, and that it was therefore an intended third-party beneficiary of those rights. *Id.* at ¶¶ 892–93.

Like its previous Motion to Dismiss, Boeing cites *McInnis & Co. v. W. Tractor & Equip.*, 388 P.2d 562, 565 (Wash. 1964) for the proposition that "parties cannot reinstate disclaimed warranties merely by claiming fraud." Dkt. #51 at 6.  *McInnis* held that if a contract expressly disclaims any implied warranties, and the plaintiff claims fraud, "[n]o action can be maintained on breach of warranty," and the plaintiff is limited to proceeding on the fraud theory. *Id.* at 13.  LOT argues in response that it should be permitted to plead both warranty claims and fraud claims, and to pursue those theories in discovery, "even if the Court later determines that LOT must choose only one path at trial."  Dkt. #59 at 17 (citing *Cozumel Leasing, LLC v. Int'l Jets Inc.*, No. 16-5089 RJB, 2016 WL 4945293, at *5-*9 (W.D. Wash. Sept. 16, 2016)).  Given that Plaintiff may eventually fail to prove fraud, but otherwise be able to demonstrate a breach of implied warranties, this argument makes sense.  It is plausible that these claims could proceed if the fraud claims are dismissed or withdrawn prior to trial. Accordingly, these claims will not be dismissed under Rule 12(b)(6) based on *McInnis*.

Turning to the remaining theories, the Court first finds that LOT has failed to add adequate facts to support a theory of procedural or substantive unconscionability with regard to

the implied warranty claims.  The Court's prior analysis of unconscionability continues to justify dismissal.  *See* Dkt #39 at 13–14.  Even if LOT were to amend the pleading to shore up such a theory, the Court agrees with Boeing that "the Amended Complaint admits that LOT executed the lease and assignment agreements after months of extensive, detailed discussions between sophisticated negotiating teams," Dkt. #51 at 17.  There are insufficient facts to support a finding that the warranties or exclusion of warranties were substantively unconscionable, and it is not clear that LOT even argues that point.  Instead, the parties discuss the contracts' exclusion of consequential damages—but Boeing only tangentially discusses the issue, and its requested relief is to dismiss causes of action, not types of available damages.  The Court will defer ruling on consequential damages until the summary judgment stage.

The failure of essential purpose theory, on the other hand, is supported by at least some plausible new facts.

The UCC permits a party to avoid a contractual exclusion or limitation of remedies where "circumstances cause an exclusive or limited remedy to fail of its essential purpose." RCW 62A.2-719(2).  A limited remedy fails of its essential purpose "when it deprives a party of the substantive value of its bargain." *Ruiz Fajardo Ingenieros Asociados S.A.S. v. Flow Int'l Corp.*, 2018 WL 6809511, at *3 (W.D. Wash. Dec. 27, 2018) (citing RCW 62A.2-719).

LOT alleges that the exclusive express warranties failed of their essential purpose because Boeing took too long to develop a fix that satisfied government regulators, *see* Dkt. #43 at ¶¶ 648, 671, and "repeatedly assured operators such as LOT that a fix was imminent" during the grounding, *id*. at ¶ 655.  The record appears to show that these allegations are debatable but plausible and that the law supports a possible path forward for failure of essential purpose to permit these warranty claims to proceed.  This serves as a second basis to deny Boeing's Motion with regard to these implied warranty claims.

Boeing argues that the implied warranties could not legally have been assigned to LOT. Dkt. #51 at 22–23. Although it appears that implied warranties were not transferred, LOT is instead arguing that the failure of the express warranties activate implied warranties under Washington law. Boeing does not have a case directly on point to shoot down that theory. The Court is not convinced that dismissal is appropriate. Boeing also argues that LOT could not have been a third-party beneficiary because LOT was not known to be the eventual lessee at the time of the original contracts—even though Boeing knew that some airline would lease these planes. Boeing's argument that "[e]ven if LOT were a third-party beneficiary, it cannot claim additional rights beyond the 'underlying contract[s]' between Boeing and the lessors," is disingenuous; LOT is not claiming anything more than that which would be held by a party to the original contract—the activation of implied warranties when the express warranties failed of their essential purpose. Considering all of the above, the Court finds LOT's implied warranty claims plausible and will allow them to proceed.

### IV.    CONCLUSION

Having reviewed the relevant pleadings and the remainder of the record, the Court hereby finds and ORDERS that Defendant Boeing's Motion to Dismiss, Dkt. #28, is GRANTED IN PART AND DENIED IN PART as stated above. Plaintiff's fourth, fifth, sixth, ninth, tenth, eleventh, and twelfth causes of action are dismissed without leave to amend. The remaining claims are not dismissed.

DATED this 7th day of February, 2023.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE