UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| POLSKIE LINIE LOTNICZE LOT S.A., <br><br> Plaintiff, <br><br> v. <br><br> THE BOEING COMPANY, <br><br> Defendant. | CASE NO. C21-1449RSM <br><br> ORDER RE: MOTIONS FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

This matter is before the Court on the parties' Motions for Summary Judgment, Dkts. #135 and #143. The Court has determined that it can rule without the need of oral argument. For the reasons stated below, the Court grants Defendant Boeing's Motion in part, denies it in part, and denies Plaintiff Polskie Linie Lotnicze LOT S.A. ("LOT")'s Motion.

## II. PROCEDURAL BACKGROUND

On October 25, 2021, Plaintiff LOT filed suit against Boeing for damages related to its purchase of 737 MAX aircraft. Dkt. #1. This came after the crashes of 737 MAX aircraft in 2018 and 2019, Lion Air Flight 610 and Ethiopian Airlines Flight 302. After the second crash, the 737 MAX was grounded by aviation authorities and Boeing acknowledged certain defects. At that point LOT had leased fourteen 737 MAX aircraft, five of which were delivered before the 737 MAX was grounded, and nine of which were never delivered.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 1

Seeking to hold Boeing responsible for its ensuing financial losses, LOT alleged the following causes of action:

1. fraudulent misrepresentation;
2. negligent misrepresentation;
3. fraudulent concealment/omission;
4. unilateral mistake;
5. mutual mistake;
6. rescission;
7. violation of the implied warranty of merchantability;
8. violation of the implied warranty of fitness for a particular purpose;
9. violation of the Washington Consumer Protection Act ("CPA");
10. product liability under the Washington Product Liability Act ("WPLA");
11. tortious interference with contracts; and
12. tortious interference with a business expectancy.

Dkt. #1.

On September 30, 2022, the Court granted Boeing's first Rule 12 Motion and dismissed claims four through twelve with leave to amend. Dkt. #39. The first three claims were not dismissed.

On October 31, 2022, LOT filed its Amended Complaint, pleading eleven of the twelve previous causes of action with the same numbering system. Dkt. #43. Boeing again moved to dismiss, and the Court granted that Motion in part, allowing only claims 1-3 and 7-8 to proceed. Dkt. #72. These claims are now the subject of the instant Motions.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 2

## III. FACTUAL BACKGROUND[1]

This case involves years of interactions between the parties and hundreds of internal records documenting the development of complex airplane systems. The Court has no intention of running through all the facts that could be presented at trial and will instead detail only those facts necessary for ruling on the instant Motions.

Although briefing and certain exhibits have been filed under seal with redacted public versions, the Court finds it to be in the public interest to issue its orders in this case without redactions. The Court has determined that the quotes below from briefing and exhibits can be published. Every effort has been taken to maintain the stated interests of the parties in redacting prior filings, weighed against the interests of the public and the need for the Court to discuss the issues in this case.

Plaintiff LOT is a commercial airline organized and existing under the laws of Poland with its principal place of business in Poland. Boeing is a U.S.-based aerospace company involved in the design, manufacture, and sale of commercial aircraft. The parties agree that LOT has been flying Boeing airplanes for more than 35 years.

In August of 2011, Boeing announced the launch of a new iteration of 737 aircraft—the "MAX" Series. Dkt. #145-1 at 2. The MAX was to be an update to the 737 "NG" plane. In its announcement, Boeing emphasized the connection to earlier 737 models and stated, "[w]e call it the 737 MAX because it optimizes everything we and our customers have learned about designing, building, maintaining and operating the world's best single-aisle airplane." *Id*.

