THE HONORABLE RICARDO S. MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

POLSKIE LINIE LOTNICZE LOT S.A.,

Plaintiff,

v.

THE BOEING COMPANY,

Defendant.

Case No. 2:21-cv-01449-RSM

THE BOEING COMPANY'S
TRIAL BRIEF

BOEING'S TRIAL BRIEF
(No. 2:21-cv-01449-RSM)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Phone: +1.206.359.8000
Fax: +1.206.359.9000

TABLE OF CONTENTS

                                                            **Page**

Introduction ........................................................................................................................... 1

Factual Background ............................................................................................................. 2

      I.      Boeing's announcement of the 737 MAX and implementation of MCAS ............. 2

      II.     In 2016, Boeing expanded MCAS and disclosed the expansion to regulators ........................................................................................................... 2

      III.    LOT's selection of the MAX in June 2016 .............................................................. 3

Relevant Rulings .................................................................................................................. 5

      I.      Through its summary judgment ruling, the Court clarified the applicable law and the narrow set of factual issues in dispute. .................................. 5

      II.     The Court's motion in limine rulings narrowed the factual disputes and provide the evidentiary framework for objections at trial. ................................. 6

Issues for Trial ..................................................................................................................... 7

      I.      The trial will focus on three issues relating to scienter and reliance. ..................... 8

      II.     LOT will not be able to prove its claims for fraud. ............................................... 8

            A.     The evidence will show that both Teal and Leverkuhn believed that MCAS solved the stall characteristics issue. ............................................. 8

            B.     LOT would have leased the MAX even if it knew about MCAS's expansion. .......................................................................................... 9

      III.   The amount of damages is contested. ............................................................... 10

Conclusion ......................................................................................................................... 10

BOEING'S TRIAL BRIEF – i
(No. 2:21-cv-01449-RSM)

Perkins Coie LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Phone: +1.206.359.8000
Fax: +1.206.359.9000

## Introduction

Defendant The Boeing Company ("Boeing") submits this trial brief, summarizing the case's factual background, the relevant rulings, and the legal and evidentiary issues remaining for trial.[1] Boeing agrees with this Court's observation at the pretrial conference that summary judgment has "narrow[ed]" the issues for trial, 10/07/2025 Tr. of Pretrial Conference ("Tr.") at 49:18, and that the remaining case is "fairly simple," *id*. at 23:19-20. The key questions are, in this Court's words, "was there fraud or not?" and "if so, what are the damages?" *Id.* at 23:20-21. Boeing, of course, submits that there was no fraud and that, even if there were, LOT's claimed damages are entirely speculative and, as a practical matter, negligible.

Boeing also submits that trial should be limited to the evidence that is relevant to answering these questions—that is, the evidence that bears on the elements of fraud, limited to the time period during which LOT can claim reliance, and the amount of any damages sustained by LOT. That is a relatively narrow evidentiary scope, especially because LOT's fraud claims focus on two limited interactions with two Boeing employees—and this Court has already ruled that the knowledge of the specific individual responsible for an alleged misstatement (or concealment) is what matters for proving scienter.

LOT's evidentiary designations and its briefing confirm that it intends to pursue a series of mini-trials about everything *except* the actual elements of fraud, including Boeing's 737 MAX design process and interactions with the Federal Aviation Administration ("FAA"). The jury may need certain context to understand the specific events and communications underlying LOT's fraud claims. But the masses of irrelevant evidence that LOT intends to introduce—often from years before the events in question or involving individuals and entities who had nothing to do with those events—stretch context to the point of distraction and unfair prejudice. Boeing accordingly anticipates that it will raise a number of evidentiary objections at trial to ensure that the jury

---

[1] This summary of arguments and evidence is necessarily limited, and Boeing reserves its rights to raise any additional arguments or evidence at trial.

BOEING'S TRIAL BRIEF – 1
(No. 2:21-cv-01449-RSM)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Phone: +1.206.359.8000
Fax: +1.206.359.9000

makes a decision based on the *relevant* facts rather than irrelevant, inflammatory, and distracting information that has nothing to do with the claims remaining in this case.