---

[1] The Court notes that both parties move for summary judgment, arguing on the one hand that there are no genuine disputes of material fact while on the other hand contesting the facts presented by the other side. In their proposed Pretrial Order, the parties state they "were unable to reach an agreement on the statement of admitted facts required by the Local Rules," and each submits its own different statement of "facts admitted by both parties." Dkt. #212 at 3. There are clearly factual disputes. The Court will do its best to summarize the relevant undisputed facts here.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 3

The MAX came with larger, more fuel-efficient "LEAP1-B" engines. *Id*. As early as February 28, 2012, Boeing's engineers determined that the larger engines caused the nose of the MAX to tilt (or "pitch") up under certain conditions. Dkt. #144-1 at 36–37. To address the MAX's pitch-up tendency, Boeing made structural changes to the airplane and implemented a new flight control software program called Maneuvering Characteristics Augmentation System ("MCAS"), which would counter the pitch-up tendency by moving the airplane's horizontal stabilizer. *Id*.

In late 2012, Boeing's engineers and test pilots believed that MCAS, along with structural changes, resolved the high-speed pitch-up issue. *See* Dkt. #144-1 at 32 and 36.

In January 2016, Boeing began flight testing the MAX. *Id*. Ex. 5. In February of 2016, Boeing determined that the MAX's stall identification and characteristics—the way an aircraft behaves and handles as it approaches, enters, and recovers from a stall—presented a "high risk" to being certified by the Federal Aviation Administration ("FAA") and similar international regulatory bodies and needed to be addressed. *Id*. at 49.

Throughout March, Boeing's engineers explored various options for mitigating the MAX's stall characteristics. *See id*. at 62. In addition to implementing further structural changes to the airplane, they considered expanding MCAS to operate at lower speeds typical of a stall. *Id*. at 58. Boeing personnel conducted a variety of flight and simulator tests on this proposed solution in March 2016. *Id*. at 65–68.

On March 30, 2016, Boeing engineers met with Keith Leverkuhn, the MAX Program Manager, and Michael Teal, the MAX Chief Engineer, about the stall characteristics issue. Dkt. #144 ("Lucero Decl."), ¶ 18; Dkt. #144-1 at 73–74; and Dkt. #145-1, Ex. 4 ("Leverkuhn Dep.")

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 4

77:25-78:15). These two men would later communicate with LOT about the 737 MAX, making their knowledge of the MCAS system's potential safety problems a key issue in this case. The "Executive Summary" slide from this meeting says that "[h]igh altitude flaps up stall requires separate mitigation," and that "MCAS change predicted to result in acceptable stall characteristics." Dkt. #144-1 at 74. In his deposition, Leverkuhn was asked if, on March 30, he "understood that the flight control law that you were discussing could drive the nose of the aircraft toward the ground without pilot input," and he responded, "I knew that the MCAS was going to create a solution for the stall identification." Leverkuhn Dep. 81:18-25. That same day, the Boeing engineering team modified MCAS's technical specifications to implement its expansion to low-speed operation. *See* Dkt. #144-1 at 88–94.

On July 28, 2016, Boeing briefed FAA certification authorities on its changes to address the MAX's stall characteristics. *See* Dkt. #144-1 at 129. The slides from that briefing say that Boeing had expanded MCAS to operate at "low speed" and that the "[c]onfiguration changes provide improved stall characteristics which result in a certifiable configuration." *Id*. at 135–36. Boeing subsequently provided the FAA with additional details about MCAS's design and its expansion to low-speed operation. Lucero Decl. at ¶¶ 24-30. Boeing also shared these details with LOT's regulator, the European Union Aviation Safety Agency ("EASA"), which needed to separately approve the MAX's certification and pilot training requirements. *Id.* at ¶ 32.

The FAA certified the MAX, with the low-speed version of MCAS, on March 8, 2017. Dkt. #144-1 at 190. EASA concluded its own certification review on March 27, 2017. *Id*. at 194.

Boeing and LOT began negotiating a MAX transaction in 2016.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 5

Several Boeing employees, including Herb Wallen (Marketing Director), Maarten Kluit (Sales Director), and Monty Oliver (Sales Vice President)—handled Boeing's sales and marketing interactions with LOT during the 2016 campaign. *See* Dkt. #145-1, Ex. 2 ("LOT 30(b)(6) Dep."), 144:19-23; *see also* Dkt. #145-1 at 103–108. Wallen, Kluit, and Oliver will testify that they had no knowledge of the MAX's pitch-up characteristics or the plan to address those characteristics using MCAS. *See* Dkt. #145-1, Ex. 7 ("Wallen Dep."), 84:14-21, 87:8-16, 95:12-97:17, 170:23-172:5; *id*. Ex. 8 ("Kluit Dep."), 80:5-20, 83:16-86:24, 89:13-15, 147:1-4; and *id*., Ex. 6 ("Oliver Dep."), 57:19-58:3, 59:25-60:3.