## Factual Background

Summarized below are the relevant undisputed facts of this case that this Court has already found, Dkt. #213 (Order Re: Motions for Summary Judgment) ("MSJ Order") at 3 n.1, and that Boeing anticipates proving at trial through testimony and exhibits.

### I. Boeing's announcement of the 737 MAX and implementation of MCAS

In August 2011, Boeing announced the MAX as "a new iteration of 737 aircraft." *Id.* at 3. Early in the MAX's development, "Boeing's engineers determined that the [MAX's] larger engines caused the nose . . . to tilt (or 'pitch') up under certain conditions." *Id.* at 4. To counter that pitch-up tendency, "Boeing made structural changes to the airplane and implemented . . . [the] Maneuvering Characteristics Augmentation System ('MCAS')." *Id.* "In late 2012, Boeing's engineers and test pilots believed that MCAS, along with structural changes, resolved the high-speed pitch-up issue." *Id.*

### II. In 2016, Boeing expanded MCAS and disclosed the expansion to regulators

In February 2016, after the start of flight testing, Boeing engineers identified issues with the MAX's stall identification and characteristics. *Id*. To "mitigat[e] the MAX's stall characteristics," "Boeing's engineers explored various options," including "expanding MCAS to operate at lower speeds typical of a stall." *Id.*

On March 30, "Boeing engineers met with Keith Leverkuhn, the MAX Program Manager, and Michael Teal, the MAX Chief Engineer, about the stall characteristics issue." *Id.* As a presentation from that meeting explained, the engineering team concluded that expanding MCAS to operate at lower speeds would "result in acceptable stall characteristics." *Id.* at 5 (citation omitted). The summary of the meeting described MCAS as "the cleanest solution" and predicted that expanding MCAS "should not slow the schedule" for MAX certification. Trial Ex. EX_0172 at -875. Consistent with the documentary evidence, Leverkuhn is anticipated to testify that he was assured

BOEING'S TRIAL BRIEF – 2
(No. 2:21-cv-01449-RSM)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Phone: +1.206.359.8000
Fax: +1.206.359.9000

at the meeting that MCAS was going to create a solution for the stall characteristics issue. "That same day, the Boeing engineering team modified MCAS's technical specifications to implement its expansion to low-speed operation." MSJ Order at 5.

On July 28, "Boeing briefed FAA certification authorities on its changes to address the MAX's stall characteristics," including the MCAS expansion. *Id.* "Boeing subsequently provided the FAA with additional details about MCAS's design and its expansion to low-speed operation." *Id.* "Boeing also shared these details with LOT's regulator, the European Union Aviation Safety Agency ('EASA'), which needed to separately approve the MAX's certification and pilot training requirements." *Id.* Both the FAA and EASA certified the MAX, "with the low-speed version of MCAS," in March 2017. *Id.*

### III. LOT's selection of the MAX in June 2016

In early 2016, "Boeing and LOT began negotiating a MAX transaction." *Id.* That year, as the evidence at trial will show, LOT was emerging from a financial crisis and was looking to quickly expand its fleet to remain competitive.

The Boeing campaign team "handl[ing] Boeing's sales and marketing interactions with LOT during the 2016 campaign" included "Herb Wallen (Marketing Director), Maarten Kluit (Sales Director), and Monty Oliver (Sales Vice President)." *Id.* at 6. As this Court has found, each of them has denied having any "knowledge of the MAX's pitch-up characteristics or the plan to address those characteristics using MCAS." *Id.* And each of these individuals is expected to so testify at trial. LOT's 30(b)(6) witness also testified at deposition that he "cannot assert" that any of these individuals "lied on purpose" to LOT. *See* Dkt. #136 (Battista Decl. Ex. 32 (LOT 30(b)(6) Dep. 146:13-147:24)).

In early April 2016, "LOT visited Boeing in Seattle," including to meet with Leverkuhn for "a half-hour 'MAX Program Update.'" MSJ Order at 6. Shortly after the meeting, several Boeing employees visited LOT in Poland, where they presented on the MAX, including the expected level of "differences training" for pilots transitioning from the 737 NG to the MAX. Trial Ex.