LOT visited Boeing in Seattle in April 2016. Dkt. #145-1 at 104. LOT had a half-hour "MAX Program Update" with Leverkuhn on April 12. Dkt. #145-1 at 558. Wallen, Kluit, and other Boeing sales employees visited LOT in Warsaw later that month. Dkt. #145-1 at 104.

On June 21, 2016, a team of LOT employees issued a "Recommendation for selection of narrow-body aircraft" (the "Recommendation Report") stating that LOT should move forward with leasing a mix of NG and MAX airplanes. *See id.* at 363. The report identified the "key problem[s]," "fundamental assumptions," and "selection . . . criteria" that motivated LOT's leasing decision; these were mostly economic concerns and did not specifically mention MCAS. *See id.* at 307, 320, 328. LOT's Management Board, which included its CEO, accepted the recommendation on June 21, 2016. Dkt. #145-1 at 552.

On September 22, 2016, Michael Teal sent LOT a one-page letter with an update on the status of the MAX flight test program and progress towards certification. Dkt. #144-1 at 202. By this time, Boeing had successfully completed 11 certification flight tests with the FAA involving the activation of MCAS, including for stall characteristics testing. Lucero Decl. at ¶

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 6

36(c)-(d); Dkt. #144-1 at 209. Consistent with those tests, the September 22 letter reported that "[t]est results to date have validated the aircraft is performing as predicted." Dkt. #144-1 at 202. LOT executed a lease agreement for six MAX aircraft on September 30, 2016. *See, e.g.,* Dkt. #145-1 at 560.

In April 2017 Boeing sent LOT a presentation that specifically identified MCAS and described it as a "systems revision" from the NG. *See* Dkt. #145-1 at 562 and 567.

In December 2017, Boeing delivered LOT its first MAX airplane, followed by four more in 2018. The lessor assigned LOT certain limited rights under the airplane purchase agreement with Boeing to pursue maintenance and warranty claims. Dkt. #145-1 at 575. Under the purchase agreement's "disclaimer and release" clause, a purchaser's exclusive remedy against Boeing for an allegedly defective aircraft is replacement or "Correction"—that is, repair—of the defect. Dkt. #145-1, Ex. 28 (Aircraft General Terms Agreement or "AGTA"), Ex. C, §§ 4.1, 4.3, 11.1). In addition, the "exclusion of consequential and other damages" clause holds Boeing harmless for all "incidental or consequential damages with respect to any nonconformance or defect in any aircraft, materials, training, services or other thing provided under this AGTA and the applicable purchase agreement." *Id*. § 11.2. LOT expressly agreed that it would "be bound by and comply with . . . the disclaimer and release and exclusion of consequential and other damages provisions" in the purchase agreement. Dkt. #145-1 at 577.

LOT leased an additional six MAX airplanes in May 2018. Having already committed to the MAX in 2016, LOT did not go through the same level of investigation or analysis. LOT 30(b)(6) Dep. at 67:23-68:1 ("Q: And that in your understanding is because once the MAX was chosen, that was effectively choosing for the future; is that fair? A: That is fair.").

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 7

In October 2018, Lion Air flight 610 crashed. In November, Boeing shared with LOT further information about MCAS and how pilots should respond to its erroneous activation. *See* Dkt. #145-1 at 283-84 and at 737-38. Boeing scheduled a call with LOT later that month so it could ask questions about this update; LOT "asked no questions" on the call. *Id.* at 624.

In December of 2018, LOT took delivery of another MAX plane and signed another lease for an additional three MAX. *See id.* at 627.