BOEING'S TRIAL BRIEF – 3
(No. 2:21-cv-01449-RSM)

Perkins Coie LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Phone: +1.206.359.8000
Fax: +1.206.359.9000

EX_0029B at -653. Boeing described the "target length" for this training as "2 days level B training" and emphasized that this target length was "[s]ubject to regulatory approval." *Id*.

On June 21, 2016, after further discussions, a team of LOT employees issued an 83-page "[r]ecommendation for selection of narrow-body aircraft," "stating that LOT should move forward with leasing a mix of NG and MAX airplanes." MSJ Order at 6. "The report identified the 'key problem[s],' 'fundamental assumptions,' and 'selection . . . criteria' that motivated LOT's leasing decision," which were "mostly economic concerns." *Id*. The recommendation report explicitly acknowledged that the MAX "aircraft is currently in the certification process, and only after it is completed will it be possible to provide reliable figures" about MAX training costs. Trial Ex. A-015 at 50. "LOT's Management Board, which included its CEO, accepted the recommendation on June 21, 2016." MSJ Order at 6.

Around three months later, on September 22, "Teal sent LOT a one-page letter with an update on the status of the MAX flight test program and progress towards certification." *Id*. By then, "Boeing had successfully completed 11 certification flight tests with the FAA involving the activation of MCAS, including for stall characteristics testing." *Id*. "Consistent with those tests, the September 22 letter reported that '[t]est results to date have validated the aircraft is performing as predicted.'" *Id*. at 7 (alteration in original) (citation omitted). Shortly after that letter, on September 30, "LOT executed a lease agreement for six MAX aircraft." *Id*.

Boeing delivered five MAX airplanes to LOT in 2017 and 2018. *Id*. In May 2018, LOT leased an additional six MAX aircraft, *id*., and it would lease 15 MAXs in total, Trial Ex. EX_2078. Before leasing those additional aircraft, and "[h]aving already committed to the MAX in 2016, LOT did not go through the same level of investigation or analysis." MSJ Order at 7.

In March 2019, after the two MAX accidents, "EASA grounded the MAX across Europe, including LOT's airplanes." *Id*. at 8. In March 2020, the COVID pandemic began, leading to the collapse of air travel worldwide. By mid-2020, LOT had terminated the leases for the 10 undelivered MAXs. Trial Ex. EX_0492-EX_500, EX_0536. "When EASA lifted its grounding order in

BOEING'S TRIAL BRIEF – 4
(No. 2:21-cv-01449-RSM)

Perkins Coie LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Phone: +1.206.359.8000
Fax: +1.206.359.9000

January 2021, Boeing provided updated MCAS software, and LOT reintegrated the MAX into its fleet." MSJ Order at 8.

Relevant Rulings

The Court's rulings in response to the parties' summary judgment motions and their motions in limine will guide the trial.

I. **Through its summary judgment ruling, the Court clarified the applicable law and the narrow set of factual issues in dispute.**

The Court's summary judgment ruling allowed two of LOT's claims—for fraudulent misrepresentation and fraudulent concealment—to proceed but clarified several important issues.

First, the Court rejected LOT's argument that Boeing would be "liable for fraud provided that 'at least one' of its agents knows that the information being communicated to [LOT] is false or misleading." MSJ Order at 10 (citation omitted). Instead, the Court quoted the Ninth Circuit for the proposition that "[a] 'corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter at the time that he or she makes the statement.'" *Id.* (quoting *In re Apple Comput., Inc.*, 127 F. App'x 296, 303 (9th Cir. 2005)). LOT therefore will need to prove at trial that the same Boeing employee who made a statement to LOT or concealed information from LOT had the requisite knowledge and intent at the time that he or she made the statement or concealed the information.