On March 10, 2019, Ethiopian Airlines flight 302 crashed. Two days later, EASA grounded the MAX across Europe, including LOT's airplanes. When EASA lifted its grounding order in January 2021, Boeing provided updated MCAS software, and LOT reintegrated the MAX into its fleet. *See* Dkt. #145-1, Ex. 5 ("Milczarski Dep."), 272:4-6. LOT filed this suit in 2021 to recover economic damages from the grounding. *See* Dkt. #1.

On January 6, 2021, Boeing entered into a Deferred Prosecution Agreement with the U.S. Department of Justice. Dkt. #145 ("Paisner Decl."), ¶ 51. Boeing admitted that starting in November 2016—after LOT executed its first MAX lease agreement in September, but before it executed subsequent agreements—two of its employees engaged in a conspiracy to deceive the FAA about MCAS. *Id.* The Deferred Prosecution Agreement stated that "the misconduct was neither pervasive across the organization, nor undertaken by a large number of employees, nor facilitated by senior management." *Id*. The DPA also acknowledged that Boeing had "disclosed MCAS's expanded operational scope to different FAA personnel who were responsible for determining whether the 737 MAX met U.S. federal airworthiness standards." *Id*. To be clear, the misconduct described in the Deferred Prosecution Agreement involved the FAA, not LOT's regulatory authority, EASA.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 8

## IV.     DISCUSSION

### A. Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Material facts are those which might affect the outcome of the suit under governing law. *Anderson*, 477 U.S. at 248. In ruling on summary judgment, a court does not weigh evidence to determine the truth of the matter, but "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994) (citing *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992)).

On a motion for summary judgment, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Sullivan v. U.S. Dep't of the Navy*, 365 F.3d 827, 832 (9th Cir. 2004). The Court must draw all reasonable inferences in favor of the non-moving party. *See O'Melveny & Meyers*, 969 F.2d at 747, *rev'd on other grounds*, 512 U.S. 79 (1994). However, the nonmoving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### B. Fraud Claims (Claims 1 and 3)

LOT pursues claims for both fraudulent misrepresentation and omission. The parties agree that claims for fraudulent misrepresentation require proving nine separate elements by clear, cogent, and convincing evidence: (1) a representation of existing fact, (2) its materiality, (3) its falsity, (4) the speaker's knowledge of its falsity, (5) the speaker's intent to deceive, (6)

plaintiff's ignorance of its falsity, (7) plaintiff's reliance on its truth, (8) plaintiff's right to rely upon it, and (9) resulting damages. *See Elcon Constr., Inc. v. E. Wash. Univ.*, 273 P.3d 965, 970 (Wash. 2012); *McRae v. Bolstad*, 676 P.2d 496, 500 (Wash. 1984). A fraud claim "may also be predicated on concealment," but only "where there is a duty to disclose." *Tokarz v. Frontier Fed. Sav. & Loan Ass'n*, 656 P.2d 1089, 1094 (Wash. Ct. App. 1982). Merely establishing the existence of such a duty, however, does not suffice to prove fraud unless the other eight elements of fraud are also established. *See Baker Boyer Nat'l Bank v. Foust*, 436 P.3d 382, 386 (Wash. Ct. App. 2018).

LOT argues that "[u]nder Washington law, a corporation is liable for fraud provided that 'at least one' of its agents knows that the information being communicated to the plaintiff is false or misleading." Dkt. #155 at 21–22 (citing *BP W. Coast Products, LLC v. Shalabi*, 2012 WL 2277843, *4 (W.D. Wash. June 14, 2012). *BP W. Coast Products* in turn cites *Plywood Marketing Associates v. Astoria Plywood Corp.*, 16 Wn. App. 566, 575 (1975). In *Plywood*, the Court held that "[g]enerally a corporate principal is chargeable with notice of facts known to its agent, except when the agent has not acted for or on behalf of the corporation, or has acted adversely to the principal in his own interest." 16 Wn. App. at 575 (citing *Hendricks v. Lake*, 12 Wn. App. 15, 528 P.2d 491 (1974); Restatement (Second) of Agency §§ 274, 279 (1958)).