The Court also emphasized three factual disputes that will need to be decided at trial. *First*, the jury will need to decide whether "the MCAS issue was a known, unacceptable risk or something that was reasonably believed to be solved." *Id.* at 13. *Second*, "[i]t will be up to [the] jury to properly characterize the[] statements" from "Leverkuhn and Teal about positive progress" with the MAX. *Id.* at 12. More specifically, the jury must decide whether Leverkuhn's and Teal's statements "were 'mere puffery' or 'expressions of future hopes or expectations,'" *id.* (citation omitted), and whether both "believed that Boeing had solved the stall characteristics issue" or instead "misrepresented known risks at the time," *id.* at 11-12. *Third*, the Court concluded that the jury

BOEING'S TRIAL BRIEF – 5
(No. 2:21-cv-01449-RSM)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Phone: +1.206.359.8000
Fax: +1.206.359.9000

also will need to decide whether "LOT relied on the alleged misrepresentations" or whether "LOT would have leased the MAX regardless of the expected differences training level." *Id.* at 12 (citation omitted).

II. **The Court's motion in limine rulings narrowed the factual disputes and provide the evidentiary framework for objections at trial.**

The Court issued several important motion in limine rulings, which bear on the parties' ongoing disputes regarding exhibits and deposition excerpts designated for trial.[2]

***The MAX Accidents.*** The Court held that LOT "is free to reference [the Lion Air and Ethiopian Airlines accidents] and the MCAS system but not to cite specific factual findings of the accident reports." Dkt. #217 (Order Re: Motions in Limine) at 4. The parties continue to dispute the application of this ruling, especially as it pertains to video deposition testimony that LOT wishes to play, and whether it may also extend to evidence of other unrelated accidents involving other airplane models.

***The DPA and NPA.*** The Court also declined to admit Boeing's deferred prosecution agreement and non-prosecution agreement (together, the "DPA"). Introducing "these entire documents," the Court explained, would "be confusing to the jury, cumulative, or unnecessary." *Id.* To the extent that LOT attempts to introduce at trial any *specific* portion of the DPA, the Court confirmed that "Boeing is free to [] object." *Id.* LOT maintains both documents on its exhibit list and seeks to introduce testimony from various Boeing employees about their knowledge of the facts recited in the DPA. Boeing intends to reassert its objections to this evidence at trial. These objections include that the DPA involves the wrong regulatory authority—and therefore is irrelevant to LOT's claims—because, as this Court has noted, "[t]o be clear, the misconduct described in the Deferred Prosecution Agreement involved the FAA, not LOT's regulatory authority, EASA." MSJ Order at 8. They also include that the prejudicial effect of evidence relating to the DPA dramatically outweighs any minimal probative value.

---

[2] To date, LOT maintains around 450 exhibits on its trial list and plans to proffer nineteen witnesses via deposition designation.

BOEING'S TRIAL BRIEF – 6
(No. 2:21-cv-01449-RSM)

Perkins Coie LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Phone: +1.206.359.8000
Fax: +1.206.359.9000

***MAX Design Evidence.*** In response to Boeing's request that the Court limit evidence about the MAX's design, especially from before and after the key period of the parties' lease negotiations in 2016, the Court stated that it "shares Boeing's concern that LOT will present cumulative or irrelevant exhibits." Dkt. #217 at 9. LOT's proposed evidence continues to validate that concern. It includes approximately 55 exhibits related to the MAX's development prior to 2016 and around six from the date of the Lion Air accident in October 2018 or later, and much of its deposition designations concern these non-2016 periods as well. The Court indicated that it "will entertain appropriate objections at trial for cumulative or irrelevant exhibits or testimony," *id.* at 9, and Boeing will assert objections to the extent that LOT seeks to introduce this evidence at trial.

***The Staff Report and JATR Report.*** The Court deferred decision on the admissibility of two reports on the MAX, one prepared by congressional staff ("Staff Report") and the other by the Joint Authorities Technical Review ("JATR Report"). Because LOT has not "identif[ied] any specific passages" from these reports, the Court declined to admit those reports categorically and authorized Boeing "to object to portions under FRE 402 and 403." *Id.* at 5. The Court also noted at the pretrial conference that the Staff Report is "[p]robably not" necessary context. Tr. 50:6-8. LOT has not withdrawn these exhibits or designated specific excerpts.