Boeing characterizes LOT's legal strategy for these claims as relying on "collective scienter," which it calls "legally inadequate." Dkt. #143 at 16. A "corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter at the time that he or she makes the statement." *In re Apple*

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 10

*Comput., Inc.*, 127 F. App'x 296, 303 (9th Cir. 2005) (citing *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435-36 (9th Cir. 1995)).

The Court agrees with Boeing that LOT's position overstates Washington law and misapplies it to the facts of this case. Here, the record shows that most individuals with knowledge of the falsity of statements about the MCAS system were not managing agents or speaking agents but were employees communicating internally within Boeing.

Boeing states, "[a]fter several years of discovery, LOT is now forced to rest its fraud claims on the statements of two individuals—Keith Leverkuhn and Michael Teal—who interacted only glancingly with LOT." Dkt. #143 at 18. Boeing runs through the statements of these two individuals. Leverkuhn offered a half-hour general update on the "MAX program" and presented only positive information and represented that the certification process was going "according to plan." Boeing argues that Leverkuhn did not make false statements because he believed that Boeing had solved the stall characteristics issue, relying on Leverkuhn's own deposition testimony that he trusted Boeing's "very robust" processes. *Id*. at 18-19 (citing Leverkuhn Dep. 63:24-64:5, 80:12-20).

One problem with this line of thinking is that it requires the Court to trust Leverkuhn's own statements about his thinking without a credibility assessment. Another problem is that it requires the Court to weigh evidence to determine the truth of the matter. LOT cites to emails and deposition testimony that weighs against Boeing's statements. *See* Dkt. #155 at 19–20. Finally, the Court notes that, generally speaking, Boeing is minimizing evidence against it and maximizing evidence in its favor, turning the summary judgment standard on its head.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 11

Boeing argues that statements from Leverkuhn and Teal about positive progress with MCAS were "mere puffery" or "expressions of future hopes or expectations." Dkt. #143 at 21–22. Interpreting the facts and drawing all inferences in favor of the non-moving party, Boeing cannot rely on these legal theories because of the real possibility that their statements misrepresented known risks at the time. It will be up to a jury to properly characterize these statements.

Boeing also argues that LOT did not rely on any misrepresentation. However, Boeing's framing of this issue goes to the weight of the evidence. *See, e.g.,* Dkt. #143 at 23 ("Nor is there any real dispute that LOT would have leased the MAX regardless of the expected differences training level.") LOT has presented at least some evidence to contradict this assertion. *See* Dkt. #155 at 29–30 (citing its 30(b)(6) witness deposition and LOT's Recommendation Report). The Court will not weigh the evidence at this stage and the parties are free to argue to the jury whether or not LOT relied on the alleged misrepresentations.

Boeing next argues that LOT cannot bring fraudulent omission claims. To prevail on its fraudulent omission claim, LOT must show that Boeing had a "duty to disclose" the challenged omission. *Oates v. Taylor*, 199 P.2d 924, 927 (Wash. 1948). A concealed defect gives rise to actionable fraud only if the seller has "knowledge of the defect." *Alejandre v. Bull*, 153 P.3d 864, 872 (Wash. 2007); *see also Colonial Imports*, 853 P.2d at 917 (articulating "knowledge" requirement). Where a "manufacturer has superior information regarding defects that are not readily ascertainable to customers, it has a duty to disclose that information." *Short v. Hyundai Motor Co.*, 444 F. Supp. 3d 1267, 1280 (W.D. Wash. 2020). LOT argues in its own Motion that Boeing had a duty to disclose that:

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 12

- The MAX's flight controls had been modified with the addition of MCAS, a novel flight control law that Boeing implemented to address the MAX's pitchup handling qualities (see Ex.9, RFAs28-31);

- MCAS was subject to a single-point [Angle of Attack or "AOA"] failure (see Ex.13, RFA113);

- The MAX exhibited uncertifiable stall ID and stall characteristics that Boeing attempted to fix by expanding MCAS such that it could erroneously activate during passenger flight (*see* Ex.24, at BOE_LOT_0716049); and

- The FAA AEG's Level-B pilot-training determination was obtained by Boeing through fraudulent means. *See* Ex.65.