***Congressional Testimony.*** Despite granting LOT's request to introduce the congressional testimony of two Boeing executives, the Court directed LOT not to submit "the entire testimony as an exhibit" and noted "that specific objections under 402 and 403 may be upheld." Dkt. #217 at 6. To date, LOT's exhibit list still contains only the full transcripts.

***Testimony from Curtis Ewbank.*** While the Court has ruled that the deposition transcript of Mr. Ewbank and his two ethics complaints are admissible at trial, Boeing maintains multiple objections to specific lines of questioning in his proffered testimony on the grounds that they violate other applicable evidentiary rules, including specific rulings by the Court.

**Issues for Trial**

Based on the above evidence and rulings, only a few legal and evidentiary issues remain.

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Phone: +1.206.359.8000
Fax: +1.206.359.9000

## I. The trial will focus on three issues relating to scienter and reliance.

LOT asserts two claims: for fraudulent misrepresentation and fraudulent concealment. As the Court has explained, the "claims for fraudulent misrepresentation require proving nine separate elements by clear, cogent, and convincing evidence: (1) a representation of existing fact, (2) its materiality, (3) its falsity, (4) the speaker's knowledge of its falsity, (5) the speaker's intent to deceive, (6) plaintiff's ignorance of its falsity, (7) plaintiff's reliance on its truth, (8) plaintiff's right to rely upon it, and (9) resulting damages." MSJ Order at 9-10. "A fraud claim 'may also be predicated on concealment,' but only 'where there is a duty to disclose.'" *Id.* at 10 (quoting *Tokarz v. Frontier Fed. Sav. & Loan Ass'n*, 656 P.2d 1089, 1094 (Wash. Ct. App. 1982)). LOT thus must prove not only "the existence of such a duty," but also "the other eight elements of fraud." *Id.*

Based on those elements, and as guided by this Court's findings through summary judgment, Boeing anticipates that the trial will focus on: (i) whether any Boeing employee knowingly and intentionally misrepresented or concealed material information when interacting with LOT; (ii) whether LOT still would have leased the MAX had Boeing told LOT about the stall characteristics issue or the MCAS expansion; and (iii) LOT's damages (if any) caused by the alleged fraud.

## II. LOT will not be able to prove its claims for fraud.

LOT's much-reduced case now boils down to the claim that it was defrauded by "two people" on two occasions in 2016: Leverkuhn, during his half-hour meeting with LOT in April, and Teal in the one-page letter in September detailing the status of MAX certification. Dkt. #136 (Battista Decl. Ex. 32 (LOT 30(b)(6) Dep. 143:23-144:9, 145:4-5)). LOT will not be able to prove either of its fraud claims.

### A. The evidence will show that both Teal and Leverkuhn believed that MCAS solved the stall characteristics issue.

As the evidence at trial will show, Boeing engineers concluded in early 2016 that expanding MCAS would provide a solution for the MAX's stall characteristics, which is what they told Leverkuhn and Teal on March 30, 2016. And while Boeing engineers identified and worked to

BOEING'S TRIAL BRIEF – 8
(No. 2:21-cv-01449-RSM)

Perkins Coie LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Phone: +1.206.359.8000
Fax: +1.206.359.9000

resolve technical issues as part of the normal airplane development process in 2016, they reasonably believed that the MCAS expansion had effectively resolved the stall characteristics issue. Certainly, there is no evidence that Teal and Leverkuhn were aware at the time of any indications otherwise, making their representations to LOT complete and truthful.

No witness can testify to the contrary. Instead, LOT will proffer (video) testimony of other Boeing engineers who were involved in various aspects of the MAX's design, much of which will relate to design decisions and testing that occurred outside of the key period in 2016. And to the extent this testimony relates to 2016, it (like the rest) will show that Boeing engineers followed the company's established design process and reached a good-faith consensus that the MCAS expansion would resolve the stall characteristics issue. Critically, no evidence will suggest that concerns about the MCAS expansion were conveyed to Boeing leadership or to Teal or Leverkuhn.