Dkt. #135 at 27.

Boeing argues that the highly technical information LOT identifies constitutes at most the type of "not-yet-extant" issue that cannot give rise to a duty to disclose. Dkt. #143 at 24. Boeing is free to argue this to the jury, as questions of fact permeate the notion that the MCAS issue was a known, unacceptable risk or something that was reasonably believed to be solved. Boeing's arguments that LOT did not ask questions after the first crash or list MCAS-related issues in its internal pre-contract discussions are not dispositive.

In sum, both parties cite to the extensive record in this case, pointing to dozens of communications between the parties. The Court will not get drawn into an assessment of the weight or veracity of all of the facts in this case. Interpreting the facts and drawing all inferences in favor of the non-moving party, summary judgment cannot be granted for either party on the fraud claims due to the above genuine disputes of material fact.

//

//

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 13

## C. Implied Warranties (Claims 7 and 8)

Boeing moves to dismiss LOT's claims for breach of the implied warranties of merchantability and fitness for a particular use. *See* Dkt. #143 at 32–33. Both claims are initially premised on the theory previously dismissed by the Court: that Boeing's "fraud and gross negligence," detailed above, allow LOT to rescind the AGTAs' and Purchase Agreements' express limitations on remedies and disclaimers of warranties, thereby triggering implied warranties of merchantability and fitness under Article 2 of Washington's UCC. *See* Dkt. #43 at ¶¶ 875–997. In response to the Court's prior ruling, LOT has added new theories. LOT pleads that under RCW62A.2-719, "if the Warranties as limited by Boeing fail of their essential purpose, then they are voided, and LOT is entitled to all of the implied warranties available under Washington law, including the implied warranty of merchantability." *Id.* at ¶ 895. LOT argues these warranties failed of their essential purpose because of how long the 737 MAX aircraft were grounded and because "Boeing continued to falsely assure operators including LOT that a fix for MCAS was imminent." *Id.* at ¶ 898.

LOT also pleads that the contracts' exclusion of consequential damages is unconscionable because it was procured by, and a result of Boeing's gross negligence" and "because it does not reflect the parties' intended allocation of risk, or intended benefit of the bargain." *See id.* at ¶ 923 and ¶ 928. LOT says it did not bargain for planes that would be grounded for so long, or the risk of Boeing taking nearly two years to remedy the MCAS defect while it "continually misled LOT concerning the timing of the remedy…" *Id.* at ¶¶ 924–927.

LOT pleads Boeing knew LOT was to receive an assignment of rights relating to LOT's acquiring MAX 737 aircraft, and that it was therefore an intended third-party beneficiary of those rights. *Id*. at ¶¶ 892–93.

The Court declined to dismiss these amended claims in a subsequent Order, for two reasons: first, in case "the fraud claims are dismissed or withdrawn prior to trial," Dkt. #72 at 11 (internal quotation marks omitted); and second, because it found that LOT's allegations that "the exclusive express warranties failed of their essential purpose" were "debatable but plausible," *id.* at 12.

The UCC permits a party to avoid a contractual exclusion or limitation of remedies where "circumstances cause an exclusive or limited remedy to fail of its essential purpose." RCW 62A.2-719(2). A limited remedy fails of its essential purpose "when it deprives a party of the substantive value of its bargain." *Ruiz Fajardo Ingenieros Asociados S.A.S. v. Flow Int'l Corp.*, 2018 WL 6809511, at *3 (W.D. Wash. Dec. 27, 2018) (citing RCW 62A.2-719).

LOT alleges that the exclusive express warranties failed of their essential purpose because Boeing took too long to develop a fix that satisfied government regulators, *see* Dkt. #43 at ¶¶ 648, 671, and "repeatedly assured operators such as LOT that a fix was imminent" during the grounding, *id*. at ¶ 655.