Accordingly, at the time of his half-hour meeting with LOT in April 2016, Leverkuhn reasonably believed that the MCAS expansion would resolve the stall characteristics issue, as he will testify. Teal, similarly, had no cause for concern, making his representations in the September 2016 progress report complete and accurate. In addition to the positive report he heard at the March 30 meeting, by September Boeing had refined the MAX to improve its stall characteristics, conducted additional testing validating the changes, and successfully flown multiple certification flight tests involving MCAS.

### B. LOT would have leased the MAX even if it knew about MCAS's expansion.

LOT's fraud claims also will fail because it will not be able to show reliance—*i.e.*, that it would not have picked the MAX if Boeing had told it about the stall characteristics issue or the MCAS expansion. The lack of reliance will be clear from the testimony of LOT's then-CEO Rafal Milczarski; contemporaneous LOT documents; LOT's conduct after being informed about MCAS, including its continued leasing of MAX airplanes; and the testimony of Boeing's expert, Professor Rigas Doganis, about the facts that airlines consider in making leasing decisions.

LOT will argue that these issues mattered to it because of their potential impact on pilot

differences training. As the evidence will show, however, LOT would have leased the MAX regardless of the expected differences-training level. Boeing described Level B training to LOT as a "target," not a certainty. And LOT's own report recommending the MAX explicitly recognized the uncertainty of the training approval process. Trial Ex. A-015 at 50. Accordingly, the evidence will belie any suggestion that Boeing made an assurance of Level B training to LOT, let alone that LOT could have been reasonably relying on such a purported assurance.

If Boeing had disclosed the stall characteristics issue or details about MCAS's expansion, it would have shown simply that Boeing was working through a design issue—one of hundreds of such issues it had identified during the design process. Indeed, contrary to LOT's hindsight-based litigation theory of reliance, LOT did not ask a single question about MCAS when Boeing identified MCAS specifically to LOT as a "systems revision" in 2017. MSJ Order at 7 (citation omitted). And LOT *still* entered into a new lease agreement after the Lion Air accident and Boeing's additional subsequent disclosures about MCAS.

### III. The amount of damages is contested.

The parties will present expert testimony on the extent of LOT's damages if liability is proven. LOT's expert, Samuel Engel, will testify that LOT suffered $153.4 million in losses. Boeing will counter with expert opinions from Doganis and Avram Tucker. Doganis will testify that Engel's analysis is unreliable based on known and historical industry trends. Tucker will opine on the weaknesses and errors presented in Engel's economic damages model. Tucker's critique of Engel's analysis will include Engel's failure to factor "LOT's unpaid lease payments" on the 10 undelivered MAXs "into the damages calculation," ignoring this "benefit received by [LOT] due to" Boeing's allegedly wrongful conduct. Dkt. #217 at 1-2. As Tucker will testify, if this benefit and other relevant factors are taken into account, LOT's damages claim is effectively eliminated.

### Conclusion

Boeing respectfully suggests that this is a simple and straightforward case that should be kept that way to ensure a jury decision based on the relevant facts and applicable law.

Perkins Coie LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Phone: +1.206.359.8000
Fax: +1.206.359.9000

Dated: October 27, 2025

By: s/ *Michael S. Paisner*
Michael S. Paisner, WSBA Bar No. 48822
Harry H. Schneider, Jr., WSBA No. 9404
Christopher M. Ledford, WSBA No. 44515
Ulrike B. Connelly, WSBA No. 42478
Michelle L. Maley, WSBA No. 51318
**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Telephone: +1.206.359.8000
Facsimile: +1.206.359.9000
MPaisner@perkinscoie.com
HSchneider@perkinscoie.com
CLedford@perkinscoie.com
UConnelly@perkinscoie.com
MMaley@perkinscoie.com

*Attorneys for Defendant The Boeing Company*

BOEING'S TRIAL BRIEF – 11
(No. 2:21-cv-01449-RSM)

**Perkins Coie LLP**
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Phone: +1.206.359.8000
Fax: +1.206.359.9000