The Court finds that LOT has reached the end of being able to bring both fraud and implied warranty claims under the above law, and clearly wishes to pursue fraud claims. Further, the Court now agrees with Boeing that based on the record on summary judgment and the case law cited by Boeing, the three-year period of repair was sufficient to render invalid a

claim that the express warranties failed of their essential purpose. Accordingly, these claims are properly dismissed as a matter of law.

### D. Negligent Misrepresentation (Claim 2)

In addition to waiving the above implied warranties, the same section of the AGTA also applied to "any obligation, liability, right, claim or remedy in tort, whether or not arising from the negligence of Boeing." AGTA, Ex. C § 11.1(iii). Boeing argues that courts have consistently held that disclaimers of this type bar claims against airplane manufacturers for negligent torts. Dkt. #143 at 31 (citing *S. A. Empresa De Viacao Aerea Rio Grandense v. Boeing Co.*, 641 F.2d 746 (9th Cir. 1981); *Cont'l Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1527 (9th Cir. 1987); *Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp.*, 617 F.2d 936, 940-41 (2d Cir. 1980)). LOT argues that this clause is unenforceable due to Boeing's misrepresentations before contract formation and that Boeing had an independent duty to avoid making misrepresentations. Dkt. #155 at 31 (citing *Yakima Cty. (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 390 (1993); *Premera Blue Cross v. Canon Solutions America*, 2017 WL 714216, at *2 (W.D. Wash. Feb. 23, 2017); *Donatelli v. DR Strong Consulting Engr's*, 179 Wn.2d 84, 96 (2013); *Jackowski v. Borchelt*, 174 Wn.2d 720, 738 (2012) ("Because the duty to not commit fraud is independent of the contract, the independent duty doctrine permits a party to pursue a fraud claim … The same is true for a claim of negligent misrepresentation")). LOT argues that *S. A. Empresa*, *supra*, had "nothing to do with pre-contract misrepresentations" and only applied to claims arising from "post-delivery negligence." *Id*. at 31–32.

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 16

The court in *S. A. Empresa* specifically considered the argument that a disclaimer of this type applied only to *pre*-delivery negligence and found that "nothing on the face of the contract contravenes Judge McGovern's conclusion that the phrase 'buyer … waives … any obligation … arising from tort …' means what it says." 641 F.2d at 750. That case also stated that "Washington treats negligent misrepresentation as mere negligence, not as fraud vitiating an exculpatory provision." *Id*. at 753.

Boeing argues in its Reply that the independent duty doctrine permits negligent misrepresentation claims "only to the extent the duty to not commit negligent misrepresentation is independent of the contract," Dkt. #165 at 18 (citing *Jackowski v. Borchelt*, 278 P.3d 1100, 1109 (Wash. 2012)), and that the duty was "assumed in [the] contract," *Id.* (citing *Donatelli v. D.R. Strong Consulting Eng'rs, Inc.*, 312 P.3d 620, 626 (Wash. 2013)).

Given all of the above, the Court agrees with Boeing that this clause is enforceable and that the independent duty doctrine does not apply. This claim was assumed in the contract by language that clearly applies to what is alleged here—negligent misrepresentations about the MCAS defect. LOT has thus waived its negligent misrepresentation claim and it is properly dismissed on summary judgment.

**E. Other Issues**

Having ruled on the above claims, the Court declines to address the admissibility of evidence or other relief requested in the above Motions not related to the summary judgment dismissal of claims.

//

//

ORDER RE: MOTIONS FOR SUMMARY JUDGMENT - 17

## V. CONCLUSION

Having reviewed the relevant pleadings and the remainder of the record, the Court hereby finds and ORDERS that Plaintiff LOT's Motion for Partial Summary Judgment, Dkt. #135, is DENIED and that Defendant Boeing's Motion for Summary Judgment, Dkt. #143, is GRANTED IN PART and DENIED IN PART. Plaintiff's second, seventh, and eighth causes of action are dismissed without leave to amend. The remaining fraud claims are not dismissed.

DATED this 2nd day of October, 2025.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE